# EXHIBIT A

DAL 77,491,090v6
131832.01404/21799028v.2

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of _____, 2009, between and among *Altaire Village, L.L.C., a Delaware limited liability company* ("Seller"), and *National City Bank, a national banking association* ("Purchaser").

## WITNESSETH:

WHEREAS, Seller is a debtor-in-possession under Title 11 of the United States Code, 11 U.S.C. Section 101 et seq. (the "Bankruptcy Code") and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on April 22, 2009 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (Case No. 09-11390) (the "Bankruptcy Case"); and

WHEREAS, Seller presently owns the Land and the Improvements located in *Fort Lauderdale, Broward County, Florida* (the "Property"); and

WHEREAS, certain terms used in this Agreement are defined in Article I below; and

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to Sections 363 and 365 of the Bankruptcy Code all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein:

NOW, THEREFORE, in consideration of the promises and the mutual' covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Certain Definitions. For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning set forth in the Recitals of this Agreement.

"Asset Acquisition Statement" shall have the meaning set forth in Section 11.3 of this Agreement.

"Assigned Contracts" shall have the meaning set forth in Section 2.1(c) of this Agreement.

"Assigned Deposits" shall have the meaning set forth in Section 2.1(d) of this Agreement.

"Assumed Liabilities" shall have the meaning set forth in Section 2.3 of this Agreement.

"Bankruptcy Case" shall have the meaning set forth in the Recitals of this Agreement.

"Bankruptcy Code" shall have the meaning set forth in the Recitals of this Agreement.

"Bankruptcy Court" shall have the meaning set forth in the Recitals of this Agreement.

"Bidding Procedures Order" means an order of the Bankruptcy Court, substantially in the form of Exhibit A hereto, with such changes as are reasonably acceptable to Purchaser and Seller.

"Business Day" means any day of the year on which national banking institutions in Florida are open to the public for conducting business and are not required or authorized to close.

"Closing" shall have the meaning set forth in Section 4.1 of this Agreement.

"Closing Date" shall have the meaning set forth in Section 4.1 of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" shall have the meaning set forth in Section 7.1 of this Agreement.

"Confidential Information" shall have the meaning set forth in Section 8.6 of this Agreement.

"Contemplated Transactions" shall have the meaning set forth in Section 2.1 of this Agreement.

"Contract" means the written contracts, to which Seller is a party (or which otherwise relate to the Property) providing for the maintenance or repair of the Property. Contracts for property management services between Seller and its Affiliate or any other Person will be terminated as of the Closing Date.

"Documents" means all lease files, documents, instruments, papers, books, reports, records, tapes, photographs, letters, budgets, forecasts, ledgers, journals, title policies, rent rolls and tenant lists, plans and specifications, technical documentation (design specifications, operating manuals and maintenance manuals and logs, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Property or the Purchased Assets in each case whether or not in electronic form.

2

"Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection of human health and safety or the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"Excluded Assets" shall have the meaning set forth in Section 2.2 of this Agreement.

"Excluded Liabilities" shall have the meaning set forth in Section 2.4 of this Agreement.

"Final Order" means an order or judgment, the operation or effect of which has not been stayed, reversed or amended and as to which order or judgment the time to appeal has expired and as to which no appeal was filed, or if filed, is no longer pending and has been fully and finally resolved.

"Governmental Authority" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Authority including petroleum and its by-products, asbestos, biomedical waste, medical waste and any chemical, material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

"Improvements" means all buildings and other fixtures and improvements located on the Land.

"Intangibles" means any trade name used in connection with the ownership, operation and promotion of the Property, all logos used in connection with the advertising and promotion of the Property, and all local telephone numbers and listings for the Property.

"Knowledge" means the actual knowledge of those officers/managers of Purchaser or of those officers/managers of Seller, as applicable, each of which is identified on Schedule 1.1(a).

"Land" means those certain parcels of land located in *Broward County, Florida,* and more particularly described on Exhibit C attached hereto, together with (i) all right, title and interest of Seller, if any, in any land lying in the bed of any street road, avenue or alley, open or closed, adjacent to or abutting such land, to the center line thereof; (ii) all easements, covenants and other rights, if any, appurtenant to, and all the estate and rights of Seller in and to, such land and the Improvements thereon; and (iii) all right, title and interest of Seller in and to the proceeds

3

of, or any award made for, a taking of all or any part of such land or Improvements thereon by any Governmental Authority pursuant to the exercise of its power of eminent domain.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"Leases" means those certain written leases, licenses or other occupancy agreements, including all amendments, extensions, modifications and supplements thereto, for portions of the Land and/or the Improvements as more particularly described in Exhibit C attached hereto.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, alternative dispute resolution, proceedings (public or private) or claims or any proceedings by or before a Governmental Authority or the Bankruptcy Case.

"Liability" means any debt liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued liquidated or unliquidated, or due or to become due), and including all fines, penalties, costs and expenses relating thereto.

"Licenses" means all written licenses, certificates of compliance, authorizations, approvals and permits issued by any Governmental Authority relating to Seller's (and not any Tenant's) use, operation, ownership. development or maintenance of the Property.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, adverse claim, and transfer restriction under any agreement, of any kind or nature, known or unknown.

"Material Adverse Effect" means (i) any effect or change that would be or is reasonably determined to be materially adverse to the Property (taken as a whole), including its results of operations or condition (financial or otherwise), or (ii) a material adverse effect on the ability of Seller to consummate the Contemplated Transactions or to perform its obligations under this Agreement, provided, however, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (a) any adverse change, event, development, or effect arising from or relating to (1) general business or economic conditions, including such conditions related to the businesses of Seller, (2) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (3) financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (4) changes in United States generally accepted accounting principles, (5) the taking of any action contemplated by this Agreement and the other agreements contemplated hereby, (6) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or consummation of the transactions contemplated by this Agreement, or (7) any effect resulting from the filing or pendency of the Bankruptcy Case or

4

proceedings relating thereto and reasonably anticipated effects thereof (b) any existing event, occurrence, or circumstance with respect to which Purchaser has knowledge as of the date hereof.

"Nonassignable Asset" shall have the meaning set forth in Section 2.6(b) of this Agreement.

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Authority.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Property through the date hereof consistent with past practice, subject, however, in respect of the period after the Petition Date, to those actions necessary and incident to the Bankruptcy Case.

"Permitted Encumbrances" means (i) the exceptions, restrictions, easements, covenants, reservations, and rights of way affecting the Property listed on Exhibit D attached hereto and; (iii) all zoning, entitlement and other land use and environmental regulations or designations by any Governmental Authority.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Authority or other entity.

"Petition Date" shall have the meaning set forth in the Recitals of this Agreement.

"Property" means the Land and all Improvements located thereon, together with all Tangible Personal Property and all right, title and interest of Seller in and to (i) the Contracts, transferable Licenses, assignable Intangibles and Warranties related to the Land and Improvements, and (ii) the Leases.

"Purchased Assets" shall have the meaning set forth in Section 2.1 of this Agreement.

"Purchased Personal Property" shall have the meaning set forth in Section 2.1(b) of this Agreement.

"Purchased Real Property" shall have the meaning set forth in Section 2.1(a) of this Agreement.

"Purchase Price" shall have the meaning set forth in Section 3.1 of this Agreement.

"Purchaser" shall have the meaning set forth in the Recitals of this Agreement.

"Purchaser Documents" shall have the meaning set forth in Section 6.2 of this Agreement.

5

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

"Remedial Action" means any and all actions as required by a Governmental Authority to (i) investigate, monitor, clean up, remove, remediate, treat or in any other way address any Hazardous Material; (ii) prevent any Release so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or any natural resources; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care concerning Hazardous Material; or (iv) to correct a condition of noncompliance with, or in violation of, Environmental Law.

"Representatives" means with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, advisors, and other representatives.

"Revised Statements" shall have the meaning set forth in Section 11.3 of this Agreement.

"Sale Motion" means the motion or motions of Seller, in form and substance reasonably acceptable to Purchaser and Seller, seeking approval and entry of the Bidding Procedures Order and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court substantially in the form of Exhibit B hereto, with such changes as are reasonably acceptable to Purchaser and Seller.

"Security Deposits" means all security deposits and other deposits (including interest, if any, accrued thereon in accordance with the terms of the Leases) relating to space within the Property paid by Tenants to Seller or its property manager and in the possession or control of Seller or its property manager.

"Seller" shall have the meaning set forth in the Section of the Recitals hereof.

"Tangible Personal Property" means all furniture, furnishings, fixtures, equipment, machinery, appliances, tools, and other tangible personal property of every kind and description owned by Seller and located on, attached to or used or useful in connection with the management, leasing, operation, maintenance and repair of the Land and/or the Improvements, including any right, title or interest of Seller in any space plans relating to Leases of space in the Improvements, prepared by Seller or on its behalf and in the possession of Seller, Seller's inventory of spare and replacement parts, Seller's inventory of consumable supplies.

"Taxes" means all taxes and special assessments related to the real estate assessed or imposed against the Land and Improvements.

"Tenants" means all Persons leasing or occupying space within the Improvements pursuant to the Leases.

"Transfer Taxes" shall have the meaning set forth in Section 11.1 of this Agreement.

6

"Warranties" means all assignable warranties or guaranties presently in effect from contractors, suppliers or manufacturers of personal property installed in or used in connection with the Property or any work performed or improvements included as a part of the Property.

1.2     List of Schedules and Exhibits.

| | |
|---|---|
| Schedule 1.1(a) | "Knowledge" Officers/Managers of Purchaser and Seller |
| Schedule 2.1(a) | Leases |
| Schedule 2.1(c) | Assigned Contracts; |
| Schedule 5.3(c) | Nonassignable (without consent) Purchased Assets |
| Schedule 5.5 | Legal Proceedings |
| Schedule 5.6 | Environmental Matters |
| | |
| Exhibit A | Bidding Procedures Order |
| Exhibit B | Sale Order |
| Exhibit C | Legal Description of Land |
| Exhibit D | Permitted Encumbrances |

1.3     Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Periods.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)     Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of

7

headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)     <u>Herein</u>. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    <u>Including</u>. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii)   <u>Made available to Purchaser</u>. The phrase "made available to Purchaser" shall mean made available to Purchaser through posting in Seller's electronic data room, via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

(ix)     <u>Survival of Certain Covenants</u>. Any covenant which by its terms is to be performed after the Closing shall survive the Closing, notwithstanding the fact that the provision does not explicitly provide that the covenant shall survive the Closing.

(b)     The parties hereto have been advised by experienced counsel, and have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     <u>Purchase and Sale of Assets</u>. On the terms and subject to the conditions set forth in this Agreement at the Closing and subject to Bankruptcy Court approval as provided under Section 363(f) of the Bankruptcy Code, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser (the "<u>Contemplated Transactions</u>") all of Seller's right, title and interest in, to and under the Purchased Assets, subject to all Permitted Encumbrances. The term "<u>Purchased Assets</u>" means all of Seller's rights, titles and interests in and to the following:

(a)     all right, title and interest of Seller in and to the Land and Improvements, and all improvements and fixtures thereto and other appurtenances and rights in respect thereof and all Leases identified on <u>Schedule 2.1(a)</u>, which such Schedule 2.1(a) Purchaser shall be permitted to amend to add certain Leases three (3) days prior to Closing (collectively, the "<u>Purchased Real Property</u>");

(b)     (i) all Tangible Personal Property, (ii) to the extent transferable, all Licenses used by Seller in the Property and assignable Intangibles, and (iii) to the extent

8

transferable, all rights of Seller under or pursuant to all Warranties, other than any Warranties pertaining to any Excluded Assets (collectively, the "Purchased Personal Property");

(c)     all Contracts identified on Schedule 2.1(c) and all rights arising out of the foregoing, (collectively, the "Assigned Contracts");

(d)     all Security Deposits and deposits for electricity, telephone or other utilities and deposits posted under any Assigned Contract remaining as of the Closing Date, other than any deposits paid in connection with or relating to any Excluded Assets or which have been or will be netted by the holder thereof against any unpaid pre-petition or post-petition liability of Seller (the "Assigned Deposits");

(e)     to the extent transferable, all telephone numbers and facsimile numbers, and domain names and email addresses; and

(f)     any claim, right or interest, of Seller in or to any refund, rebate, abatement or other recovery for Taxes for any calendar preceding or including the Closing Date, together with any interest due thereon or penalty rebate arising therefrom; and

(g)     any and all other assets owned by Seller that are material to the operation of the Property in the Ordinary Course of Business, other than Excluded Assets.

2.2     Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets.  The term "Excluded Assets" shall mean the following assets, properties, interests and rights of Seller:

(a)     all cash, cash equivalents, bank deposits or similar cash items of Seller, except the Assigned Deposits;

(b)     any other Contract to which Seller is a party or under which it has rights that is not used primarily in the Property or, though used primarily in the Property, is used to a material degree in any of business operations of Seller, unless included in Schedule 2.1(c) among the Assigned Contracts;

(c)     any (i) personnel files for employees of Seller; (ii) other books and records that Seller are required by Law to retain; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Property as conducted before the Closing (except as prohibited by Law) or that relate to any of the Purchased Assets; (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party; (iv) documents relating to proposals to acquire the Property by Persons other than Purchaser; (v) any Documents primarily related to or that are required to realize the benefits of any Excluded Assets; and (vi) documents necessary to prepare tax returns and cost reports;

(d)     all insurance policies or rights to proceeds with respect to Excluded Assets and in respect of tort liabilities and other Excluded Liabilities;

9

(e)     all of Seller's deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(f)     any rights, claims or causes of action of Seller against third parties relating to assets, properties, business or operations of Seller, including any actions under sections 544, 545, 547, 548, 549, 550, 551 and 724(a) of the Bankruptcy Code;

(g)     any right to receive or expectancy of Seller in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate); and

(h)     all other rights of Seller under this Agreement, Seller Documents and the Contemplated Transactions.

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume and shall timely pay, perform and discharge in accordance with their respective terms, the following Liabilities (collectively, the "Assumed Liabilities"):

(a)     The Assigned Contracts, the Leases and the Permitted Encumbrances; and

(b)     the Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement, if any.

2.4     Excluded Liabilities.   Purchaser shall not assume or become liable for the payment or performance of any of the following Liabilities of Seller, whether accrued or unaccrued, known or unknown, fixed or contingent ("Excluded Liabilities"), all of which shall remain Liabilities of Seller:

(a)     any Liability based upon any wrongful or negligent act or omission of Seller prior to the Closing;

(b)     any taxes in the nature of income tax imposed upon Seller in connection with the sale of the Purchased Assets contemplated hereby;

(c)     any Liability associated with any Excluded Assets;

(d)     any Liability relating to any breach of contract, breach of warranty, tort, infringement, or violation of Law by Seller;

(e)     any Liability arising out of or in connection with the Assigned Contracts, Leases, Permitted Encumbrances or Legal Proceedings (whether instituted prior to or after Closing) to the extent arising from acts or omissions which occurred prior to the Closing Date;

(f)     all liabilities and obligations of Seller to Purchaser under this Agreement or with respect to or arising out of the transactions contemplated hereby.

10

2.5    Cure Amounts. Except as otherwise permitted by the next sentence of this paragraph, the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assign to Purchaser, and Purchaser shall assume from Seller, the Purchased Assets. All amounts, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of Seller in respect of any Liens, Taxes or other Assumed Liabilities pertaining to the Purchased Assets shall be paid by Purchaser at or before the Closing (except as otherwise agreed to by the other party to the Purchased Assets) and Seller shall have no liability for the payment of such amounts.

2.6    Further Conveyances and Assumptions.

(a)    From time to time following the Closing, each party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and Seller Documents and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement and Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby. In the event that Purchaser or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller. In the event that Seller or its Affiliates receives any Purchased Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Purchased Assets (or any payments or proceeds related thereto) to Purchaser.

(b)    To the extent that the assignment of any Purchased Asset shall require the consent of any other party and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset") nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained. With respect to Purchased Personal Property that is material for the Property as a going concern after the Closing Date, the Seller shall, and shall cause its Affiliates to, use their commercially reasonable efforts to cooperate with Purchaser at its request for up to ninety (90) days following the Closing Date in endeavoring to obtain such consents promptly, provided, however, that such efforts shall not require the Seller or any of its Affiliates to incur any expenses or Liabilities or provide any financial accommodation or to remain secondarily liable or contingently liable for any Assumed Liabilities in order to obtain any such consent.

2.7    Bulk Sales Laws. The parties hereto hereby waive compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

11

## ARTICLE III
## CONSIDERATION

3.1     Purchase Price. The consideration for the Purchased Assets shall be comprised of the following: (a) the assumption by Purchaser of the Assumed Liabilities set forth in Section 2.3; (b) Eight Hundred Fifty Thousand Dollars ($850,000.00); (c) Transfer Taxes, if any, and other payment obligations of Purchaser hereunder and (d) all cure amounts as set forth in Section 2.5 herein (the "Purchase Price").

3.2     Payment of Consideration. On the Closing Date, Purchaser shall be deemed to have paid the Purchase Price in the amount of Eight Hundred Fifty Thousand Dollars ($850,000.00) on account of the Seller's indebtedness to Purchaser. In addition, Purchaser shall assume the obligation to pay in the ordinary course of business after the Closing Date, the Assumed Liabilities and any other amounts set forth in Section 3.1.

## ARTICLE IV
## CLOSING AND TERMINATION

4.1     Closing Date. Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at Carlton Fields, City Place Tower, 525 Okeechobee Boulevard, Suite 1200, West Palm Beach, Florida 33401 (or at such other place as Seller and Purchaser may designate in writing) at 10:00 a.m. (Florida time) on a date that is no less than two (2) Business Days following the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), but in no event later than September 9, 2009, unless another time or date, or both, are agreed to in writing by Seller and Purchaser. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date". Unless otherwise agreed by Seller and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller in the Purchased Assets to be acquired by Purchaser hereunder, and any Assumed Liability and all risk of loss with respect to the Purchased Assets, shall be considered to have passed to Purchaser as of 12:01 a.m. (Florida time) on the Closing Date.

4.2     Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)     a certificate of good standing of Seller from the State of Delaware;

(b)     a true and complete copy of the certificate of formation of Seller and all amendments thereto, certified by the State of Delaware and a certificate to conduct business in the State of Florida, certified by the State of Florida;

(c)     true and complete copies of resolutions and/or consents of the board of directors/managers/members of Seller, certified by Seller, authorizing the execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the transactions contemplated hereby by Seller;

12

(d)  a duly executed conveyance deed in a form reasonably acceptable to Purchaser and Seller, together with duly executed affidavits of title in form reasonably acceptable to Seller;

(e)  a duly executed bill of sale and assignment and assumption agreement, as to all Purchased Personal Property, in a form reasonable acceptable to Purchaser and Seller;

(f)  the certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b);

(g)  a duly executed Non-Foreign Person Affidavit for Seller in compliance with Section 1445 of the Code;

(h)  original counterparts of each Assigned Contract and Lease that is in Seller's possession, custody or control;

(i)  all other instruments of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser and Seller, as may be necessary to (i) convey the Purchased Assets to Purchaser, subject to the Permitted Encumbrances and (ii) satisfy the requirements of Purchaser's title insurance company;

(j)  an original executed assignment in recordable form in favor of Purchaser of any and all of Seller's right, title and interest in and under the Submerged Land Lease (as defined on Schedule 2.1(a)); and

(k)  a certified copy of the Sale Order having been entered by the Bankruptcy Court and docketed, in form and substance acceptable to Purchaser.

4.3  Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Seller:

(a)  a duly executed bill of sale and assignment and assumption agreement in a form reasonable acceptable to Purchaser and Seller;

(b)  the certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b);

(c)  a certificate of good standing of Purchaser from the State of Delaware.

(d)  a true and complete copy of the certificate of formation of Purchaser and all amendments thereto, certified by the State of Delaware.

(e)  true and complete copies of resolutions and/or consents of the board of directors/managers/members of Purchaser, certified by Purchaser, authorizing the execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the transactions contemplated hereby by Purchaser; and

13

(f)     such other documents, instruments and certificates as Seller may reasonably request;

4.4     Termination of Agreement.     In respect of the Contemplated Transactions, this Agreement may be terminated prior to the Closing as follows:

(a)     Termination by Purchaser.     Purchaser may terminate this Agreement upon the occurrence of any of the following:

(i)     if any of the conditions to the obligations of Purchaser to close that are set forth in Sections 10.1 and 10.3 shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser; or

(ii)     if there shall be a material breach by Seller of any material representation or warranty, or any covenant or agreement contained in this Agreement which breach cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Purchaser to Seller of such breach; or

(iii)     so long as Purchaser is not then breach of its obligations under this Agreement in any material respect, if (A) the Bidding Procedures Order is not entered within sixty (60) days from the date hereof or (B) the Sale Order is not entered within sixty (60) days from the date hereof; or

(iv)     upon written notice to Seller if the Closing shall not have occurred by the close of business on July 9, 2009; provided, however, that if (A) the Closing shall not have occurred by the close of such date due to an action or failure to act by a Governmental Authority that prevents the consummation of the Contemplated Transactions and (B) the Seller is otherwise capable of satisfying the conditions to its obligations to consummate the Contemplated Transactions set forth in Article X, a termination under this Section 4.4(a)(iv) shall not be effective for twenty (20) days after the provision of written notice; provided, further, that such termination shall not be effective if all conditions to the obligations of the Seller to consummate the Contemplated Transactions set forth in Article X shall have been satisfied or otherwise waived and the Closing shall have occurred within such 20-day period, and Purchaser shall continue to fund all costs of operating and maintaining the Property, including related overhead and legal and other professional fees and expenses until Closing, to the extent the Seller does not otherwise have cash. Notwithstanding anything contained herein to the contrary, if Closing shall not have occurred within such 20-day period (i.e., on or before July 29, 2009), Seller agrees to execute and deliver to National City Bank (or its assignee as permitted hereunder), as Purchaser, and Purchaser agrees to accept, a deed in-lieu of foreclosure ("Deed in Lieu of Foreclosure") for the Land and Improvements for an AS IS sale and in form acceptable to Purchaser prior to August 5, 2009. Upon the delivery by Seller and acceptance by Purchaser of the Deed in Lieu of Foreclosure as described in the immediately preceding sentence, Purchaser agrees to (i) pay the fees set forth on Exhibit A of the Bidding Procedures Order in an amount not to

14

exceed $75,250.00 in accordance with the terms of the Bidding Procedures Order and (ii) waive any deficiency claim Purchaser may have against Seller or Seller's officers, directors and representatives including, without limitation, all claims arising from any guaranty of any indebtedness owned by Seller to Purchaser.

(b) <u>Termination by Seller</u>. Seller may terminate this Agreement upon the occurrence of any of the following:

(i) if any of the conditions to the obligations of Seller to close that are set forth in <u>Sections 10.2</u> and <u>10.3</u> shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; or

(ii) if there shall be a material breach by Purchaser of any material representation or warranty, or by Purchaser of any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(iii) if Closing fails to occur on or prior to July 29, 2009 and Purchaser thereafter fails to accept the Deed in Lieu of Foreclosure prior to August 5, 2009 and made the payments and waive deficiency claims as set forth in <u>Section 4.4(a)(iv)</u> hereof.

(c) <u>Termination by Purchaser or Seller</u>. Either Purchaser or Seller may terminate this Agreement upon the occurrence of any of the following:

(i) by mutual written consent of Seller and Purchaser; or

(ii) if the Bankruptcy Court shall enter an order approving a Competing Bid, and a transaction associated with such bid that actually closes, subject to the limitations set forth in the Bidding Procedures Order.

(d) <u>Extension of Time Periods</u>. The time periods for termination of this Agreement set forth in this <u>Section 4.4</u> may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court.

4.5 <u>Procedure For Termination</u>. In the event of termination of this Agreement by Purchaser or Seller, or both, pursuant to <u>Section 4.4</u>, written notice thereof shall forthwith be given to the other parties, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in <u>Section 4.4</u>) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by <u>Section 4.6</u> without further action by the parties.

4.6 <u>Effect of Termination</u>.

(a) In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this

15

Agreement after the date of such termination and such termination shall be without liability to any party; provided, however, that the obligations of the parties set forth in Sections 4.6 and 8.6 and Article XII of this Agreement, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I of this Agreement shall survive any such termination and shall be enforceable in accordance with their terms. In addition, if this Agreement is terminated as provided herein, each party shall upon request redeliver or destroy as soon as practicable any or all documents, work papers and other material of any other party relating to its business or affairs or the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record.

(b)     Nothing in this Section 4.6 shall relieve the parties of any liability for a breach of this Agreement prior to the date of termination. Notwithstanding the foregoing, no attorneys' fees reasonably incurred by a party in connection with the transactions contemplated hereby shall be payable to or out-of-pocket expense reimbursement or other fees shall be made to any party upon termination of this Agreement pursuant to Section 4.4.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that:

5.1     Organization and Good Standing. Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

5.2     Authorization of Agreement. Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for) Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action, including approval of its directors, members and/or trustees (as applicable), necessary for it to validly execute and deliver, this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement to be executed and delivered by Seller in connection with Seller entering into this Agreement.

5.3     Consents of Third Parties: Contractual Consents. To Seller's Knowledge, as of the date hereof, except as set forth on Schedule 5.3 all of the Purchased Assets, subject to assignment, can be assigned to Purchaser pursuant to Section 365(c)(1) of the Bankruptcy Code without the consent of the counterparty or relevant Governmental Authority, as applicable.

5.4     Title to Purchase Assets. Seller owns each of the Purchased Assets, subject to the Permitted Encumbrances.

5.5     Litigation. Except for Legal Proceedings that have been stayed and as set forth on Schedule 5.5 there are no Legal Proceedings pending or, to the Knowledge of Seller, threatened against Seller or involving the Property or the Purchased Assets before any Governmental Authority.

16

5.6     Environmental Matters.  The representations and warranties contained in this
Section 5.6 are the sole and exclusive representations and warranties of Seller pertaining or
relating to any environmental, health or safety matters, including any arising under any
Environmental Laws. Except as set forth on Schedule 5.6 hereto:

(a)     To the Knowledge of Seller, the operation of the Property and the
Purchased Assets are in compliance in all material respects with, all applicable Environmental
Laws;

(b)     To the Knowledge of Seller, Seller is not the subject of any outstanding
Order, notice, directive, or other writing from or Contract with any Governmental Authority
respecting (i) Environmental Laws, (ii) Remedial Action or (iii) any Release or threatened
Release, in each case, relating to the operation of the Property or to any Purchased Asset; and

(c)     To the Knowledge of Seller, Seller has not received any written
communication or other notice alleging that Seller may be in violation of any Environmental
Law or may have any liability under any Environmental Law, in each case related to the Property
or to any Purchased Asset.

5.7     Leases.  To the knowledge of Seller, there are no other leases, occupancy
agreements or licenses, oral or written for any portion of the Property except for the Leases. To
the knowledge of Seller, the Leases are in full force and effect, and neither Seller, nor the tenants
thereunder are in default under the Leases.  To the knowledge of Seller, true, correct and
complete copies of the Leases have been made available to Seller.

5.8     Contracts.  To the knowledge of Seller, there are no contracts, agreements or
licenses, oral or written, regarding the operation, maintenance, marketing, development or sale of
the Property, or any portion thereof, other than the Assigned Contracts.

5.9     Options.  To the knowledge of Seller, and except as previously disclosed to the
Purchaser's counsel, no person has an option, right of first refusal, first offer or similar right to
lease or purchase the Property or any portion thereof.

5.10    No Other Representations or Warranties Schedules.    Except for the
representations and warranties contained in this Article V (as modified by the Schedules hereto),
neither Seller nor any other Person makes any other express or implied representation or
warranty with respect to the Seller, the Property, the Purchased Assets the Assumed Liabilities or
the transactions contemplated by this Agreement, and the Seller disclaims any other
representations or warranties, whether made by the Seller, its Affiliates or any of their respective
officers, directors, employees, agents or other Representatives.  Except for the representations
and warranties contained in Article V hereof (as modified by the Schedules hereto), Seller (i)
expressly disclaims and negates any representation or warranty, expressed or implied, at
common law, by statute, or otherwise, relating to the condition of the Purchased Assets
(including any implied or expressed warranty of merchantability or fitness for a particular
purpose, or of conformity to models or samples of materials), and (ii) disclaims all liability and
responsibility for any representation, warranty, projection forecast, statement, or information

17

made, communicated, or furnished (orally or in writing) to Purchaser or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser or its Representatives by any director, officer, employee, agent, consultant, or other Representative of the Seller or any of their Affiliates). The Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Property. The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1     <u>Organization and Good Standing</u>. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2     <u>Authorization of Agreement</u>. Purchaser has full power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Purchaser Documents</u>") and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and Purchaser Documents have been duly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and Purchaser Documents will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and Purchaser Documents when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     <u>Conflicts; Consents of Third Parties</u>.

(a)     Purchaser is not required to obtain any consent, approval, authorization, waiver, Order, license or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof; the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for such consents, waivers, approvals, Orders, Licenses, authorizations, declarations, filings and notifications (A) that have already been obtained or

18

made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Contemplated Transactions.

(b)     None of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

6.4     Litigation.     There are no Legal Proceedings pending or, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby. Purchaser is not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.

6.5     Acknowledgement Regarding Condition of the Property.

(a)     Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller to Purchaser in Article V hereof (as modified by the Schedules hereto as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties (and Schedules) contained therein, the Purchased Assets and the Property are being transferred to Purchaser on a "WHERE IS" and, as to condition, "AS IS" basis. Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in Article V hereof (as modified by the Schedules hereto, as supplemented or amended). Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller, the Property or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and neither Seller, any of its Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or the use by Purchaser or any of its Affiliates of, any such information, including, without limitation, any confidential memoranda distributed on behalf of Seller relating to the Property or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with the sale of the Property and the transactions contemplated hereby. Purchaser acknowledges that it, along

19

with its Representatives, has conducted or, as of the Closing Date, will have conducted, to its satisfaction, its own independent investigation of the Property and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has, or will have, relied on the results of its own independent investigation. WITHOUT LIMITING TUE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES THAT SELLER HAS NOT MADE ANY REPRESENTATION RELATING TO THE PROPERTY REGARDING SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, COMPLIANCE WITH ZONING LAWS, ENVIRONMENTAL LAWS, OR ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES, REGULATIONS OR ORDINANCES RELATING TO THE USE THEREOF, EXCEPT AS EXPRESSLY STATED HEREIN. PURCHASER ALSO ACKNOWLEDGES AND AGREES THAT THE INSPECTION AND INVESTIGATION OF THE PURCHASED ASSETS BY PURCHASER AND ITS REPRESENTATIVES HAS BEEN ADEQUATE TO ENABLE PURCHASER TO MAKE ITS OWN DETERMINATION WITH RESPECT TO THE SUITABILITY OR FITNESS OF THE PROPERTY, INCLUDING WITH RESPECT TO SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, ZONING LAWS, ENVIRONMENTAL LAWS, AND ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES REGULATIONS OR ORDINANCES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PURCHASED ASSETS ARE BEING SOLD BY SELLER, AND PURCHASER AGREES TO ACCEPT THE PURCHASED ASSETS, IN "AS-IS" AND "WHERE-IS" CONDITION ON THE CLOSING DATE. PURCHASER ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT (I) PURCHASER HAS HAD AN OPPORTUNITY TO MAKE AN INDEPENDENT INVESTIGATION AND EXAMINATION OF THE PURCHASED ASSETS (AND ALL MATTERS RELATED THERETO), AND TO BECOME FULLY FAMILIAR WITH THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE PROPERTY, AND (II) SELLER AND ITS EMPLOYEES, RESIDENTS, INTERNS, FELLOWS, AGENTS, MEMBERS, DIRECTORS, AND OFFICERS HAVE NOT MADE AND SHALL NOT MAKE ANY VERBAL OR WRITTEN REPRESENTATIONS, WARRANTIES OR STATEMENTS OF ANY NATURE OR KIND WHATSOEVER TO PURCHASER, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE ABOVE, AND, IN PARTICULAR, EXCEPT AS EXPRESSLY SET FORTH HEREIN, NO REPRESENTATIONS OR WARRANTIES HAVE BEEN MADE OR SHALL BE MADE WITH RESPECT TO (A) THE PHYSICAL CONDITION OR OPERATION OF THE PROPERTY, INCLUDING THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS THEREON (INCLUDING THE PRESENCE OF ASBESTOS OR ASBESTOS CONTAINING MATERIALS OR THE RELEASE OR THREATENED RELEASE OF HAZARDOUS SUBSTANCES), (B) THE REVENUES OR EXPENSES OF THE PROPERTY, (C) THE ZONING AND OTHER LEGAL REQUIREMENTS APPLICABLE TO THE PROPERTY OR THE COMPLIANCE OF THE PROPERTY THEREWITH, (D) THE NATURE AND EXTENT OF ANY MATTER AFFECTING TITLE TO THE REAL ESTATE OR TO ANY PERSONALTY, (E) THE QUANTITY, QUALITY, OR CONDITION OF THE PERSONALTY, OR (F) ANY OTHER MATTER OR THING AFFECTING OR RELATING TO THE PROPERTY, OR ANY PORTION THEREOF, THE INTERESTS THEREIN TO BE CONVEYED TO PURCHASER PURSUANT TO THE TERMS OF

131832.01405/11910839v.6

THE TRANSACTIONS CONTEMPLATED HEREBY. THE FOREGOING SHALL NOT, IN ANY WAY, AFFECT PURCHASER'S RIGHTS UNDER <u>ARTICLE XII</u> HEREOF. PURCHASER ACKNOWLEDGES THAT THE DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS PARAGRAPH ARE AN INTEGRAL PORTION OF THIS AGREEMENT.

(b)     Except as set forth in this Agreement, Seller hereby specifically disclaims any warranty, guaranty, oral or written, express or implied or arising by operation of law or otherwise, with respect to the matters referred to in <u>Section 6.7(a)</u> above and any warranty of condition, habitability, merchantability or fitness for a particular purpose, in respect to the Purchased Assets. Purchaser declares and acknowledges that this express disclaimer shall be considered a material and integral part of this sale and is reflected in the consideration payable by Purchaser hereunder and, as an inducement for Seller to proceed with this transaction, Purchaser further declares and acknowledges that this disclaimer has been brought to the attention of Purchaser and explained in detail and that Purchaser has voluntarily and knowingly consented thereto. Seller acknowledges that the foregoing shall not affect Purchaser's rights under <u>Article XII</u> hereof.

6.6     <u>No Other Representations or Warranties; Schedules</u>.     Except for the representations and warranties contained in this <u>Article VI</u> (as modified by the Schedules hereto), neither Purchaser nor any other Person makes any other express or implied representation or warranty with respect to Purchaser or the transactions contemplated by this Agreement, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of its officers, directors, employees, agents or other Representatives. Except for the representations and warranties contained in this <u>Article VI</u> (as modified by the Schedules hereto), Purchaser disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any director, officer, employee, agent, consultant, or other Representative of Purchaser or any of its Affiliates). The disclosure of any mailer or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material. The representations and warranties of Purchaser are for diligence purposes only and do not survive the Closing, however, its disclaimers survive.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

7.1     <u>Competing Transaction</u>.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or otherwise better competing bids (each a "<u>Competing Bid</u>").

(b)     Prior to Seller furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the

21

Purchased Assets, Seller shall enter into a customary confidentiality agreement with such Person on terms no less favorable to Seller than those contained in Section 8.6.

(c)     Following the entry of the Bidding Procedures Order by the Bankruptcy Court and until the Contemplated Transactions are consummated, Seller is permitted to cause its Representatives to market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Representatives) in connection with any sale or other disposition of all or any part of the Purchased Assets, alone or in connection with the sale or other disposition of any other asset of Seller. In addition, during such time period, Seller has the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Property and the assets of Seller to prospective purchasers.

7.2     Bankruptcy Court Filings. As promptly as practicable following the execution of this Agreement, but in no event later than ten (10) Business Days after the execution of this Agreement, Seller shall file and seek the approval of the Bankruptcy Court of the Sale Motion and the Bidding Procedures Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Purchaser, including, without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, each party shall use their respective commercially reasonable efforts to defend against such appeal. In the event that an appeal is taken, or a stay pending appeal is requested from the Sale Order or the Bidding Procedures Order, Seller shall promptly notify Purchaser of such appeal or stay request and shall provide Purchaser within three (3) Business Days a copy of the relevant notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

7.3     Notice of Sale. Notice of the sale of Purchased Assets contemplated in this Agreement shall be in a form reasonably acceptable to Purchaser and be served in accordance with applicable Law (including, to the extent applicable, Rules 2002, 3016, 3017 and 6004 of the Federal Rules of Bankruptcy Procedure and any local rules or orders of the Bankruptcy Court) and the Bidding Procedures Order on all Persons required to receive notice under applicable Law.

## ARTICLE VIII
## COVENANTS

8.1     Access to Information. Subject to the other provisions of this Article 8, Seller agrees that, prior to the Closing Date, Purchaser shall be entitled, through its Representatives, to make such investigation of the assets, properties and operations of the Property and such examination of the books and records of Seller pertaining to the Property, the Purchased Assets

22

and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records; it being understood, however, that the foregoing shall not entitle Purchaser to access any books, records or Documents the disclosure of which by Seller to Purchaser would violate (A) any agreement or obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or (B) any obligation of confidentiality by which Seller is bound under applicable Law. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, any request for such examination shall be made to one a Persons, identified by Seller in advance to the receipt of such request, and any access to any of the Property by Purchaser must be approved by one of such Persons, and Purchaser's access to such information shall be subject to any restrictions on disclosure by Seller to Purchaser or use of the information contained therein by Purchaser applicable pursuant to any agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law. Seller shall cause its Representatives to cooperate with Purchaser and its Representatives in connection with such investigation and examination, and Purchaser and its Representatives shall cooperate with Seller and its Representatives and shall use its commercially reasonable efforts to minimize any disruption to Seller's business and operations, including the Property. Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, Seller, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller.

8.2    Conduct of the Property Pending the Closing.

(a)    Prior to the Closing, except (1) as required by applicable Law, (2) as otherwise expressly contemplated by this Agreement, or (3) with the prior written consent of Purchaser Seller shall: (i) use its commercially reasonable efforts to (A) maintain the Purchased Assets in good working order and condition consistent with past practices, ordinary wear and tear excepted and (B) maintain the insurance coverage currently in place with respect to the Purchased Assets (or comparable replacement coverage); (ii) comply in all material respects with all Laws and Orders pertaining to the Property; (iii) comply with all Seller's obligations under the Leases and Assigned Contracts; (iv) not modify, amend or terminate any of the Assigned Contracts or Leases; and (v) not enter into any lease, license or occupancy agreement for any portion of the Property or enter into any contract affecting the Property which survives the Closing Date.

(b)    Except (1) as required by applicable Law, (2) as otherwise expressly contemplated by this Agreement or (3) with the prior written consent of Purchaser, Seller shall not, solely as it relates to the Property:

(i)    subject any of the Purchased Assets to any Lien, except for Permitted Encumbrances; provided, however, that nothing herein shall prevent Seller from granting any Lien on Purchased Assets in connection with any debtor-in-possession financing approved by the Bankruptcy Court;

23

(ii)    acquire or lease any properties or assets that would be Purchased Assets or sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets (except pursuant to an existing Contract for fair consideration in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets);

(iii)    cancel or compromise any material debt or claim or waive or release any right of Seller that constitutes a Purchased Asset except in the Ordinary Course of Business;

(iv)    enter into, modify or terminate any labor or collective bargaining agreement or through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(v)    other than in the Ordinary Course of Business, remove any Tangible Personal Property used in the Ordinary Course of Business without replacing such property with substantially equivalent or better property; or

(vi)    agree to do anything prohibited by this Section 8.2(b).

(c)    Seller shall notify Purchaser of any written notice given prior to Closing to any other party to a Lease or Assigned Contract that such party is in default thereunder or in breach thereof, which default or breach remains uncured, or any notice of termination thereof.

8.3    Consents and Licenses; Insurance.

(a)    Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, including, without limitation, by taking the actions referred to in Section 8.4, to obtain at the earliest practicable date all consents, approvals, authorizations, waiver and Orders required to be obtained by Seller (including all consents Listed in Schedule 5.3(c)) and to give at the earliest practicable date any notices required to be given by Seller, in order for Seller to consummate the transactions contemplated by this Agreement on the terms and in the manner provided hereby; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Authority) or to initiate any litigation or legal proceedings to obtain any such item except as otherwise provided by Section 8.4. Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with them, including by taking the actions referred to in Section 8.4 to obtain at the earliest practicable date all consents, approvals, authorizations, waivers, Orders, and licenses required to be obtained by Purchaser, and to give at the earliest practicable date any notices required to be given by Purchaser, in order for Purchaser to consummate the transactions contemplated by this Agreement on the terms and in the manner provided hereby and to operate the Property after the Closing; provided, however, that Purchaser shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Authority) or to initiate any litigation or legal proceedings to obtain any such consent or approval except as otherwise provided by Section 8.4. Other than Cure Amounts to be paid by Purchaser pursuant

24

to Section 2.5, nothing contained herein shall require Seller to expend any funds in order to remove or eliminate any Lien on any Purchased Asset in order to deliver such Purchased Asset to Purchaser pursuant to this Agreement free o such Lien;

(b)     As of the Closing, Purchaser shall have appropriate insurance coverage in place for the Property consistent with what would be maintained under good industry business practices.

8.4     Consents and Approvals.

(a)     The parties recognize and agree that time is of the essence for the closing of the Contemplated Transactions. Purchaser shall cooperate with Seller, on an expedited basis, in making all required notices and applications, so that the parties may receive all approvals required to consummate the Contemplated Transactions.

(b)     Each of Purchaser and Seller shall use its reasonable best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions contemplated by this Agreement Each such party shall promptly inform the other parties of any material oral communication with, and provide copies of written communications with, any Governmental Authority regarding any such filings or any such transaction. No such party shall independently participate in any formal meeting with any Governmental Authority in respect of any such filings, investigation, or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and/or participate.

8.5     Further Assurances. Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement, and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, promptly after the discovery by Seller or any of its Affiliates after the Closing of any item included within the definition of Purchased Assets but not transferred, conveyed or assigned to Purchaser, (i) Seller will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance or non-assumption of such item and provide Purchaser with all the information in Seller's possession about, and with access to such item as Purchaser may reasonably request, and (ii) if requested by Purchaser, Seller shall and shall cause their respective Affiliates to, use commercially reasonable efforts to transfer, convey or assign to Purchaser such item in the manner and on the terms and conditions as applicable to a Purchased Asset. In addition, if Seller or its Affiliate after the Closing receives payment on any account receivable that is a Purchased Asset, it shall as soon as practicable remit such amount received to Purchaser, together with such information identifying the account to which such payment relates as is reasonably available to Seller, and, if Purchaser or its Affiliates after the Closing receives payment on any account receivable that is an Excluded Asset it shall as soon as practicable remit such amount received to Seller, together with such information identifying the account to which such payment relates as is reasonably available to Purchaser. The provisions of this Section 8.5 shall survive the Closing.

25

8.6    Intentionally Omitted.

8.7    Publicity. Each of Seller and Purchaser agrees that it shall not issue any written press release concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of either Purchaser or Seller, as applicable, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of such issuing party upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that such party that intends to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof.

8.8    Supplementation and Amendment of Schedules. Each of the parties may, with the prior written consent of the other party, include and exclude, from time to time and at any time, in the Schedules and Exhibits any items and/or facts that it subsequently discovers. No such supplement or amendment shall have any effect on any representation or warranty contained herein or upon the satisfaction of the condition to closing set forth in Section 10.1(a) or 10.2(a), as applicable; provided, however, if the Closing shall occur, then Purchaser shall be deemed to have waived any right or claim pursuant to the terms of this Agreement or otherwise, including pursuant to Article XI hereof with respect to any and all matters disclosed pursuant to any such supplement or amendment at or prior to the Closing.

8.9    Cooperation. Seller and Purchaser agrees to reasonably cooperate with each other, from the date hereof up through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

8.10    Repair of Damage; Condemnation.

(a)    In the event that between the date hereof and the Closing Date, there is any damage to any Tangible Personal Property or real property that is a Purchased Asset, Purchaser shall accept the Purchased Assets in their then-current condition and proceed with the Closing, in which case Purchaser will be entitled to an assignment of all of the Seller's rights to any insurance proceeds covering such damage or terminate this Agreement.

(b)    Seller shall give Purchaser prompt notice if any Tangible Personal Property or real property that is a Purchased Asset is (i) taken by a Governmental Authority, or (ii) damaged or destroyed.

(c)    If after the date hereof and prior to the Closing, either (i) all or any material portion of the Purchased Real Property is condemned or taken by eminent domain (or is the subject of a pending or contemplated condemnation proceeding or taking by eminent domain which has not been completed), or (ii) any zoning, variance or similar Law affecting any significant portion of the Purchased Real Property is changed, Seller shall promptly give Purchaser reasonably detailed notice of such condemnation, taking or change and Purchaser shall have the option to terminate this Agreement by giving notice to Seller within twenty (20) days after the receipt of such Seller notice. If Purchaser does not exercise its option to terminate this

26

Agreement as set forth in this Section 8.10(c) then this Agreement shall remain in full force and effect without a reduction in the Purchase Price and Purchaser shall be entitled to any and all claims that Seller may have to condemnation awards and/or any and all causes of action with respect to such condemnation or taking of, or such change relating to the Purchased Real Property, and Seller shall pay to Purchaser at Closing, by certified or official bank check, an amount equal to all payments theretofore made with respect to such condemnation, taking or change. For purposes of this paragraph, "material shall mean a condemnation or taking which, in Purchaser's reasonable judgment, shall have a Material Adverse Effect.

### ARTICLE IX
### RESERVED

### ARTICLE X
### CONDITIONS TO CLOSING

10.1    Conditions Precedent to Obligations of Purchaser.  The obligations of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects (without giving effect to any materiality or Material Adverse Effect qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect, provided, however, that in the event any such representation or warranty has been breached the condition set forth in this Section 10.1(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect;

(b)    Seller shall have performed and complied in all respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date and Purchaser shall have received a certificate, signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect, provided, however, that the condition set forth in this Section 10.1(b) shall be deemed satisfied unless all such failures to so perform or comply taken together results in a Material Adverse Effect; and

(c)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2.

10.2    Conditions Precedent to Obligations of Seller.  The obligation of Seller to consummate the Contemplated Transactions as provided by this Agreement are subject to the

27

fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)     The representations and warranties of Purchaser set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; provided, however, that the condition set forth in this Section 10.2(b) shall be deemed satisfied unless all such failures to so perform or comply taken together prevent or materially delay the ability of Purchaser to perform their respective obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3.

10.3     Conditions Precedent to Obligations of Purchaser and Seller. The respective obligations of the parties to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     There shall not be in effect any Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions;

(b)     The Bankruptcy Court shall have entered the Bidding Procedures Order; and

(c)     The Bankruptcy Court shall have entered the Sale Order.

10.4     Frustration of Closing Conditions. No party may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, to excuse it from consummating the Contemplated Transactions if such failure was caused by such party's failure to comply with any provision of this Agreement.

28

## ARTICLE XI
## TRANSFER TAXES AND OTHER CLOSING

11.1    Transfer Taxes. Purchaser shall pay any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement, if any ("Transfer Taxes").

11.2    Taxes, Etc. Taxes, rents under the Leases and charges under the Assigned Contracts shall be assumed by Purchaser on the Closing Date.

## ARTICLE XII
## MISCELLANEOUS

12.1    Expenses. Except as otherwise provided in this Agreement, each party shall bear its own attorneys fees incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby. All other fees, costs and expenses payable in connection with the transfer of the Purchased Assets to Purchaser including, without limitation, all title insurance premiums, escrow and title search fees, lien search fees, appraisal and environmental due diligence expenses, survey expenses, brokerage fees, commissions and similar compensation, and assumption fees, If any, shall be paid by Purchaser.

12.2    Injunctive Relief. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Section 12.2 shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

12.3    Submission to Jurisdiction Consent to Service of Process. Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.6 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of Pennsylvania sitting in Philadelphia County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the

29

laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 12.6</u>.

12.4    <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the schedules and exhibits hereto) and the Escrow Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

12.5    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida applicable to contracts made and performed in such State.

12.6    <u>Notice</u>. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), or (ii) One business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Purchaser to:                    If to Seller, to:

National City Bank                     Legal Department
101 South 5th Street                   10350 Bren Road West
Louisville, Kentucky 40202             Minnetonka, MN 55343


Attn: Gary Sieveking                   Attn: Anne Marie Solberg
Facsimile: _____            Facsimile: _____
Phone: (502) 581-7660                  Phone: _____

30

12.7 Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby arc consummated as originally contemplated to the greatest extent possible.

12.8 Binding Effect Assignment. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. A successor to Seller shall include Seller as a reorganized debtor. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void; provided, however, that Purchaser may assign its right to acquire any or all of the Purchased Assets and its other rights hereunder to an entity wholly owned by it that also assumes all of Purchaser's obligations hereunder (but such assumption shall not relieve Purchaser of its obligations hereunder) without the consent of Seller; and provided further, Purchaser may assign its right to acquire any or all of the Purchased Assets to a third Person at Closing without the consent of Seller. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.

12.9 No Personal Liability. In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the liability of any person for his or her fraudulent acts).

12.10 Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLER:**

**ALTAIRE VILLAGE, L.L.C.**, a Delaware limited liability company

By: _____
Name: _____
Title: _____

**PURCHASER:**

**NATIONAL CITY BANK**, a national banking association

By: _____
Name: GARY SIEVEKING
Title: SENIOR VICE PRESIDENT

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

## Schedule 1.1(a)

## "Knowledge" Officers/Managers of Purchaser and Seller

Purchaser:

Gary Sieveking

Seller:

Anne Marie Solberg

33

## Schedule 2.1(a)

### Leases

1.　　Sovereignty Submerged Lands Lease with the Trustees of the Internal Improvement Fund of the State of Florida recorded in Official Records Book 20797, page 1, as modified by that certain Renewal of Sovereignty Submerged Lands Lease recorded in Official Records Book 28702, page 967; by Assignment of Leasehold Interest recorded in Official Records Book 31578, page 1515; by Sovereignty Submerged Lands Lease Modification to Reflect Change in Ownership recorded in Official Records Book 32094, page 862; Sovereignty Submerged Lands Lease Renewal recorded in Official Records Book 35126, page 520; Sovereignty Submerged Lands Lease Modification recorded in Official Records Book 42849, page 770; and Sovereignty Submerged Lands Lease Renewal recorded in Official Records Book 45366, page 396 ("Submerged Land Lease").

34

Assigned Contracts

None

35

Schedule 5.3(c)

Nonassignable (without consent) Purchased Assets

None

131832.01405/11910839v.6

## Schedule 5.5

## Legal Proceedings

None

37

## Schedule 5.6

### Environmental Matters

None

131832.01405/11910839v.6

Bidding Procedures Order

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **Chapter 11** |
| **OPUS SOUTH CORPORATION, et al.,**[1] | **Case No. 09-11390 (MFW)** |
| **Debtors.** | **Jointly Administered** |

## ORDER (1) APPROVING BIDDING PROCEDURES IN ADVANCE OF AUCTION, (2) APPROVING FORM AND MANNER OF NOTICE OF PROPOSED CURE AMOUNTS, AUCTION, AND FINAL HEARING, AND (3) GRANTING RELATED RELIEF

Upon the emergency motion (the "**Motion**")[2] filed by the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") requesting entry of an order (the "**Procedures Order**") pursuant to Sections 105, 363(b), (f), and (m), and 365 of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"): (1) approving the proposed Bidding Procedures (as defined below) related to the disposition of substantially all of the assets of each of the Debtors; (2)

---

[1] The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are: Opus South Corporation (4928); Opus South Contractors, L.L.C. (1657); Altaire Village, L.L.C. (8521); Clearwater Bluff, L.L.C. (1608); Calm Waters, L.L.C. (7875); Waters Edge One, L.L.C. (3936); Laguna Riviera Ventures, L.L.C. (7950); 400 Beach Drive, L.L.C. (0489); Nature Coast Commons, L.L.C. (3567) (converted to Chapter 7 on May 19, 2009); Shoppes of Four Corners, L.L.C. (7932); and 8th & 14th, L.L.C. (0119). The debtors' corporate headquarters are located at, and the mailing address for each debtor is, 3344 Peachtree Road NE, Suite 1650, Atlanta, Georgia, 30326.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

approving the form, extent, and manner of notice of the proposed Cure Amounts, Auction, and Final Hearing (each as defined below); and (3) granting related relief, the Court, having reviewed the Motion and the objections thereto and having heard the statements of counsel and considered the agreements of the parties and the evidence presented at a hearing before the Court on the Motion,

## FINDS AND CONCLUDES AS FOLLOWS:

A.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The Debtors filed the Motion on April 22, 2009, proposing to sell substantially all of the assets of each of the Debtors to one or more purchasers, whether individually or as one or more packages, and seeking approval of the Bidding Procedures related to the proposed Transactions. The term **"OS Assets"** as used herein shall mean the following:  (1) substantially all of Debtor 8th & 14th, L.L.C.'s real and personal property, including, but not limited to, such Debtor's interest in that certain real estate development project commonly known as the Birmingham Social Security Administration Center located in Birmingham, Alabama; (2) substantially all of Debtor Altaire Village, L.L.C.'s real and personal property, including, but not limited to, such Debtor's interest in certain real property located near Fort Lauderdale, Florida, as well as boat slips, a building, and any improvements thereon; and (3) substantially all of Debtor Laguna Riviera Ventures, L.L.C.'s real and personal property (collectively, the **"Laguna Property"**), including, but not limited to, such Debtor's interest in that certain real estate development project commonly known as Laguna at Riviera Dunes located in Palmetto, Florida, and the condominium units, boat slips, improvements, fixtures, and vacant land related thereto.

40

C.     The statutory and legal predicates for the relief sought in the Motion are Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.  The Court reserves all of the parties' rights with respect to objections to the potential sale under Section 363 of the Bankruptcy Code, and this Procedures Order does not constitute a ruling that the grounds for a sale under Section 363(f) of the Bankruptcy Code have or have not been satisfied.  To the extent a sale is not approved for any of the OS Assets, Paragraphs 5 through 9 of this Procedures Order shall still remain in full force and effect.

D.     The Debtors have articulated good and sufficient reasons for approving the Bidding Procedures and the form and manner of notice of the proposed Cure Amounts, Auction, and the Final Hearing thereon (as defined below).

E.     The Bidding Procedures are reasonable and appropriate, and represent the best method, under the circumstances, for maximizing the value of and return for the OS Assets.

F.     The relief granted herein is in the best interests of the Debtors, their estate, creditors, and other parties-in-interest.

G.     The Debtors have complied with Rule 6004-1(c) of the Local Rules for the United States Bankruptcy Court for the District of Delaware.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

**1.     The Motion is granted as set forth herein.**

**2.     The Debtors are authorized and empowered to take such steps, expend such sums of money (to the extent authorized herein or under some other financing, cash collateral, or protective advances order), and do such other things as may be necessary to implement and effect the terms and requirements of this Procedures Order.**

**3.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Procedures Order.**

41

4.    Each Debtor shall solicit bids for its assets individually and may solicit bids for groups of assets with other of the Debtors (each such bid a "Group Bid" and collectively, "Group Bids"); provided, however, any Group Bid made by a Qualified Bidder (as defined below) shall detail the allocation of the gross bid price among the individual OS Assets covered by the Group Bid.

5.    Each mortgagee with a mortgage or lien on the OS Assets (the "Mortgagees") agrees, and it is hereby ordered, as follows:

42

a.  If an OS Asset is sold to a third-party, the following shall be paid from the proceeds of each sale:  (i) all broker fees related to such sale as set forth and capped on the fee and expense schedule attached hereto as **Exhibit "A"** (the "Fee and Expense Schedule"); (ii) the actual legal fees incurred by the Debtors related to such sale, including fees incurred in negotiating and drafting the Motion and this Procedures Order and an equal share of all fees and expenses incurred that relate to such sale in general but cannot be broken down per individual OS Asset, capped for each OS Asset at the amounts reflected on the attached Fee and Expense Schedule; and (iii) the reasonable out-of-pocket advertising expenses of Chatham Financial Corporation incurred with regard to such sale as set forth and capped on the attached Fee and Expense Schedule.

b.  If an OS Asset is sold to such Mortgagee pursuant to the credit bid procedures set forth herein, such Mortgagee shall pay:  (i) all broker fees related to such sale based on the credit bid amount as set forth and capped on the attached Fee and Expense Schedule; (ii) the actual legal fees incurred by the Debtors related to such sale, including fees incurred in negotiating and drafting the Motion and this Procedures Order and an equal share of all fees and expenses incurred that relate to such sale in general but cannot be broken down per individual OS Asset, capped for each OS Asset at the amounts reflected on the attached Fee and Expense Schedule; and (iii) the reasonable out-of-pocket advertising expenses of Chatham Financial Corporation incurred with regard to such sale as set forth and capped on the attached Fee and Expense Schedule.

131832.01405/11910839v.6

c.     With regard to the fees and expenses set forth in Subparagraphs (a) and (b) above, the Debtors shall file with the Court within thirty (30) days after the closing of any OS Asset sale one or more applications requesting payment of such fees and expenses. Any such application shall include documentation supporting such fees and expenses. Any Mortgagee shall have a right to object to the reasonableness of such fees and expenses. Subject to the provisions of Paragraph 8 herein, the Mortgagees shall pay such fees and expenses within eleven (11) business days of approval thereof by the Court.

6.     If a Mortgagee's collateral is not sold to either a third party at the Auction, the Mortgagee (pursuant to its credit bid rights), or otherwise pursuant to the Motion and this Procedures Order, such Mortgagee shall pay: (a) the actual legal fees incurred by the Debtor related to such sale, including fees incurred in negotiating and drafting the Motion and this Procedures Order and an equal share of all fees and expenses incurred that relate to such sale in general but cannot be broken down per individual OS Asset, capped for each OS Asset at the amounts reflected on the attached Fee and Expense Schedule; and (b) the reasonable out-of-pocket advertising expenses of Chatham Financial Corporation incurred with regard to such sale process as set forth and capped on the attached Fee and Expense Schedule. Notwithstanding anything in this Paragraph 6 to the contrary, a Mortgagee shall not be required to pay the actual legal fees incurred by a Debtor related to such sale in the event the Debtor, or a Chapter 7 trustee upon conversion, elects to not proceed with the sale process requested in the Motion or the Court dismisses such bankruptcy case, unless, however, the Debtor's or Chapter 7 trustee's decision not to proceed with such sale, or the dismissal of such case, was a result of the Mortgagee's failure to complete the sale process, including failure to close on or before July 9, 2009 (or such other date as agreed to by the Debtors), or the

44

Mortgagee's failure or refusal to timely fund the Advances through the closing date (as defined below). With regard to the fees and expenses set forth in this paragraph, the Debtors shall file with the Court within thirty (30) days after the originally scheduled Auction date one or more applications requesting payment of such fees and expenses. Any such application shall include documentation supporting such fees and expenses. Any Mortgagee shall have a right to object to the reasonableness of such fees and expenses. Subject to the provisions of Paragraph 8 herein, the Mortgagees shall pay such fees and expenses within eleven (11) business days of approval thereof by the Court.

      7.      Each Mortgagee agrees and each is hereby ordered to fund the property stabilization and preservation costs (collectively, the "Advances") set forth in the respective budgets attached hereto as <u>Exhibits "B" through "D"</u> and incorporated herein by reference (collectively, the "Budgets"). Except as otherwise provided in this Paragraph 7, such Advances are to be paid for any stabilization and preservation costs incurred from and after the Petition Date through the date of the closing of the sale of the respective Mortgagee's collateral or, if no winning bidder is selected at the Auction, for one week after the Auction, but not in excess of the amounts set forth in the Budgets and in no event after a Debtor's voluntary conversion of its bankruptcy case or dismissal of such by the Court. Except as otherwise provided in this Paragraph 7, each Mortgagee shall fund to or for the benefit of the property (a) its initial obligation for Advances under the Budgets within two (2) business days following entry of this Procedures Order unless otherwise agreed to by each Debtor and its respective Mortgagee, and (b) subsequent obligations for Advances set forth in the applicable Budget on the Wednesday prior to the week budgeted for such expenses unless otherwise agreed to by each Debtor and its respective Mortgagee. Notwithstanding the foregoing provisions of Paragraph 7 hereof, any Mortgagee with respect to which a final cash collateral order, protective advances order,

45

and/or debtor-in-possession financing order has been entered by the Court in this jointly administered bankruptcy case (each, a "Final Financing Order") that already provides for payment of all or a portion of the Advances shall not be obligated to fund such Advances under this Paragraph 7 to the extent such Advances are funded under such Final Financing Order. The Debtors shall provide weekly reconciliations each Monday with respect to the preceding week's expenditures made pursuant to the Budget. The Debtors are allowed a variance of less than or equal to 10% per line item and in the aggregate with respect to the expense line items set forth in each Budget. To the extent any amounts budgeted for a particular week under any Budget are not actually used, such amounts shall roll forward and be available for use in subsequent weeks. Notwithstanding the foregoing, the timing and mechanics of the payment of Advances as to the Laguna Property shall be governed by a protective advances order to be sought by Debtor Laguna Riviera Ventures, L.L.C. and its Mortgagee.

8.      If any Mortgagee, with respect to which a Final Financing Order has been entered by the Court in this jointly administered bankruptcy case that permits payments as provided herein, becomes obligated to pay any broker's fees, Debtors' legal fees, reasonable out-of-pocket expenses of Chatham Financial Corporation, and/or any Advances as provided in Paragraphs 5, 6, and 7 herein above (collectively, the "Sale Expenses"), each Debtor subject to such Final Financing Order shall pay such Sale Expenses from excess cash collateral, to the extent thereof, or the applicable debtor-in-possession financing or protective advances motion if authorized thereunder and within the timeframe provided above, before such Mortgagee shall be obligated to pay any such Sale Expenses. Sale Expenses paid with cash collateral, protective advances, and/or debtor-in-possession financing shall be deemed to be permitted uses of cash collateral, protective advances, and debtor-in-possession financing and subject to

46

the terms of any applicable Final Financing Order, notwithstanding the provisions of Paragraph 9 hereof.

9. Except payments of Advances comprising Sale Expenses from cash collateral as provided in Paragraph 8 hereof, Advances made by the Mortgagees pursuant to the Budgets shall be recourse to the respective Mortgagee's collateral for which the Advances were made, but shall not be entitled to administrative priority under Section 503 of the Bankruptcy Code or otherwise (*i.e.*, any such claim will be treated and have the same priority as if such Advances and the resulting claims were made and arose immediately before the date of the filing of the Debtors' petition for relief); provided, however, that a Mortgagee shall have a super-priority administrative expense claim with respect to Advances made pursuant to this Procedures Order in an amount equal to, on a dollar-for-dollar basis, any claims or recoveries by the Debtors' estates against such Mortgagee with respect to the Mortgagee's pre-petition relationship with the Debtor. Any such Advances shall, however, constitute additional mortgage debt with respect to the respective Debtor's mortgage obligations to the respective Mortgagee.

10. The amounts set forth on the Fee and Expense Schedule and the Advances may, at the option and direction of the respective Mortgagee, be funded from the related Debtor's accounts in which the Mortgagee has a first-priority lien or from an account in the name of the Debtor owning the property that is the cash collateral of such Mortgagee and the respective Debtor shall be authorized to use such funds pursuant to the terms of this Procedures Order.

11. The Debtors agree and the Court hereby orders that the rights of the Debtors and their estates to assert a claim for surcharge under Section 506(c) of the Bankruptcy Code are hereby waived in these Chapter 11 cases with respect to the Mortgagees' collateral constituting OS Assets, but only to the extent of (a) professional fees incurred in these cases, (b)

47

general administrative costs incurred by Opus South Corporation, and (c) the Advances made hereunder or under any applicable Final Financing Order.

12.     Each Mortgagee with a mortgage interest or security interest in any OS Asset that is sold or marketed for sale pursuant to the Motion and this Procedures Order agrees and is hereby deemed to have waived and otherwise released its respective Debtor, including such Debtor's officers, directors, and representatives, from any and all claims related to any resulting deficiency, and all claims arising from any guaranty of the Mortgagee's loan and collateral pledged by the Debtors to such Mortgagee, provided however, that each Mortgagee shall be entitled to file proofs of claim against its respective Debtor or guarantor to the extent of any claims arising from such Debtor's willful misconduct or actual fraud. To the extent any OS Assets securing such Mortgagee's claim are not sold in a Transaction approved by the Court, the Mortgagee's rights with respect to, including the right to recover on its claim from, such OS Assets shall continue unimpaired. Each such Mortgagee shall look only to its respective collateral, including any post-petition cash collateral and post-petition liens granted to such Mortgagee, for satisfaction of its respective claim. Notwithstanding any other term or provision of this Procedures Order, each Mortgagee's waiver and release as provided in this Paragraph 12 shall only be effective as and when title to such Mortgagee's claimed collateral is transferred from the applicable Debtor to a buyer or such Mortgagee pursuant to a Transaction approved by this Court.

13.     Notice of the Procedures Order, Auction, Final Hearing, and the proposed assumption and assignment of the Assigned Contracts (as defined in the Motion) to a purchaser pursuant to a Modified APA shall be good and sufficient, and no other or further notice shall be required, if given as follows:

   a.     **Notice of Auction and Final Hearing.**  Within two (2) business days after the Court's entry of this Procedures Order, the Debtors (or its agents) shall

48

serve a copy of the form of sale notice attached hereto as <u>Exhibit "E,"</u> which form of notice is hereby approved, by first-class United States mail, postage pre-paid, upon (i) the Office of the United States Trustee, (ii) any persons who have entered an appearance in the case or otherwise in writing requested notice, (iii) all entities known to have expressed an interest in a transaction with respect to the OS Assets during the past twelve months (12) months, (iv) all entities known to have a present interest in the OS Assets; (v) all federal, state, and local regulatory or taxing authorities or recording offices in the jurisdictions in which the applicable Debtor's assets are located; (vi) all parties to executory contracts with the applicable Debtors; (vii) all secured creditors of the Debtors; (viii) all known unsecured creditors of the Debtors; (ix) counsel for any committee(s) formed pursuant to Section 1102 of the Bankruptcy Code (if any hereafter is formed); (x) all persons or entities entitled to receive notice pursuant to the Bankruptcy Rules, the Local Rules of the Court, or other applicable law; (xi) all applicable homeowners' associations and condominium unit owners; (xii) all other entities identified on the Debtors' Rule 2002 Service List; (xiii) all subcontractors who did work on the applicable Debtors' properties; and (xiv) all architects, engineers, contractors, professionals, laborers, and materialmen who furnished materials or provided services to the Debtors owning OS Assets or to the OS Assets.

b.    **Cure Notice.** On or before June 10, 2009, the Debtors shall file with the Court and serve by first-class United States Mail, postage pre-paid, on all non-debtor parties to executory contracts and unexpired leases that may be assumed and assigned (collectively, the **"Assigned Contracts"**) a copy of the Cure Notice (as defined in the Motion), a form of which is attached hereto as <u>Exhibit "F,"</u> which form of notice is hereby approved, of (i) the Debtors' intent to make the Assigned Contracts available for assumption and assignment, and (ii) the proposed cure amount (the **"Cure Amount"**). Each non-debtor party to an Assigned Contract shall have until June 25, 2009, to object to the assumption and assignment of the Assigned Contract or the Cure Amount. If objecting to the Cure Amount, the non-debtor party must state in its objection with specificity what Cure Amount it believes is required and the default to which it relates (with appropriate documentation in support thereof). Any objection to the Cure Amounts that is timely filed and served by any non-debtor party to an Assigned Contract in accordance with the Cure Notice, and which is not otherwise resolved by the parties, shall be heard and resolved by the Court at the Final Hearing. If no objection is timely filed and served, the Assigned Contract may be assumed and assigned to any purchaser on the closing date of the applicable Transaction, and the Cure Amount set forth in the Cure Notice shall be binding on the non-debtor party, notwithstanding anything to the contrary in any Assigned Contract or any other document. The non-debtor party to the Assigned Contract shall be forever barred from asserting any other claims against the Debtors, any purchaser, or their property that arise out of or relate to the Assigned Contract, the OS Assets, or the Transaction. Each non-debtor party to an Assigned Contract shall be served with a copy of the Court's order authorizing the assumption and assignment of any such contract(s) within five

49

(5) business days after the entry of such order. Within two (2) business days after the Auction, the Debtors shall file with the Court a list of which Assigned Contracts each Winning Bidder intends to have assumed and assigned to it.

14.     Any fully executed contract memorializing an agreement for the disposition of all or a part of the OS Assets by and between the Debtor and a purchaser shall be substantially in the form of the APA attached to the Motion and shall be substantially consistent with the terms and conditions thereof, although the APA may be amended to reflect, among other things, that the Sale shall be free and clear of all liens, claims, encumbrances, contract claims, warranties, and successor liability, to the fullest extent permitted by Section 363 of the Bankruptcy Code.

15.     The Debtors are authorized to reject any bid or offer made by a Potential Buyer (as defined below) that, in the exercise of the Debtors' reasonable business judgment, after consultation with the applicable Mortgagees and any unsecured creditors' committee appointed in these cases, is not in conformity with the terms and conditions of the APA or the Bidding Procedures (as defined below).

16.     The Court hereby approves the following bidding procedures (the "Bidding Procedures") which shall govern all proceedings relating to the APA and any subsequent bids for the OS Assets in this case:

      a.    **Potential Bidder**.  Parties interested in participating in the bidding process ("**Potential Buyers**") and Mortgagees interested in participating in the bidding process ("**Credit Buyers**," and together with Potential Buyers, the "**Potential Bidders**") may participate in the sale process. Potential Buyers will be required to deliver to the Debtors (and the Debtors will provide to the Mortgagees (to the extent not already delivered)) the following:

          i.    An executed confidentiality agreement in form and substance acceptable to the Debtors; and

         ii.    The most current audited (if prepared) and the latest unaudited financial statements as well as financial information evidencing the Potential Bidder's ability to close the transaction that meets with the

Debtors' satisfaction.

As promptly as practicable after a Potential Bidder delivers the above information, the Potential Bidder shall be eligible to access information regarding to the OS Assets, as described in the APA. The Debtors reserve the right to refuse any Potential Bidder access to the due diligence materials if such access is deemed to be harmful to the Debtors' estates. Credit Buyers will not be obligated to comply with subparagraphs (i) and (ii) above.

b.  **Deadline for Submission of Bids**. The deadline for Potential Bidders submitting any and all competing bids shall be on or before **June 25, 2009, at 5:00 p.m. (Prevailing Delaware Time)** (the "**Bid Deadline**").

c.  **Deadline for Submission of Statement of Claim.** Each Mortgagee shall submit a statement of its claim amount in writing to the Debtors on or before June 18, 2009.

d.  **Submission of Bids by Potential Buyers**. In order to qualify as a potential Qualified Bidder (as defined below) of any OS Assets, a Potential Buyer must timely submit a written bid for a portion or all of the OS Assets that:

    i.  Contains an executed Modified APA in substantially the same form as set forth in Exhibit "1" to the Motion, marked to show all modifications thereto (a "**Modified APA**"), wherein the Potential Buyer identifies:

        1.  Which of the OS Assets the Potential Buyer seeks to acquire;

        2.  To the extent the total bid submitted relates to the assets of more than one Debtor, the allocation of such total bid between each Debtor's property bid upon by such Potential Buyer; and

        3.  Which of the Debtors' executory contracts and unexpired leases such bidder seeks to assume and the proposed terms of cure.

    ii.  Includes a blacklined copy of the Modified APA showing all changes made to the APA.

    iii.  Does not contain:

        1.  A request for any type of expense reimbursement or similar type of payment; or

        2.  Any due diligence, financing contingencies, or other contingency of any kind not otherwise contained in the APA.

    iv.  Is accompanied by evidence of authorization and approval from such Potential Buyer's board of directors (or comparable governing body)

with respect to the submission, execution, delivery, and closing of the Modified APA.

v.     Is accompanied by financial and other information regarding such Potential Buyer's financial condition and capability to consummate the transactions contemplated by the Modified APA and which will allow the Debtors and the Mortgagees for the OS Assets subject to such Potential Buyer's bid to make a reasonable determination as to whether such written bid is a Qualified Bid, including, without limitation:

      1.     The most current audited (if available) and latest unaudited financial statements (the "**Financial Information**") of such Potential Buyer; or

      2.     If the Potential Buyer is an entity formed for the purpose of acquiring OS Assets then:

            A.     The Financial Information of the equity holder(s) of the Potential Buyer or such other form of financial disclosure acceptable to the Debtors; and

            B.     The written commitment of such equity holder(s) to be responsible for the Potential Buyer's obligations in connection with the acquisition of OS Assets.

vi.     Discloses fully the identity of each entity that will be bidding for OS Assets or otherwise participating in connection with such Qualified Bid, and the complete terms of any such participation.

vii.     Discloses fully the terms of the proposed employment of any of Debtors' employees, management, or officers in connection with such bid.

viii.     Is accompanied by a cash deposit in an amount equal to 10% of the total purchase price set forth in the Modified APA (a "**Deposit**").

ix.     Permits the Debtor, pursuant to the local rules of the Court, to maintain reasonable access to its books and records following the closing of any sale of an OS Asset, as necessary for the administration of its bankruptcy case and estate.

x.     Is delivered to (1) Debtors' counsel such that it is received by the close of business on the Bid Deadline by the following individuals: (a) Victoria Counihan, Greenberg Traurig, LLP, The Nemours Building, 1007 North Orange Street, Suite 1200, Wilmington, Delaware 19801; and (b) Matthew Gensburg, Greenberg Traurig, LLP, 77 West Wacker Drive, Suite 3100, Chicago, Illinois 60601, and (2) counsel for any unsecured creditors' committee appointed in these

52

cases (collectively, the **"Notice Parties"**). The Debtors shall provide the Mortgagees with copies of all documents delivered related to such Mortgagee's real property collateral.

e.    **Submission of Bids by Credit Buyers.** In order to submit a Qualified Bid, a Credit Buyer must timely submit a written bid for a portion or all of the OS Assets that:

 i. Contains an executed Modified APA, with all modifications thereto, wherein the Credit Buyer identifies:

  1. Which of the OS Assets (on which the Credit Buyer has a lien) the Credit Buyer seeks to acquire; and

  2. Which of the Debtors' executory contracts and unexpired leases such Credit Buyer seeks to assume and the proposed terms of cure.

 ii. Includes a blacklined copy of such Modified APA showing all changes made to the APA and a statement of the amount of the Credit Buyer's full claim, which amount shall include the advances to the Debtors as set forth in this Procedures Order and which will represent the largest amount the Credit Buyer may bid. Nothing will require the Credit Buyer to bid its entire amount. If the Debtors object to the amount of the Credit Buyer's claim, they will inform the Credit Buyer of such dispute by **June 26, 2009, at 5:00 p.m. (Prevailing Delaware Time)**. Any dispute that cannot be resolved by the Credit Buyer and the Debtors will be resolved by the Court prior to the Auction.

 iii. Does not contain:

  1. A request by the Credit Buyer for any type of expense reimbursement or similar type of payment; or

  2. Any due diligence, financing contingencies, or other contingency of any kind not otherwise contained in the APA.

 iv. Discloses fully the terms of the proposed employment of any of the Debtors' employees, management, or officers in connection with such bid.

 v. Permits the Debtor, pursuant to the local rules of the Court, to maintain reasonable access to its books and records following the closing of any sale of an OS Asset, as necessary for the administration of its bankruptcy case and estate.

 vi. Is delivered to the Notice Parties by the close of business on the Bid Deadline.

131832.01405/11910839v.6

f.   **Qualification of Bid.** After a Potential Buyer has delivered a bid, the Debtors, in consultation with the Mortgagees, will determine whether such Potential Buyer is a "**Qualified Bidder**" and such bid is a "**Qualified Bid.**" Promptly after making such determination, the Debtors will advise such bidder of this determination. The Debtors reserve the right to reject any bid. Credit Buyers are deemed to be Qualified Bidders upon compliance with the provisions of Paragraph (e) above.

g.   **Auction.** The Debtors will conduct an auction with the Qualified Bidders to determine the highest or best bid for the OS Assets beginning at **10:00 a.m. (Prevailing Delaware Time) on June 30, 2009, at the law offices of Greenberg Traurig, LLP located at The Nemours Building, 1007 North Orange Street, Suite 1200, Wilmington, Delaware 19801** (the "**Auction**"). The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear at the Auction. Each Qualified Bid other than the opening bid is referred to as a "**Subsequent Bid.**" At the conclusion of the Auction, or as soon thereafter as practicable, the Debtors shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the process, the Debtors' estates, and the Transactions, including those factors affecting the speed and certainty of consummating the Transactions; (ii) identify the highest or otherwise best offer(s) for each OS Asset received at the Auction (the "**Winning Bid**", and the bidder(s) making such bid, the "**Winning Bidder**"); and (iii) designate any Back-Up Bidders (as defined below).

h.   **Right to Withdraw Asset or Permit Package Bids.** At any time prior to the Final Hearing, a Mortgagee may, in its sole discretion, withdraw any OS Assets on which the Mortgagee has a lien from the sale process if the amount to be paid to the Mortgagee from the sale proceeds is less than the amount of the Mortgagee's full claim. To withdraw any such OS Asset from the sale process, such Mortgagee shall give notice in writing that such OS Asset is withdrawn from the sale process to (i) any Potential Buyer which has submitted a bid on such OS Asset that has been provided to such Mortgagee, (ii) the Notice Parties (as defined herein), and (iii) the Office of the United States Trustee, Attn: Jane Leamy, Esq. However, notwithstanding any such withdrawal of a property, such Mortgagee shall remain obligated to pay all Sale Expenses related to such OS Asset as provided in Paragraphs 5 through 8 of this Procedures Order. Any Mortgagee on any of the properties to be sold may bid collectively for all or less than all of the OS Assets on which it has a mortgage lien.

i.   **Auction Procedures.** The Auction will be conducted as follows:

   i.   The Auction will be conducted openly and all of the Debtors' creditors will be permitted to attend.

   ii.   Only Qualified Bidders may make any subsequent Qualified Bids at the Auction.

54

iii. At least one (1) business day prior to the Auction, each Qualified Bidder who has submitted timely a Qualified Bid must inform the Debtors whether it intends to participate in the Auction. Failure to comply with this provision may preclude an otherwise Qualified Bidder from attending and/or participating in the Auction. As soon as is practicable before the Auction, the Debtors must provide copies of the Qualified Bid the Debtors believe is the highest or otherwise best offer to all Qualified Bidders who are eligible to attend and participate in the Auction.

iv. All Qualified Bidders who have submitted a Qualified Bid shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bids will be fully disclosed to all other bidders throughout the entire Auction.

v. All Qualified Bidders attending the Auction shall agree to remain ready, willing, and able to close a Transaction with respect to specific OS Assets under the terms of their last Qualified Bid submitted at such Auction with respect to specific OS Assets as the back-up bidder (the "**Back-Up Bidder**" and such last bid, the "**Back-Up Bid**") until the earlier of (1) the close of the Transaction with respect to the specific OS Assets, or (2) July 19, 2009, and shall close if the Winning Bidder fails to close, if, as, and when determined by the Debtors to be the new Winning Bidder.

vi. The Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order entered in connection herewith.

vii. Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid. The bidding shall be in minimum increments to be set by the Debtors at the Auction. The Auction shall also continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids with full knowledge and written confirmation of the then-existing highest bid or bids.

viii. Each Qualified Bidder participating at the Auction shall represent and certify in writing at the Auction that it is not engaged in any collusion with respect to the bidding or sale.

ix. Bidding at the Auction will be transcribed or videotaped.

j. **Final Hearing**. A hearing to approve the Transactions (the "**Final Hearing**")

55

will be held on **July 2, 2009, at 10:30 a.m. (Prevailing Delaware Time).** All objections to any Transaction, including the assumption and assignment of any Assigned Contract and the proposed Cure Amount, shall be filed with the Bankruptcy Court and served on the Notice Parties on or before **June 25, 2009 at 5:00 p.m. (Prevailing Delaware Time)** (the "**Objection Deadline**"). The Winning Bidder(s) and any Back-Up Bidder(s) must produce a competent witness at the Final Hearing (and any subsequent hearing) to provide testimony, if necessary, to establish adequate assurance of future performance by each such bidder under the unexpired leases and executory contracts to be assigned to such bidder, to the extent required by Sections 365(b) of the Bankruptcy Code. At the Final Hearing, the Debtors will request that the Court approve each Transaction with regard to the Back-Up Bidder in the event the contemplated Transaction with the Winning Bidder does not timely close; in which case such Back-Up Bidder shall become the Winning Bidder without further order of the Court. At the hearing or promptly thereafter, the Court shall enter an order providing that the Winning Bidder, (i) if a Credit Buyer, will be receiving title to the OS Assets free and clear of all liens, claims, contract claims, warranties, successor liability claims, and interests, including, without limitation, those junior to the lien of the Credit Buyer, to the fullest extent permitted under Section 363 of the Bankruptcy Code, and (ii) if a Potential Bidder, free and clear of all liens, claims, and encumbrances and contract claims, warranties, and successor liability claims on the OS Assets.

k. **Closing.** The closing of a Transaction shall take place on or before **July 9, 2009**, except upon the waiver of this requirement by the Debtors.

l. **Return of Deposits.** The Deposits of all Qualified Bidders (except for the Winning Bidder) shall be held in an interest-bearing escrow account. Notwithstanding the foregoing, any Deposit, if any, submitted by the Winning Bidder, together with interest accrued thereon, shall be applied against the payment of the Purchase Price upon closing of the Transaction with the Winning Bidder. Except as otherwise provided in a Modified APA and herein, all Deposits (together with interest accrued thereon) shall be returned to each Qualified Bidder not selected by the Debtors as either the Winning Bidder or the Back-Up Bidder within five (5) business days of the adjournment of the Auction. The Deposit of the Back-Up Bidder, to the extent not designated as the Winning Bidder, shall be returned to the Back-Up Bidder within five (5) business days of the date of closing the Transaction with respect to the related OS Assets.

17. **The failure of any objecting person or entity to timely file and serve its objection to the Motion, the Transactions, or the Debtors' consummation and performance of any Modified APA, including the assumption and assignment of the Assigned Contracts, on or before the Objection Deadline shall be a bar to the assertion, at the Final Hearing or thereafter,**

56

of any objection to the Motion, the Auction, the Transactions, or the Debtors' consummation and performance of any Modified APA, including the assumption and assignment of the Assigned Contracts, if authorized by the Court.

18.     The Mortgagees are hereby deemed to be a Qualified Bidder for all purposes hereunder.  The credit bid rights of any Mortgagee are preserved in accordance with Section 363(k) of the Bankruptcy Code.  Mortgagees may bid all or any lesser amount of the total amount of the Mortgagee's allowed claims, including, but not limited to, principal, interest, late charges, attorneys' fees, advances, expenses, fees, premiums, and Sale Expenses.

19.     Any sale of the OS Assets pursuant to the Motion, this Procedures Order, and any other order of the Court approving a Transaction shall be free and clear of all claims, including, but not limited to, successor liability claims, successor development claims, condominium contract claims, condominium warranty claims, all junior lien holders and mechanic lien claims, and shall be free and clear of any liability for warranties or as a successor developer under Chapter 718, Florida Statutes, or under any similar statutory provision.

20.     The Debtors (a) shall determine, in their sole reasonable business judgment after consultation with the Mortgagees with respect to the OS Assets subject to a Qualified Bid, which Qualified Bid is the Winning Bid, after considering, among other things, the total consideration to be received by the Debtors' estate with respect to any OS Asset after taking into account the payment of liabilities to be assumed by each Qualified Bidder, (b) at the conclusion of the Auction, shall announce its determination as to the Winning Bidder submitting the Successful Bid with respect to any OS Assets, and (c) may reject, at any time before entry of a final order granting the relief sought in the Motion, any Qualified Bid that, in the Debtors' sole reasonable business judgment, is (i) inadequate or insufficient, (ii) not in

57

conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, this Procedures Order, or the terms and conditions of the APA, or (iii) contrary to the best interest of the Debtors, their respective estates, and/or its creditors, including the Mortgagees.

21.     The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

22.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

Dated: _____, 2009

_____
HONORABLE MARY F. WALRATH

UNITED STATES BANKRUPTCY JUDGE

131832.01405/11910839v.6

## Exhibit B

Sale Order

**To Be Provided**

131832.01405/11910839v.6

## Exhibit C

### Legal Description of Land

PARCEL I:

LOTS 7 AND 8, BLOCK 1, OF GALT OCEAN MILE, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 34, AT PAGE 16 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.

AND

LOT 1, OF BLOCK 5, GALT OCEAN MILE, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 34, PAGE 16, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.

PARCEL II:

LOTS 1, 2, 3 AND 4, BLOCK 1, GALT OCEAN MILE, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 34, PAGE 16, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.

AND

ALL OF THAT CERTAIN 10 FOOT ALLEY LYING IN BLOCK 1, GALT OCEAN MILE, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 34, PAGE 16, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, AND BEING BOUNDED AS FOLLOWS:

ON THE NORTH, BY THE SOUTH LINE OF LOT 4 OF SAID BLOCK 1; ON THE EAST, BY THE WEST RIGHT-OF-WAY LINE OF NORTHEAST 32ND AVENUE; ON THE SOUTH BY THE NORTH LINE OF LOTS 2 AND 3 OF SAID BLOCK 1, AND ON THE WEST BY THE EAST LINE OF LOT 1 OF SAID BLOCK 1.

AND

LOTS 2, 3, 4, 5 AND 6, BLOCK 5, GALT OCEAN MILE, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 34, PAGE 16, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.

PARCEL III:

LEASEHOLD INTEREST AS SET FORTH IN THAT CERTAIN LEASE RECORDED IN OFFICIAL RECORDS BOOK 20797, PAGE 1; AS AFFECTED BY RENEWAL OF SOVEREIGNTY SUBMERGED LANDS LEASE, RECORDED IN OFFICIAL RECORDS BOOK 28702, PAGE 967; AND ASSIGNMENT OF LEASEHOLD INTEREST, RECORDED IN OFFICIAL RECORDS BOOK 31578, PAGE 1515; AND SOVEREIGNTY SUBMERGED LANDS LEASE MODIFICATION TO REFLECT CHANGE OF OWNERSHIP, RECORDED IN OFFICIAL RECORDS BOOK 32094, PAGE 862; SOVEREIGNTY SUBMERGED LANDS LEASE RENEWAL, RECORDED IN OFFICIAL RECORDS BOOK 35126, PAGE 520; SOVEREIGNTY

131832.01405/11910839v.6

SUBMERGED LANDS LEASE MODIFICATION RECORDED IN OFFICIAL RECORDS BOOK 42849, PAGE 770; AND SOVEREIGNTY SUBMERGED LANDS LEASE RENEWAL RECORDED IN OFFICIAL RECORDS BOOK 45366, PAGE 396, PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.

PARCEL IV:

LOT 11, BLOCK 2, GALT OCEAN MILE, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 34, PAGE 16, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.

PARCEL V:

LOTS 5 AND 6, BLOCK 1 OF GALT OCEAN MILE, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 34, PAGE 16, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.

131832.01405/11910839v.6

<u>Exhibit D</u>

Permitted Encumbrances

1.      Taxes and assessments for the year **2009** and subsequent years, which are not yet due and payable.

2.      Matters appearing on the plat of GALT OCEAN MILE, recorded in Plat Book 34, page 16, including, but not limited to, any building setback lines and/or easements lying within the lot(s) described in Schedule "A"; as affected by Resolution No. 02-115 of the City Commission of Fort Lauderdale, Florida, recorded in Official Records Book 33598, page 1372.

3.      Terms, conditions and easements set forth in that certain Attendant Off-Street Parking Agreement with the City of Fort Lauderdale, recorded in Official Records Book 6051, page 301.

4.      Terms and conditions of that certain Guarantee Sewer Connection Agreement recorded in Official Records Book 7759, page 630.

6.      Terms and conditions of that certain Unity of Title Agreement with the City of Fort Lauderdale, Florida, recorded in Official Records Book 7794, page 18.

7.      Terms and conditions of that certain Agreement with the City of Fort Lauderdale recorded in Official Records Book 7985, page 59.

8.      Terms and conditions of that certain Off Street Parking Agreement with the City of Fort Lauderdale, Florida, recorded in Official Records Book 11358, page 517.

9.      Terms and provisions of that certain Sovereignty Submerged Lands Lease with the Trustees of the Internal Improvement Fund of the State of Florida recorded in Official Records Book 20797, page 1, as modified by that certain Renewal of Sovereignty Submerged Lands Lease recorded in Official Records Book 28702, page 967; by Assignment of Leasehold Interest recorded in Official Records Book 31578, page 1515; by Sovereignty Submerged Lands Lease Modification to Reflect Change in Ownership recorded in Official Records Book 32094, page 862; Sovereignty Submerged Lands Lease Renewal recorded in Official Records Book 35126, page 520; Sovereignty Submerged Lands Lease Modification recorded in Official Records Book 42849, page 770; and Sovereignty Submerged Lands Lease Renewal recorded in Official Records Book 45366, page 396.

10.     Ordinance No. C-02-17 by the City Commission of the City of Fort Lauderdale, Florida, recorded in Official Records Book 33598, page 1362.

11.     Perpetual Conservation Easement granted by the State of Florida, Board of Trustees of the Internal Improvement Fund, to Altaire Village, L.L.C., a Delaware limited liability company, recorded in Official Records Book 42641, page 1344.

131832.01405/11910839v.6

12.    South Florida Water Management District Environmental Resource Permit Notice recorded in Official Records Book 42462, page 1641.

131832.01405/11910839v.6