**EXHIBIT 1**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | **Chapter 11** |
| **In re:** | ) | |
| | ) | **Case No. 09-11390 (MFW)** |
| **OPUS SOUTH CORPORATION, et al.,** | ) | |
| | ) | |
| **Debtors.** | ) | **Jointly Administered** |
| | ) | |
| | ) | |

## FIRST AMENDED DISCLOSURE STATEMENT FOR WACHOVIA BANK, NATIONAL ASSOCIATION, AGENT'S PLAN OF LIQUIDATION FOR WATERS EDGE ONE, L.L.C. PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

David R. Kuney
Sidley Austin, LLP
1501 K. Street N.W.
Washington, D.C. 20005
(202) 736-8650

Bridget J. Hauserman
Sidley Austin LLP
787 Seventh Avenue
New York, N.Y.
(212) 839-5599

-and-

Steven K. Kortanek
Womble Carlyle Sandridge & Rice, PLLC
222 Delaware Avenue
Wilmington, DE 19801
(302) 252-4363

Counsel to Wachovia Bank, National Association, Agent

1

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE PLAN. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. THE AGENT MAY SUPPLEMENT OR AMEND THIS DISCLOSURE STATEMENT OR ANY EXHIBITS ATTACHED HERETO AT ANY TIME PRIOR TO THE HEARING TO APPROVE THE DISCLOSURE STATEMENT.**

**IMPORTANT DATES**

- Date by which ballots must be received: February 10, 2010.

- Proposed Date by which objections to Confirmation of the Plan must be filed and served: February 1, 2010 at 4:00 p.m. EST.

- Hearing on Confirmation of the Plan: February 17, 2010 at 11:30 a.m. (Prevailing Eastern Time)

# SUMMARY OF THE PLAN

**THIS IS ONLY A SUMMARY OF THE INFORMATION CONTAINED IN THE PLAN AND THIS DISCLOSURE STATEMENT. ALL CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THOSE DOCUMENTS IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.**

| | |
|---|---|
| **Plan:** | Wachovia Bank, National Association, Agent, First Amended Plan of Liquidation For Waters Edge One, L.L.C. Pursuant to Chapter 11 of the United States Bankruptcy Code, dated November 30, 2009, and as may be amended from time to time. |
| **Lenders:** | Wachovia Bank, National Association, as agent (the "<u>Agent</u>" or "<u>Wachovia</u>") and on its own behalf, and Regions Bank, PNC Bank, National Association,[1] and Bank of America,[2] and where the context so indicates, as the DIP Lenders. |
| **Debtor:** | Waters Edge One, L.L.C., a Delaware limited liability company. |
| **General Purpose:** | The Liquidation Trust, as a representative of the estate, will liquidate the Debtor's principal asset through the pursuit of litigation, defined as the RMSSR Claims. A trustee will manage the Liquidation Trust (the "<u>Liquidation Trustee</u>" or "<u>Trustee</u>") and will distribute the assets to the creditors of the Debtor's estate, as described below. |
| **Unclassified Claims:** | Unclassified Claims consist of all Administrative Claims (including the fees and reimbursable costs of the Debtor) and Tax Claims and the claims of the DIP Lenders under the DIP Facility. All Allowed Administrative Claims and Allowed Tax Claims will be paid in full generally (a) on the Effective Date, or (b) if such Claim is Allowed after the Effective Date, when such Claim is Allowed, provided however, the Plan will not pay income taxes generated by the operation of the Debtor, as such taxes, if any, are the responsibility of the owners of the Debtor. United States Trustee and other bankruptcy fees will be paid in full on or before the Effective Date or as they come due. The DIP Facility has a first priority lien on the proceeds of the RMSSR Claims, and shall receive payment in full from the RMSSR Claims before any distribution to any other creditor from the RMSSR Claims. The DIP Facility may also be repaid from an Exit Facility to be negotiated hereafter with the Liquidation Trustee. The Debtor shall return to the DIP Lenders all undisbursed funds received under the DIP Facility on the Effective Date. |
| **Classes of Claims:** | <u>Class 1</u>: Class 1 consists of Allowed Priority Claims. The Debtor has not disclosed the existence of any Priority Claims. To the extent that such Claims arise, the Plan will pay such claims in full on the Effective Date, but reserves the right to request that such claimants agree to be paid out of the net proceeds from the RMSSR Claims, after payment first to the DIP Lenders under the terms of the DIP Facility and the Pledge Agreement and the payment in full of any Exit Financing. |

---

[1] PNC Bank, National Association is the successor in interest of National City Bank.
[2] Bank of America is the successor in interest of LaSalle Bank, National Association.

**Class 2:** Class 2 consists of the Lenders' Allowed Unsecured Claim, which shall be paid pro rata with other general unsecured creditors from the net proceeds of the RMSSR Claims.

**Class 3:** Class 3 consists of all other general, unsecured creditors. Each holder of an Allowed Class 3 Claim shall receive its pro rata share of the Estate assets, and any proceeds of the RMSSR Claims, after payment in full of all Allowed Administrative Claims, the DIP Facility, any Exit Facility, Allowed Tax Claims and any additional amounts advanced by the DIP Lenders. Payment shall be made thirty (30) days after the date the RMSSR Resolution Date. Class 3 shall only be entitled to receive post petition interest on its Claim from the RMSSR Claims if there are sufficient funds to pay in full the holders of Claims under Class 2 and Class 3 from the net proceeds of the RMSSR Claims. In addition, Class 3 may be entitled to post-petition interest if there are monetary recoveries from sources other than the RMSSR Claims which generate sufficient funds to pay the holders of the Class 3 Claims in full.

**Class 4:** Holders of the Class 4 Interests shall not receive or retain any property from the RMSSR on account of such Interests unless and until the Class 2 and Class 3 Claimants are paid in full all sums due and owing in respect of their Allowed Claims, plus pre and post petition interest and other charges permitted under applicable law, from the RMSSR Claims. The holders of Class 4 Interests may also receive excess proceeds from other recoveries, excluding the RMSSR Claims, only after the holders of the Class 3 Claims have been paid in full, including all post petition interest. The Interests will not be cancelled and the Debtor may not be dissolved pursuant to 11 Del. Code § 303, until after the RMSSR Resolution Date unless the Agent and the Interest holders consent to an earlier dissolution.

**Financing:** The funding for the Plan and for the post-confirmation activities of the Trustee, will be either through the existing DIP Facility, as defined in the Plan, in the form of advances to be made prior to the effective date of the Plan of Reorganization to fund the future and estimated costs of the Trustee and if required, Administrative Expenses due on the Effective Date. Alternatively, or in addition, funding may be in the form of Exit Financing, as defined in the Plan, to be provided by the Lenders or the Exit Lenders to the Liquidation or Litigation Trustee to fund the expenses of the applicable Trust on terms substantially similar to the current DIP Facility, as described below. The Lenders may either restate and amend the DIP Facility to reflect that the Borrower shall become the Liquidation Trust, and that all of the rights and remedies of the Lenders shall survive, including the lien of the DIP Lenders under the Pledge Agreement or may utilize the Exit Financing to pay in full the DIP Facility, with the Exit Financing to be secured by, among other things, the proceeds of the RMSSR Claims.

**Effective Date:** The Effective Date will be a date selected by the Trustee which is a business day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Section 11.1 of the Plan have been (i) satisfied, or (ii) waived pursuant to Section 11.2 of the Plan.

| | |
|---|---|
| **Classes:** | Administrative Claims, Tax Claims and the Priority Claims are deemed to have accepted the Plan and are not entitled to vote. Classes 2, 3, and 4 are entitled to vote on the Plan. |
| **Voting:** | Those creditors or Interest holders entitled to vote on the Plan should complete the enclosed ballot and return it to Waters Edge One, L.L.C. Plan Voting; Attn: Ms. Pamela Groff, Womble Carlyle Sandridge & Rice, PLLC, 222 Delaware Avenue, Suite 1501, Wilmington, DE 19801. Ballots must be received on or before February 20, 2010 at 4:00 p.m. prevailing Eastern time. Only those ballots returned in a timely manner and in accordance with the accompanying notice and instructions will be counted in determining whether a particular Class of creditors has accepted or rejected the Plan. Acceptance of the Plan by a Class of Claims requires accepting votes by (1) more than one-half of the voting creditors of such class, and (2) holders of claims totaling at least two-thirds of the total amount of claims held by voting creditors of such class. Acceptance of the Plan by a class of Interests requires acceptance by at least two-thirds (2/3) in amount of the Allowed Interests of such class that have voted to accept or reject the Plan |
| **Hearing:** | The hearing on the adequacy of this Disclosure Statement will be held before Judge Walrath in Courtroom #4, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801 **on January 4, 2010 at 2:00 p.m. prevailing Eastern time.** Objections to the adequacy of this Disclosure Statement are due on or before December 28, 2009 at 4:00 p.m. prevailing Eastern time. A hearing on the Confirmation of the Plan will be held before Judge Walrath in Courtroom #4, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801 **on February 17, 2010 at 10:30 a.m. prevailing Eastern time.** Objections to the Confirmation of the Plan are due on or before _____, 2010 at 4:00 p.m. prevailing Eastern time. |
| **Additional Information:** | Requests for additional information regarding the Plan or this Disclosure Statement should be directed to the Agent's counsel: |

David R. Kuney
1501 K Street, N.W.
Washington, D.C.
dkuney@sidley.com
202-736-8650

# Table of Contents

**Page**

**IMPORTANT DATES** ................................................................................................. 2

I. INTRODUCTION .......................................................................................................1

    A.   General. ............................................................................................................ 1

    B.   Purpose of Disclosure Statement. .................................................................... 1

    C.   Defined Terms. ................................................................................................. 3

II. CONFIRMATION PROCEDURES ..........................................................................3

    A.   Classes Entitled to Vote. .................................................................................. 3

    B.   Voting on the Plan. ........................................................................................... 3

    C.   Hearing to determine adequacy of the Disclosure Statement. .......................... 4

    D.   Hearing on Confirmation of the Plan. .............................................................. 5

    E.   Acceptances Necessary for Confirmation. ....................................................... 6

    F.   Confirmation Without Unanimous Acceptances. ............................................. 6

    G.   Recommendations. ........................................................................................... 7

III. DESCRIPTION OF THE DEBTOR AND ITS BUSINESS ....................................7

    A.   Organization and Ownership. .......................................................................... 7

    B.   The Purpose of the Debtor. .............................................................................. 7

    C.   Property Financing. .......................................................................................... 8

    D.   The RMSSR Claims. ..................................................................................... 10

    E.   Events Leading to the Chapter 11 Filing. ...................................................... 11

    F.   Commencement of the Debtor's Case. ........................................................... 11

    G.   Financial Information and the Debtor's Schedules of assets and liabilities. .... 12

    H.   Liquidation of the Debtors' Estates ............................................................... 14

    I.   The Protective Advances by the Lenders. ...................................................... 16

    J.   The Global Settlement ................................................................................... 17

    K.   DIP Financing. .............................................................................................. 19

    L.   Approval of the Global settlement and entry of Final DIP Financing Order.... 20

    M.   Auction and Sale of the Property ................................................................... 21

    N.   Bar Date ........................................................................................................ 25

    O.   Waiver of Debtor's exclusive right to file a plan of reorganization ................ 25

IV. SUMMARY OF THE PLAN ..................................................................................26

A.    Overview of the Plan. ...................................................................................... 26

B.    Designation and Treatment of Claims and Interests Under the Plan. .............................. 26

C.    Implementation of the Plan. ............................................................................... 30

D.    Treatment of Executory Contracts and Unexpired Leases. ............................................ 38

E.    Distributions. .................................................................................................. 39

F.    Retention of Causes of Action. ........................................................................... 40

G.    Release, Injunctive and Related Provisions. ..................................................... 42

V. THE PLAN CONFIRMATION PROCESS ........................................................................45

A.    Acceptance and Confirmation. ............................................................................ 45

B.    Acceptance of the Plan. ..................................................................................... 45

C.    The RMSSR Claims. ......................................................................................... 46

D.    Feasibility. ...................................................................................................... 47

E.    Successor Liability. ........................................................................................... 47

F.    Risk Factors. ................................................................................................... 48

VI. BEST INTEREST TEST .............................................................................................49

VII. GENERAL FEDERAL INCOME TAX CONSIDERATIONS .............................................50

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .....51

A.    Liquidation Under Chapter 7. ............................................................................ 51

B.    Dismissal of the Bankruptcy Case. ..................................................................... 51

IX. CONCLUSION .........................................................................................................52

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | **Chapter 11** |
|  | ) |  |
|  | ) | **Case No. 09-11390 (MFW)** |
| **OPUS SOUTH CORPORATION, et al.,** | ) |  |
|  | ) |  |
| Debtors. | ) | **Jointly Administered** |
|  | ) |  |
|  | ) |  |

**DISCLOSURE STATEMENT FOR WACHOVIA BANK, NATIONAL ASSOCIATION,
AGENT'S FIRST AMENDED PLAN OF LIQUIDATION FOR WATERS EDGE ONE,
LLC  PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**I.**

**INTRODUCTION**

A.     **General.**

On April 22, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief

under Chapter 11 of the Bankruptcy Code.  On November 30, 2009, the Lenders filed the

Lenders' Plan of Liquidation, (the "Plan") and this disclosure statement (the "Disclosure

Statement").  A First Amended Plan of Liquidation was filed on or about December 31, 2009.

The Term "Plan" as used herein refers to the First Amended Plan, and any subsequent

modifications or changes.  A copy of the Plan is attached to this Disclosure Statement as Exhibit

A.

B.     **Purpose of Disclosure Statement.**

The purpose of this Disclosure Statement is to provide holders of Claims and Interests

with enough information to enable a hypothetical, reasonable creditor or Interest holder to make

an informed judgment on voting on the Plan.  This Disclosure Statement does not contain a

complete description of the Plan, the financial status of the Debtor or the Bankruptcy Code.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN, AND IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN.  IT IS INTENDED TO AID AND SUPPLEMENT SUCH REVIEW.  IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT BEFORE DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF NOVEMBER 30, 2009 AND ARE BASED ON THE FACTS KNOWN TO THE AGENT  AT THAT TIME.  THE AGENT BELIEVES  THAT THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT IS ACCURATE AS OF THAT DATE BUT NOTE THAT IT HAS RELIED PRIMARILY UPON THE INFORMATION FILED BY THE DEBTOR.

NO PERSON SHOULD CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH PERSON SHOULD CONSULT WITH THEIR OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION AND THE PLAN.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN DETERMINING WHETHER TO ACCEPT OR REJECT THE PLAN.

C.      **Defined Terms**.

Unless otherwise defined, all capitalized terms contained in this Disclosure Statement shall have the meanings ascribed to them in the Plan or where appropriate, the Global Settlement Agreement, as defined herein.[3] The rules of construction and definitions contained in the Bankruptcy Code and the Bankruptcy Rules are applicable to this Disclosure Statement.

## II.

## CONFIRMATION PROCEDURES

A.      **Classes Entitled to Vote**.

There are four (4) Classes of Claims and Interests under the Plan. Class 1 is unimpaired and is presumed to have accepted the Plan. Impaired Classes 2 through 4 are entitled to vote on the Plan.

B.      **Voting on the Plan**.

Any Claim or Interest holder whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment by the Plan is considered "impaired." Allowed Claims in Class 1 (Priority Claims) are unimpaired and deemed to have accepted the Plan. Under the Plan, holders of Allowed Claims in Class 2 (Lenders' Allowed Unsecured Claim), Class 3 (other Unsecured Claims), and Class 4 (Interests) are impaired and entitled to vote on the Plan by submitting the ballot enclosed with this Disclosure Statement.

To vote to accept or reject the Plan, holders of Claims and Interests in Classes 2 through 4 must complete and sign the enclosed ballot and return it to the following address so that it is received by 4:00 p.m. Eastern time on or before February 10, 2010 (the "Voting Deadline"):

---

[3] Any party in interest may obtain a copy of the Global Settlement Agreement by contacting counsel for the Agent at the address shown on the cover or signature page of this Disclosure Statement.

Waters Edge One, L.L.C. Plan Voting
Attn: Ms. Pamela Groff
Womble Carlyle Sandridge & Rice, PLLC
222 Delaware Avenue, Suite 1501
Wilmington, Delaware  19801

Ballots that are validly executed, but do not clearly indicate rejection of the Plan shall be deemed to constitute a vote to accept the Plan.

**ONLY PROPERLY COMPLETED BALLOTS RETURNED BEFORE THE VOTING DEADLINE WILL BE COUNTED IN DETERMINING WHETHER A PARTICULAR CLASS OF CREDITORS HAS ACCEPTED OR REJECTED THE PLAN.**

C.      **Hearing to determine adequacy of the Disclosure Statement.**

The Bankruptcy Court has scheduled a hearing on the adequacy of this Disclosure Statement for January 4, 2010 at 2:00 p.m. prevailing Eastern time.  The hearing will be held before The Honorable Mary F. Walrath, United States Bankruptcy Judge, in Courtroom #4, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801.  The hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than by announcement of the next adjourned date in open court.

Objections to the adequacy of this Disclosure Statement must be in writing and filed and served so that any objections are received on or before December 28, 2009 at 4:00 p.m. (Eastern time) by (a) counsel to the Agent at Sidley Austin LLP, 1501 K Street N.W., Washington, D.C. 20005, David R. Kuney, and at Womble Carlyle Sandridge & Rice, PLLC, 500 Delaware Avenue, Suite 1501, Wilmington, DE 19801, Steven K. Kortanek, (b) counsel to the Debtors, Greenberg Traurig, LLP, 1007 North Orange Street, Suite 1200, Wilmington, DE 19801, Victoria W. Counihan, and (c) the Office of the United States Trustee at 844 King Street, Room 2207, Lockbox #35, Wilmington, DE 19899-0035, Attn: Jane M. Leamy, Esq.

**D.**     **Hearing on Confirmation of the Plan.**

The Bankruptcy Court has scheduled a hearing on Confirmation of the Plan for February 17, 2010 at 11:30 a.m. prevailing Eastern time. The hearing will be held before The Honorable Mary F. Walrath, Bankruptcy Judge, in Courtroom #4, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801. The hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than by announcement of the next adjourned date in open court.

Objections to the Confirmation of the Plan must be in writing and filed and served as required by the Bankruptcy Court pursuant to the scheduling order, entered by the Bankruptcy Court on _____, 2010, so that any objections are received on or before _____, 2010 at 4:00 p.m. (Eastern time) by (a) counsel to the Agent at Sidley Austin LLP, 1501 K. Street N.W., Washington, D.C. 20005, David R. Kuney, and Womble Carlyle Sandridge & Rice, PLLC, 500 Delaware Avenue, Suite 1501, Wilmington, DE 19801, Steven K. Kortanek, (b) counsel to the Debtors, Greenberg Traurig, LLP, 1007 North Orange Street, Suite 1200, Wilmington, DE 19801, Victoria W. Counihan, and (c) the Office of the United States Trustee at 844 King Street, Room 2207, Lockbox #35, Wilmington, DE 19899-0035, Attn: Jane M. Leamy, Esq.

At the hearing on February 17, 2010, the Bankruptcy Court will (1) determine whether the requisite vote has been obtained for each Class; (2) hear and determine objections, if any, to the Plan and to Confirmation of the Plan that have not been previously disposed of; (3) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and (4) determine whether to confirm the Plan.

E.      **Acceptances Necessary for Confirmation.**

An impaired class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims of such Class that have voted to accept or reject the Plan All Claims shall be allowed for voting purposes unless a Claim is determined not to be an Allowed Claim prior to the hearing on Confirmation of the Plan.

A Class of Interests shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount of the Interests that have voted to accept or reject the Plan.

Unless there is unanimous acceptance by an impaired Class of Claims, as an additional requirement for Confirmation, the Bankruptcy Court must determine that the members in each Class will receive property of a value, as of the Effective Date of the Plan, that is not less than the value that each such Class member would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

F.      **Confirmation Without Unanimous Acceptances.**

The Bankruptcy Code does not require every Class of Claims and Interests to accept the Plan in order for the Plan to be confirmed.  If the Plan is not accepted by every Class, the Bankruptcy Court may nonetheless confirm the Plan so long as (1) at least one impaired Class of Claims has voted to accept the Plan, and (2) the Bankruptcy Court holds that the Plan does not "discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not voted to accept the Plan.  This authority requires, among other things, that a secured creditor of a non-accepting impaired Class either (a) retain its lien on the property securing its claim and receive deferred cash payments totaling at least the allowed amount of such claim or (b) if the property securing such lien is sold, the lien must attach to the proceeds of the sale in the same priority and effect as it had in the underlying collateral.  Unsecured creditors of a non-accepting

impaired Class must either receive property equal to the allowed amount of their claims, or, if they receive less than such value, no Class with a lower priority may receive or retain any property under the Plan, on account of such Claims or Interest, without the consent of such dissenting impaired Class. **IN THE EVENT AT LEAST ONE IMPAIRED CLASS OF CREDITORS VOTES TO ACCEPT THE PLAN, IT IS THE AGENT'S INTENTION TO INVOKE THE PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE.**

G.      **Recommendations.**

The Agent recommends that all holders of Claims and Interests vote to accept the Plan.

III.

**DESCRIPTION OF THE DEBTOR AND ITS BUSINESS**

A.      **Organization and Ownership.**

The Debtor was formed on August 23, 2005 and is a wholly-owned subsidiary of Opus South Development, L.L.C., a non-bankruptcy entity ("OSD"). OSD currently owns all Interests in the Debtor.

B.      **The Purpose of the Debtor.**

The Debtor was formed for the purpose of acquiring land to develop and dispose of the real estate development project commonly known as Waters Edge located in Clearwater Florida (the "Waters Edge Project"). The Waters Edge Project, which is a condominium building with approximately 153 residential units and 10,000 square feet of retail space was developed by the Debtor. Opus South Contractors was the contractor. The Waters Edge Project was operated and managed by an independent manager, Opus South Corporation ("Opus South"), which provided the labor force for the day-to-day operation of the Waters Edge Project.

7

## C.    **Property Financing.**

On or about October 26, 2005, Wachovia Bank, Regions Bank, Bank of America, and PNC Bank, National Association (each, a "Prepetition Waters Edge Lender", and collectively, the "Lenders") made a syndicated construction loan to Waters Edge, in the principal amount of $90,000,000 (which was subsequently reduced to $82,000,000), with non-default interest at a variable rate.  Wachovia is the Administrative Agent for the Lenders.  The Prepetition Waters Edge Loan is evidenced by four promissory notes (one executed by Waters Edge in favor of each of the Lenders), each dated May 30, 2008, in the aggregate amount of $82,000,000 (together with all amendments and modifications thereto entered into prior to the date hereof, the "Waters Edge Notes").

Payment and performance of Waters Edge's obligations under the Waters Edge Notes and the other loan documents executed in connection therewith (collectively, the "Prepetition Waters Edge Loan Documents") were secured by, and the Administrative Agent is the holder of, among other things: (i) a first lien mortgage on certain real property of Waters Edge located in Pinellas County, Florida, commonly known as the Waters Edge Condominium Building (the "Waters Edge Property"), which mortgage was recorded with the Clerk of the Circuit Court of Pinellas County, Florida on October 27, 2005 as Instrument Number 2005430611; (ii) a first lien mortgage on certain real property of Clearwater, located in Pinellas County, Florida, commonly known as Clearwater Bluff (the "Clearwater Property"), which mortgage was recorded with the Clerk of the Circuit Court of Pinellas County, Florida on October 27, 2005 as Instrument Number 2005430613.

On or about October 26, 2005, in connection with the initial closing of the Prepetition Water Edge Loan, Opus South Corporation executed and delivered to the Lenders a written

guaranty of the full and punctual payment and performance of all of Waters Edge's obligations under the Prepetition Waters Edge Loan Documents.

Sometime in late 2007, Waters Edge discovered a material defect (the "Material Contract Defect") in all of its executed contracts for the purchase of individual condominium units in the Waters Edge Property. This Material Contract Defect is alleged to have entitled each of the purchasers under those contracts to cancel their contracts, and substantially all of the purchasers under those contracts did in fact cancel their contracts. This Material Contract Defect gave rise to the RMSSR Claims (as defined and explained below). As a result of the cancellations described above, Waters Edge was in violation of certain covenants in the Prepetition Waters Edge Loan Documents, including, without limitation, certain covenants relating to minimum condominium unit sales.

On April 30, 2008, in view of the loan defaults described above, Opus Corporation, a Minnesota corporation ("Opus Corporation") (which is the parent of Opus South but is not itself a Debtor), provided to the Lenders a letter (as amended by a subsequent letter dated May 29, 2008, the "Capital Funding Commitment Letter"), pursuant to which, among other things, Opus Corporation agreed to fund amounts sufficient to satisfy certain obligations of Waters Edge under the Prepetition Waters Edge Loan Documents.

On May 30, 2008, Waters Edge, the Agent and the Lenders entered into certain additional Prepetition Waters Edge Loan Documents and certain amendments to the existing Prepetition Waters Edge Loan Documents (collectively, the "Second Amendment Documents") which provided for certain accommodations to Waters Edge, including, without limitation (collectively, the "Waters Edge Accommodations"): (i) the extension of the Prepetition Waters Edge Loan maturity date by two years (to September 30, 2010); and (ii) concessions related to Waters

Edge's compliance with certain covenants in the original Prepetition Waters Edge Loan Documents, including, without limitation, certain covenants related to the sale of condominium units in the Waters Edge Property.

In exchange for the Waters Edge Accommodations, OSD executed that certain Collateral Assignment of Note and Mortgage (the "Collateral Assignment") dated May 30, 2008, which was recorded with the Clerk of the Circuit Court of Pinellas County, Florida on June 3, 2008 as Instrument Number 2008151039, pursuant to which, among other things, OSD collaterally assigned to the Administrative Agent its first-position mortgage (the "OSD Mortgage") on certain real property of 400 Beach Drive, located in Pinellas County, Florida, commonly known as the 400 Beach Drive Condominium Building (the "400 Beach Property," together with the Waters Edge Property and the Clearwater Property, the "Subject Properties") and a note (the "OSD Note") in the principal amount of $32,000,000 secured thereby.

On December 18, 2008, Waters Edge and Guarantor caused 400 Beach to grant, as additional collateral, a second lien mortgage (behind the OSD Mortgage) on the 400 Beach Property to the Prepetition Waters Edge Lenders, which mortgage was recorded with the Clerk of the Circuit Court of Pinellas County, Florida on December 19, 2008 as Instrument Number 2008337586 (the "400 Beach Mortgage").

The outstanding balance of the Waters Edge loan as of April 1, 2009, was approximately $69,856,024.31.

## D.  The RMSSR Claims

Prior to the commencement of the case, Waters Edge had been and is currently pursuing claims against Ruden, McClosky, Smith, Schuster & Russell, P.A. and Mark Grant (collectively, the "RMSSR Parties") pursuant to that certain case described as follows:  Waters Edge One, L.L.C. v. Ruden, McClosky, Smith, Schuster & Russell, P.A and Mark Grant, (Case No.

08012052CI-020) in the Circuit Court of the Sixth Judicial District in and for Pinellas County Florida (together with any and all actions, proceedings, cases, amendments, and appeals arising from the same facts and circumstances, thereof, but shall not include any claims against the Debtor's officers, directors or employees (the "RMSSR Claims"). The subject matter of the RMSSR Claims relates to legal services provided in connection with the Waters Edge Property. Under the terms of the DIP Facility, described below, Waters Edge granted to the DIP Lenders, a first priority perfected security interest in and to certain collateral, including the proceeds of the RMSSR Claims, as defined in a certain Pledge Agreement, which Pledge Agreement is attached to the DIP Loan Agreement, to secure any and all obligations of Waters Edge arising under the DIP Loan Agreement. See Motion for DIP Financing, Dkt. No. 557, at ¶12.

**E.      Events Leading to the Chapter 11 Filing.**

Prior to the Petition Date, the Debtors (or certain of the Debtors referred to as the "Opus Debtors") asserted that they contacted each of their lenders in an effort to restructure their underlying loans and/or to facilitate a turnover of the associated collateral through a deed-in-lieu process.[4] These efforts, however, did not result in a resolution of all issues with regard to the Opus Debtors' pre-petition secured loans. The Opus Debtors also attempted to raise capital or refinance and invoke cost-savings measures and internal controls and procedures, but were unable to avoid filing the chapter 11 cases.

**F.      Commencement of the Debtor's Case.**

On April 22, 2009 (the "Petition Date"), Opus South Corporation and various of direct and indirect subsidiaries filed for relief under Chapter 11 of the Bankruptcy Code. The Debtor entities were the following: Opus South Corporation; Opus South Contractors, L.L.C.; Altaire

---

[4] These factual assertions concerning the Debtor are based upon prior pleadings submitted by the Debtors, including but not limited to the Declaration of Ann Marie Soldberg, the Chief Restructuring Officer, dated April 22, 2009 and filed in these proceedings at Docket number 3.

Village, L.L.C.; Clearwater Bluff, L.L.C. ("Clearwater"); Calm Waters, L.L.C.; Waters Edge;

Laguna Riviera Ventures, L.L.C.; 400 Beach Drive, L.L.C. ("400 Beach"); Nature Coast

Commons, L.L.C.; Shoppes of Four Corners, L.L.C.; and 8th & 14th, L.L.C. (Referred to herein

collectively as the "Debtors" unless the context signifies otherwise.) On April 28, 2009, the

Court entered an order administratively consolidating each of the Debtors' affiliated cases. (Dkt.

No. 38.) On May 14, 2009 the Court entered an Order authorizing the Debtor, Waters Edge, to

retain the law firm of Greenberg Traurig as counsel, *nunc pro tunc* to the Petition Date.

On or about April 22, 2009, the Debtors filed certain "first day" applications and motions

(collectively, the "First-Day Motions"). In the First-Day Motions, the Debtors sought, among

other things, to: (a) establish procedures for the efficient administration of these cases; (b)

continue the Debtors' operations while in Chapter 11 with as little disruption as possible; (c)

maintain the confidence and support of key constituencies and employees; (d) obtain the use of

cash collateral; (e) dispose of substantially all of the assets of the Debtors' estates on an

expedited basis; and (f) retain appropriate professionals.

**G.** **Financial Information and the Debtor's Schedules of Assets and Liabilities.**

At the commencement of the case the Debtors sought authority to defer the filing of the

Debtors Schedules of Assets and Liabilities. (Dkt. No. 53.) On June 9, 2009 Waters Edge filed

its Schedules of Assets and Liabilities and Statements of Financial Affairs with the Bankruptcy

Court, which described its assets and liabilities, stating that such information was to the best of

the Debtor's knowledge (the "Debtor's Schedules"). (Dkt. No. 248.) The Debtor's Schedules

and monthly operating reports are available for public inspection in the office of the Clerk of the

United States Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware

19801 during regular business hours or by visiting the United States Bankruptcy Court's website

at www.deb.uscourts.gov. The information contained in the Debtor's Schedules includes the following:

**Assets**: As of the Petition Date, the Debtor states that its assets were comprised of the following:

| | |
|---|---|
| Real Property: | $93,978,000.00[5] |
| Personal Property: | $ 76,795.73 |
| Total: | $94,054,795.73 |

**Liabilities:** As of the Petition Date, the Debtor's liabilities were stated by the Debtor to be comprised of the following:

| | |
|---|---|
| Secured Claims | $70,261,538.00 |
| Priority Claims | $800.00 |
| Unsecured Non-priority Claims: | $501,763.92 |
| Total: | $70,764,101.92 |

The Agent believes that the Real Property value shown above was substantially overstated. As of the date of this Disclosure Statement, the Debtor no longer owns any real property assets. Schedule B of the Debtor's Schedules does not identity any value to the RMSSR Claims. The value of the RMSSR Claims is difficult to estimate given the exigencies of litigation. It is believed that there may be insurance for the claims, but the Agent is unaware of what defenses, if any, to coverage have been, or may be asserted. There may be other claims against the same insurance policy. The Lenders' Allowed Unsecured Claim (as defined by the Plan), and established pursuant to the Global Settlement Agreement and the Sale Order (below) was approved by the Bankruptcy Court is in the approximate amount of $39 million. (See discussion below.) Based on present information, the Agent does not believe that the net

---

[5] These values did not reflect actual fair market value, as evidenced by the subsequent Auction, discussed below.

distribution from the RMSSR Claims, after payment of the DIP Facility, will generate sufficient funds to pay all unsecured creditors in full.

## H.    <u>Liquidation of the Debtors' Estates</u>

In the affidavit supporting the First Day Motions, the Debtors informed the Court that they had been experiencing severe financial difficulties, that efforts to recapitalize or otherwise find financial solutions had not been successful, and that the Debtors, including Waters Edge, were now forced to liquidate their real property holdings through a bankruptcy sales process. The Declaration of the Chief Restructuring Officer, Ann Marie Solberg, stated as follows:

> Over the past several years, the Debtors have realized a decline in financial performance. As a result, the Debtors have faced a series of challenges for their businesses, including defaults under certain of their credit facilities and constrained liquidity. The problems faced by the Debtors are detailed further in Part III of this Declaration.
>
> In order to address the issues facing the Debtors' business, the Debtors undertook a series of activities designed to recapitalize the Debtors or provide another solution for their businesses. Initially, the Debtors focused on recapitalizing through financing and/or generating income through potential asset sales. However, due to the poor market conditions, such attempts to recapitalize have been unsuccessful.

Solberg Declaration, ¶¶10-11. (Dkt. No. 3.)

Due to their inability to sell their assets, or otherwise obtain financing, the Debtors announced their intention to liquidate their estates and to sell their real estate holdings: "A disposition of substantially all of the Debtors' assets is necessary at this time in order to maximize the Debtors' opportunities and realize any value for unsecured creditors. All other options would eclipse such value." *Id*. at ¶69¶. (Dkt. No. 3.)

In order to facilitate their anticipated liquidation of its real estate holdings, the Debtors retained Chatham Financial Corporation ("<u>Chatham</u>"). On May 8, 2009, the Debtors filed a motion entitled, Application of the Debtors for Order Authorizing Retention and Employment of

Chatham Financial Corp. as Financial Advisors and Real Estate Brokers to the Debtors, *Nunc Pro Tunc*, as of the Petition Date. (Dkt. No. 114.) Among its other responsibilities, Chatham was engaged to actively market the Debtors' real estate holdings. *Id*. at ¶11. The Court entered an Order approving the retention of Chatham, *nunc pro tunc*, to the Petition Date, on May 22, 2009. (Dkt. No. 191.)

In furtherance of their plan to liquidate their holdings, on April 22, 2009, the Petition Date, certain of the Debtors filed a Motion to (1) Approve Bidding Procedures In Advance of Auction, (2) Approve Form and Manner of Notice of Proposed Cure Amounts, Auction, And Final Hearing, and (3) Grant Related Relief (the "Bidding Procedures Motion"). (Dkt. No. 10.) In the Bidding Procedures Motion, the Debtors sought to establish procedures for liquidating their principal real estate holdings in each of the affiliated Debtors, including Waters Edge.

On May 5, 2009, Wachovia timely objected to the Bidding Procedures Motion asserting, among other things, that the sale of the properties subject to the Lenders' liens could not proceed under 11 U.S.C. § 363 without its consent and that the Bidding Procedures Motion did not protect their interests. (Dkt. No. 84.) On May 18, 2009, the Court conducted a hearing on the Bidding Procedures Motion which was limited to the approval of the bidding procedures portion of the motion and did not address the sale of the Waters Edge Property; this approval was subsequently granted, but only as part of a "Global Settlement" as more fully described below. Pursuant to an agreement, Chatham commenced its marketing activity of the Waters Edge Property on or about this date, despite the absence of any agreed order permitting the sale. That marketing activity was reported by the Debtor as generally continuing until the Auction, described below.

## I.    The Protective Advances by the Lenders.

During the course of the case, the Debtors informed the Court that Waters Edge could not generate sufficient cash on a monthly basis to pay <u>any</u> expenses being incurred by Waters Edge or by the homeowners' association at the Waters Edge; in part because it lacked any cash flow and because the Debtor was unwilling to sell the remaining units in the Waters Edge Project. Accordingly, on April 22, 2009 the Debtors filed a Motion seeking bankruptcy court approval for the entry of interim and final orders authorizing the use of cash collateral.  (Dkt. No. 9.)[6]  The Motion stated that the Debtors lacked sufficient funds to pay for electricity, water, sewer and other utilities, maintenance, facility management, security and other essential items at Waters Edge.  *Id*. at ¶8.  The Debtors informed the Court that absent immediate authority to use the Cash Collateral, the Debtors would not have sufficient funds to maintain the Properties.  *Id*. at 19.  The Debtors further informed the Court that certain vendors and service providers had notified Waters Edge that they did not intend to continue to provide services unless they were paid for their post petition services.  *Id*. at 8.

In view of the Debtor's inability to fund the operations and maintenance of the Waters Edge Property, the Lenders entered into various agreements in which the Lenders undertook to provide the necessary funding for the Waters Edge Property during the course of this case.  On May 7, 2009, the Debtor and Wachovia, as Agent, filed a joint motion seeking authority for Wachovia to make immediate protective advances to pay critical expenses.  (Dkt. No. 103.)  On May 12, 2009 the Court entered an Interim Order Authorizing Wachovia Bank to Make Immediate Protective Advances to Pay Critical Expense at the Waters Edge Project and to Pay Additional Critical Expenses at the 400 Beach Drive Project.  (Dkt. No. 128.)  The Court ruled

---

[6] Debtors' Motion Pursuant to Sections 105(a), 361, 362, 363 and 552 of the Bankruptcy Code and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure for Entry of Interim and Final Orders (1) Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, and (3) Scheduling a Final Hearing.

that these advances were to be considered as protective advances and constituted additional mortgage debt under the mortgage held by the Lenders. *Id.* at ¶2. Accordingly, by virtue of this Interim Order, the Lenders had agreed to fund certain post-petition operations of Waters Edge in recognition of the Debtors' inability to do so. On June 12, 2009 the Court entered a Final Order approving the Protective Advances. (Dkt. No. 268.)

On June 19, 2009 the Debtor and Wachovia filed another Emergency Motion to Pay Critical Expenses at the Waters Edge Project (Dkt. No. 103) seeking authority to permit Wachovia, as agent for the Lenders, to advance $359,919 for the period between June 14 and August 2, 2009, again reflecting that the Debtor lacked sufficient resources to maintain and operate the Waters Edge Property. On June 25, 2009 the Court entered an Interim Order Authorizing Wachovia Bank to Make Immediate Protective Advances to Pay Critical Expenses at the Waters Edge Project and to Pay Additional Critical Expenses at the 400 Beach Drive Project. (Dkt. No. 335.)

Among other things, the Protective Advances Order provided that if DIP Financing was later approved the amounts previously advanced under the Protective Advance Orders would be deemed made under the DIP Loan Agreement, and entitled to the same protection as such DIP Loan Agreement.

**J.       The Global Settlement Agreement**

On August 24, 2009 the Debtors filed their Motion of Certain Debtors for An Order Authorizing the Debtors to Enter Into a Settlement Agreement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedures. (Dkt. No. 556.) This Motion sought Court approval of a "global settlement" between the Lenders, Waters Edge, and other Debtors and non-debtors.

The Global Settlement Agreement achieved a number of goals. First, the Global Settlement Agreement provided for a consensual agreement by and among Wachovia, as Agent,

the Prepetition Waters Edge Lenders, and the Debtors to sell the "Subject Properties" as defined in the Motion, under 11 U.S.C. § 363. Second, despite the possibility of a large deficiency claim following the sale of the Subject Properties, the Lenders agreed, upon satisfaction of the conditions set forth in the Global Settlement Agreement, to the release of Opus South's guaranty and the Capital Funding Commitment Letter obligations, although the rights with respect to an affiliated Debtor, Calm Waters, were preserved.[7] Third, the Global Settlement Agreement provided for post-petition DIP financing by Wachovia, as Agent for the DIP Lenders, which would (i) incorporate the Protective Advances to pay the operating expenses of the Subject Properties, as set forth in agreed budgets, in order to preserve their values prior to a sale, (ii) provide additional funding to pursue the RMSSR Claims, and (iii) provide the funding necessary to permit Waters Edge to file and seek confirmation of a plan of reorganization. At the time of the filing of the Motion, it was anticipated that the RMSSR Claims may generate sufficient funds to make a substantial payment for the Wachovia deficiency claim (after a sale) and for the general unsecured claims of other Waters Edge creditors. Wachovia agreed not to seek or assert an administrative claim for this DIP Facility, but to look solely to the proceeds of the RMSSR Claims, thus assuring that the Estate would not suffer from an administrative insolvency. The Lenders also agreed that the DIP Facility would not be secured by any claims of Waters Edge under Section 544, 545, 546, 547, 548, 550 and 551 of the Bankruptcy Code.

In exchange, Opus South agreed, among other things, to provide certain assurances to Wachovia with respect to certain historic financial information given to Wachovia by Opus

_____

[7] Notwithstanding anything to the contrary in the Plan or Disclosure Statement, nothing in the Plan shall affect the rights of Wachovia, in its separate capacity as a lender to Calm Waters, LLC, to pursue all rights, claims and remedies it may have with respect to Calm Waters, including but not limited to any rights it may have under the Capital Funding Commitment Letter, and the assertion of a deficiency claim against Calm Waters as permitted by the Court's order dated July 29, 2009, entitled Order (1) Approving Bidding Procedures in Advance of Auction, (2) Approving Form and Manner of Notice of Proposed Cure Amounts, Auction, and Final Hearing, and (3) Granting Related Relief with Respect to Certain Properties. (the "Bidding Procedures Order," (ECF Dkt. 494)).

South.  The Debtors further agreed to the entitlement of the Lenders to credit bid at a sale under

11 U.S.C. § 363, and to stipulate to the amount, allowability, validity, non-avoidability and

priority of the Lenders' claim and security interest in the Subject Properties.

As part of the Global Settlement Agreement, certain of the Debtors (including 400 Beach

and Clearwater LLC) and OSD, agreed to stipulate to a binding determination of the amount,

priority, and non-avoidability and allowability of the Lenders' Allowed Claim, and Allowed

Unsecured Claim, and the validity of their liens and collateral, and to release the Lenders from

all defenses, counterclaims, third party claims, offsets, recoupment and avoidance actions.

The Global Settlement Agreement also provided for the creation of a Litigation Trust to

pursue the RMSSR Claims on behalf of the Debtor's Estate.  The Debtor and the Lenders agreed

to the terms governing the formation and duties of the Litigation Trust, which was previously

submitted to the Court as a draft and which has subsequently been finalized and filed with the

Bankruptcy Court (the "Litigation Trust").  Upon the Effective Date the Litigation Trust will be

converted into, or succeeded by the Liquidation Trust (or other estate representative) as provided

for under the Plan, or alternatively, the Litigation Trust will become a sub-trust under the

Liquidation Trust.

**K.      DIP Financing.**

On August 24, 2009, in conjunction with the Global Settlement Motion, the Debtor filed

its Motion of Waters Edge One, L.L.C. Requesting Entry of an Interim and Final Order

Authorizing Borrowing with Priority Over Administrative Expenses and Secured by Liens on

Property of the Estate Pursuant to Section 364(c) and (d) of the Bankruptcy Code and Scheduling

of a Final Hearing On Requested Final Relief.  (Dkt. No. 557.)  The Motion stated that the DIP

Lenders would make advances in an aggregate amount up to $4,398,585, including an initial

advance of $1,500,000, subject to the terms of the "Waters Edge Loan Agreement," (the "DIP

Facility") which was attached to and incorporated into the Motion. The DIP Facility is due and payable twelve months after the effective date of the DIP Facility, or, upon the Effective Date of a plan of reorganization confirmed in the Chapter 11 Case of Waters Edge.

The DIP Motion also provided that in order to secure the obligations of Waters Edge with the respect to all DIP Obligations, as defined in the DIP Loan Agreement, the DIP Lenders were granted liens and security interests on substantially all of the Water Edge's property, including the proceeds of the RMSSR Claims (the "DIP Collateral").

**L.**  **Approval of the Global Settlement Agreement and entry of Final DIP Financing Order**

On September 9, 2009 the Global Settlement Agreement was approved by the Court (the "Global Settlement Order"). ( Dkt. No. 611.) The Global Settlement Order provided, among other things, that upon the entry of both a Sale Order (see below) and a Final DIP Financing Order, for which no stay has been obtained within ten (10) days of the entry of such order, the Administrative Agent, on behalf of the Waters Edge Lenders, "is hereby deemed to have an allowed claim, in connection with the Waters Edge Loan, in an amount not less than $70,796,928.98, plus other amounts permitted by the Bankruptcy Code and other applicable law, costs and attorneys fees allowable under the Bankruptcy Code. . . which shall be allowed for all purposes in the Chapter 11 Case of Waters Edge without, and the Debtors shall waive, any offset, deduction, defense, counterclaim, subordination, avoidance action under Chapter 5 of the Code, recharacterization, or the like. . . ."

The Global Settlement Order also approved the form of the Litigation Trust and authorized the parties to finalize and obtain execution of such Litigation Trust. On September 9, 2009, the Court also entered an Order approving the Bidding Procedure Motion with respect to the Subject Properties. (Dkt. No. 608.)

On September 9, 2009, the Court entered its Final Order (I) Authorizing Waters Edge One, L.L.C. to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363 (e), 364(c), 364(d)(1) and 364(e), and (II) Granting Related Relief (the "Final DIP Order"). (Dkt. No. 609.) Among other things the Final DIP Order granted to the Lenders to the extent of any advances received by the Debtor under the DIP Facility a first priority priming security interest in and liens upon the proceeds of the RMSSR Claims (as defined in the DIP Loan Agreement) and all other prepetition and post petition property of Waters Edge that was not already subject to a valid, perfected and non-avoidable lien and all other collateral as defined in the Pledge Agreement.

## M.    Auction and Sale of the Property

On October 1, 2009, Chatham conducted an auction sale (the "Auction") of the Waters Edge Property , along with the real estate projects owned by Clearwater and 400 Beach.  Prior to the sale, Chatham had undertaken extensive marketing, including contacting thousands of potential buyers listed on its proprietary data-base and national advertising.  At the Auction, numerous potential bidders appeared, and various competing bids were submitted.  The Lenders submitted the highest bid, this being a credit bid of $20 million.  The second highest bid was $19.5 million in cash from Perez Ross Holdings, LLC, which was then designated the back-up bidder.

On October 6, 2009 the Debtor filed its Notice of Auction Results.  (Dkt. No. 698.)   The Notice of Auction Results stated, among other things, that the Auction had been conducted, per the prior Court order, that the Successful Bidder was Waters' Edge Clearwater, LLC (assignee of the Lenders) which submitted a credit bid in the amount of  $20 million.  Wachovia, as Agent and the certain of the Debtors thereupon entered into an Asset Purchase Agreement for the Waters Edge Property.  In addition, the Debtor filed its Notice of Auction (Dkt. No. 697) stating,

among other things, that the Lenders' assignee, Redus 400 Beach, LLC was the successful bidder for 400 Beach, with a credit bid of $9.0 million. Further, the Debtor filed its Notice of Auction (Dkt. No. 696) stating, among other things, that the Lenders' assignee, Redus Clearwater Bluff, LLC, was the successful bidder for Clearwater Bluff with a credit bid of $1.6 million. All of the credit bids were later applied in reduction of the Lenders' Allowed Claim.

On October 7, 2009, the Court entered its Order (1) Approving Sale of Certain Assets of the Debtor Waters Edge One, L.L.C. Free and Clear of All Liens, Claims, Encumbrances, and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), (f), and (m) and (2) Granting Related Relief (the "Sale Order.") (Dkt. No. 703.) The Sale Order approved the sale of the Waters Edge Property to the Lenders' assignee free and clear of all liens, claims, leases, encumbrances, condominium contract claims, interests, contract rights and tort claims, and the like, including but not limited to, successor liability claims, successor developer claims, condominium warranty claims, all junior lien holders and mechanics lien claims, and any successor developer liability including without limitation, any express or implied warranties under Fla. Stat. Ann. § 718.203 or any similar or related statute, pursuant to section 363 of the Bankruptcy Code. The Sale Order approved the Debtor entering into and consummating the Asset Purchase Agreement with the Lenders, or its Assignee. In addition, the Court entered orders approving the sale of the assets of the Debtor 400 Beach (Dkt. No. 704) and Clearwater (Dkt. No. 705)(collectively with the Sale Order, the "Sale Orders.") The Plan incorporates and adopts the provisions of the Sale Orders.

On or about October 16, 2009, the closing on the sale occurred, pursuant to the Sale Order, and title to the Waters Edge Property was conveyed to Waters Edge Clearwater, L.L.C., the assignee of the Lenders.

Prior to the sale, and pursuant to the Global Settlement Agreement, the Lenders were deemed to have an allowed claim in an amount not less than $70,796,928.98 plus other amounts permitted by the Bankruptcy Code and other applicable law, costs and attorneys fees allowable under the Bankruptcy Code (the "Lenders' Allowed Claim"). The Global Settlement Agreement further provided for the calculation of an Allowed Unsecured Claim following the sale of the Subject Properties. The Sale Order provided that the Lender's Allowed Unsecured Claim shall be, in an amount equal to the difference of (A) the sum of (1) $70,796,928.98 plus (2) other amounts permitted by the Bankruptcy Code and other applicable law, plus (3) costs and attorneys fees allowable under the Bankruptcy Code; minus (b) the sum of (1) the deemed consideration for the assignment of the OSD Note of $8.0 million, plus (2) any amount of the accepted cash or credit for the purchase of the Subject Property of 400 Beach Drive that is in excess of $8 million, plus (3) the accepted cash or credit bid for the purchase of the Subject Property of Waters Edge One, L.L.C., plus (4) the accepted cash or credit bid for the purchase of the Subject Property of Clearwater. Sale Order, at ¶7.

In addition certain adjustments have been made to the Lenders' allowed unsecured claim. Prior to closing the sale of the Waters Edge Property (the "Closing"), Lenders were made aware of two potential refunds (collectively, the "Refunds") owed to the owner of the Waters Edge Property resulting from the participation by Waters Edge in various government incentives programs. Waters Edge agreed to assign all of its rights to such Refunds to Lenders at Closing pursuant that certain Assignment of Licenses, Permits, Warranties and Intangibles dated October 16, 2009 (the "Assignment").

The first Refund is a refund of sales taxes on construction materials used in the construction of the Waters Edge Property by virtue of the Waters Edge Property being in a State

of Florida "Enterprise Zone" (specifically, City of Clearwater Enterprise Zone #5202). The total amount of this Refund was $807,076.22. This amount was paid to Waters Edge directly by the State of Florida and was subsequently transferred by Waters Edge to Agent for the benefit of the Lenders on November 3, 2009. Pursuant to the Assignment, Lenders agreed that their allowed unsecured claim would be reduced by one dollar ($1) for every one dollar ($1) actually received by Lenders from the State of Florida in connection with the Enterprise Zone Program for the Waters Edge Property. Accordingly, Lenders have reduced the amount of their allowed unsecured claim by $807,076.22 as a result of the payments received from the State of Florida in connection with the Enterprise Zone Program.

The second Refund is a refund for certain impact fees and public infrastructure improvements that is owed by the City of Clearwater in connection with that certain Development Agreement (Waters Edge Development) by and between the Community Redevelopment Agency of the City of Clearwater, Florida, a public body corporate and politic of the State of Florida created pursuant to Part III, Chapter 163, Florida Statutes (the "City"), and OSD, dated December 19, 2006 (the "Development Agreement"). Pursuant to the Assignment, Lenders agreed that their allowed unsecured claim would be reduced by $300,000 in exchange for the assignment to Lenders of all of OSD's rights under the Development Agreement at Closing. This was done instead of a $1/$1 reduction as funds are actually received by the Lenders (as was done with the Enterprise Zone Program payments described in the previous paragraph) because it may take some time for the City to make its reimbursement payments under the Development Agreement. No amounts have been received by Lenders from the City pursuant to the Development Agreement as of the date hereof.

Unless a prior court order is entered, the Agent may request that the entry of an order by the Court confirming the Plan shall constitute a good faith settlement of these payments pursuant to Bankruptcy Rule 9019, if required.

**N.      Bar Date**

On December 15, 2009, the Bankruptcy Court entered the Order (A) Establishing Bar Date for Filing Proofs of Claim, and (B) Approving Form and Manner of Notice of Bar Date (the "Bar Date Order"). The Bar Date Order established 4:00 p.m. Eastern time on January 20, 2010 as the last date and time by which anyone other than a governmental unit (as defined in Section 101(27) of the Bankruptcy Code) may file a Claim against the Debtor and 4:00 p.m. Eastern time on February 1, 2010 as the last date and time any governmental unit may file a Claim against the Debtor. The Debtor's liabilities, as set forth in its schedules of liabilities, may increase or decrease depending on the amount of Claims filed by the bar date.

**O.      Waiver of Debtor's exclusive right to file a plan of reorganization**

Under the Terms of the Global Settlement Agreement, the Debtor agreed that its exclusive period to file a plan would expire on October 31, 2009. The Debtor did not file a plan by such date. The Global Settlement Agreement provides that the Lenders or the Agent may file a plan after such date.

The Global Settlement Agreement is hereby incorporated into the Plan of Reorganization and all of its terms and conditions shall survive the confirmation of the Plan; any inconsistency shall be resolved by reference to the Global Settlement Agreement.

**IV.**

**SUMMARY OF THE PLAN**

**A.**     **Overview of the Plan.**

The Plan contemplates that, as of the Effective Date, an estate representative will be appointed pursuant to code section 1123(b)(3) to pursue the RMSSR Claims and Avoidance Actions, and other claims, and to liquidate the Debtor. It is currently anticipated that the estate representative will be the newly formed Liquidation Trust. The purposes of the Liquidation Trust are set forth below in Article IV. C. 4.

**B.**     **Designation and Treatment of Claims and Interests Under the Plan.**

There are three (3) Classes of Claims and one (1) Class of Interests under the Plan. Allowed Administrative Claims and Tax Claims identified in the Debtor' Schedules shall be paid in full and are not subject to classification pursuant to Section 1123(a)(1) of the Bankruptcy Code and, therefore, are not entitled to vote. Class 1 is unimpaired and, accordingly, is presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Impaired Classes 2, 3 and 4 are entitled to vote on the Plan. The Plan contemplates distribution of the available funds to the Allowed Claims in the following Classes of claimants in the order listed:

**1.**     **Unclassified Claims**

Unclassified claims shall consist of all Administrative Claims, Tax Claims and the claims arising under the DIP Facility.

**a.**     **Allowed Administrative Claims**. The Agent has been informed by the Debtor that most administrative claims incurred to date have been paid during the course of the case from the DIP Facility. Any remaining unpaid administrative expenses, which become

Allowed Administrative Claims, shall be paid from the DIP Facility, provided that there are funds remaining in the DIP Budget, including fees and reimbursable costs of the Debtor's professionals, and shall be paid in cash (i) on the Effective Date, or (ii) if such Claim is Allowed after the Effective Date, when such Claim is Allowed, or (iii) upon such terms as may be agreed upon by the claimant and the Trustee. If there are additional significant Administrative Claims asserted as being due by the Debtor, its professionals, or others, and for which no provision has been in the DIP Budget, then the Agent reserves its right to dispute the Allowability of such Administrative Claims, and/or to withdraw the Plan. Professional fees and expenses shall be paid after allowance on notice and hearing after filing of such professional's application, in accordance with the DIP Budget and the DIP Facility. United States Trustee and other bankruptcy fees shall be paid in full on or before the Effective Date or as they become due thereafter.

        **b.**    **The DIP Facility.** The DIP Lenders will receive, on the Effective Date, in full and final satisfaction of their Claims, either payment in full in cash from the proceeds of the RMSSR Claims, or, if no such funds are then available from the RMSSR Claims, then in such case, the DIP Loan will either be repaid in full at the closing on the Exit Financing, which repayment shall include all reasonable legal fees of the Agent to the extent permitted under section 1.3(b) of the DIP Loan Agreement (or other applicable section) and from any funds previously advanced to the Debtor under the DIP Loan Agreement, but which have not been expended, which are being held by the Debtor and which are to be returned to the DIP Lenders. Alternatively, and at the option of the Lenders, the DIP Lenders will continue to hold a valid, perfected, first priority lien on the RMSSR Claims, pending resolution of the RMSSR Claims, which lien and loan must be paid in full from the RMSSR Claims before any disbursement is

made to the other classes and claimants from the RMSSR Claims' proceeds, as set forth below. All of the DIP Lenders' rights, remedies, liens and entitlements under the DIP Facility shall survive the confirmation of the Plan. In any event, any undisbursed funds held by the Debtor which were previously disbursed under the DIP Facility shall be returned to the DIP Lenders on the Effective Date, subject only to payment of expenses for which the Debtor has been invoiced and which relate to periods prior to the Effective Date.

   c. **Allowed Tax Claims.** The Debtor's Schedules have identified only one claim arising under section 507(a)(8) which is a claim of $800 due to the U.S. Treasury. This claim will be paid in full on the Effective Date. Notwithstanding any other provision in the Plan or Disclosure Statement, the Plan does not propose to make any payments or assume any liability for pre-petition or post-petition income taxes due or to be due and owing with respect to the Debtor's operations and the Plan does not contemplate any such payments.

  Nothing in the Plan shall affect the Estate's or Trustee's rights in respect of any unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoff or recoupment against such unimpaired Claims.

   2. **Unimpaired Claims**

    a. **Class 1.**

  Class 1 consists of claims arising under 507(a)(4), (a)(5) and (a)(7) of the Bankruptcy Code. The Debtor's Schedules do not disclose the existence of any such Priority Claims. Unless the holders of Allowed Priority Claims agree otherwise, to the extent such Claims exist, if any, then such Allowed Priority Claims shall be  paid in full on the Effective Date, or as soon as practicable after any such Priority Claims that are Disputed Claims become Allowed Priority Claims following the Effective Date. Class 1 Claims are not impaired by the Plan. Under § 1126(f) of the Bankruptcy Code, holders of such Claims are conclusively presumed to accept

the Plan, and the votes of such holders will not be solicited.  Alternatively, the Agent reserve the right to seek the consent of any such claimants to agree to accept payment from the proceeds of the RMSSR Claims.

### 3.   Impaired Claims

#### a.   Class 2.

Class 2 consists of the Lenders' Allowed Unsecured Claim.  The Lenders have agreed to seek payment for this claim only from the net proceeds of the RMSSR Claims.  This distribution, by way of example, will not include any recoveries from any Avoidance Actions, as defined in the Plan. Class 2 shall only be entitled to receive post petition interest on its Claim from the RMSSR Claim if there are sufficient funds to pay in full the holders of Claims under Class 2 and Class 3.

#### b.   Class 3.

Class 3 consists of the all other general Unsecured Claims, as defined in the Plan.  Each holder of an Allowed Class 3 Claim shall receive its pro rata share of the Estate assets, including its pro rata share of the net proceeds of the RMSSR Claims, after payment in full of all costs and expenses of the Liquidation Trust, repayment of any Exit Facility, and after payment in full of the DIP Facility, all amounts advanced by the Lenders, and all Allowed Administrative Claims, Allowed Tax Claims and the Allowed Claims in Class 1, until paid in full in cash upon the later of (a) the Effective Date, (b) when such Claim becomes an Allowed Claim, or (c) thirty (30) days after the date the RMSSR Resolution Date, or if applicable, (d) after recovery of sums due under the Avoidance Actions.  Class 3 shall only be entitled to receive post petition interest on its Claim from the RMSSR Claims if there are sufficient funds to pay in full the holders of Claims under Class 2 and Class 3 from the net proceeds of the RMSSR Claims.  In addition, Class 3 may

be entitled to post-petition interest if there are monetary recoveries from sources other than the RMSSR Claims which generate sufficient funds to pay the holders in full.

### c. Class 4.

Holders of the Class 4 Interests shall not receive or retain any property from the RMSSR on account of such Interests unless and until the Class 2 and Class 3 Claimants are paid in full all sums due and owing in respect of their Allowed Claims, plus pre and post petition interest and other charges permitted under applicable law, from the RMSSR Claims. Class 4 may receive excess proceeds from other recoveries, excluding the RMSSR Claims, only after Class 3 has been paid in full, plus interest. The Interests will not be cancelled and the Debtor may not be dissolved pursuant to 11 Del. Code § 303, until after the RMSSR Resolution Date unless the Agent and the Interest holders consent to an earlier dissolution.

## C. Implementation of the Plan.

### 1. Formation of the Liquidation Trust and Appointment of the Trustee.

Pursuant to the Bankruptcy Court Order entitled, "Order Approving Certain Debtors' Motion for an Order Authorizing Debtors To Enter into a Settlement Agreement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure," dated September 9, 2009 (the "Global Settlement Order," ECF Dkt. 611), the Court approved the Global Settlement Agreement and the creation of a Litigation Trust to pursue the RMSSR Claims with the appointment of Executive Sounding Board Associates as Trustee. The Court further found and declared that the pursuit of the RMSSR Claims by the Litigation Trust as an estate representative "does not violate any Florida state law provision, or public policy, or other applicable law or rule that limits or restricts the assignment of a tort claim by a plaintiff to a third party and that the Estate Representative will be pursuing the RMSSR Claims solely for the benefit of Waters Edge's creditors, and such designation shall not be a defense to the RMSSR Claim by any party."

On the Effective Date, a Liquidation Trust shall be formed. The assets and functions of the Litigation Trust will be transferred to the Liquidation Trust, which pursuant to Bankruptcy Code section 1123(b)(3) will serve as a representative of the Debtor's estate, will operate under substantially the same rulings and determinations by the Court in the Global Settlement Order, above, with respect to the RMSSR Claims, (which determination shall be incorporated into the Confirmation Order) and will continue to pursue the RMSSR Claims, and liquidate and distribute all of the Debtor's Assets pursuant to the terms of the Plan. Alternatively, the Litigation Trust may serve as a "sub-trust" of the Liquidation Trust. The Trustee of the Litigation Trust may, if requested by the Lenders, serve as the Trustee for the Liquidation Trust. Following the transfer of the Debtor's Assets to the Liquidation Trust pursuant to the Plan, the Trustee shall succeed to all of the Debtor's right, title and interest in and to the Debtor's Assets, and the Debtor, as grantor, shall have no interest in, or with respect to, the Debtor's Assets.

The Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Liquidation Trust Agreement and the Plan. The Lenders may remove the Trustee at any time in accordance with the provisions of the Liquidation Trust Agreement. The Lenders shall be entitled to select the Trustee's counsel for all Avoidance Actions and Claims, including but not limited to, the RMSSR Claims.

**2. Transfer of the Debtor's Assets to the Liquidation Trust.**

To the extent that a Liquidation Trust is created and becomes effective, then on the Effective Date, the Debtor's Estate and the Litigation Trustee, as appropriate, shall transfer and shall be deemed to have irrevocably transferred to the Liquidation Trust, for and on behalf of the Beneficiaries, with no reversionary interest in the Debtor, the Debtor's Assets which shall become part of the Liquidation Trust's Assets. If the Liquidation Trust is not yet effective, then

such transfer shall be deemed to be made upon its becoming effective.  In addition, the Debtor shall transfer to the Trustee for the Liquidation Trust, the Debtor's evidentiary privileges, including the attorney/client privilege, solely as they relate to the Claims and Avoidance Actions, and shall also transfer to the Trustee for the Liquidation Trust all of its books and records relating to the Claims, Avoidance Actions and Disputed Claims.  The Trustee shall make the Debtor's books and records available to the Debtor or its representatives upon reasonable request.  The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief.  Upon such transfer, the Debtor shall have no other further rights or obligations with respect thereto.  The Liquidation Trustee may, at his option, abandon, waive or prosecute any Avoidance Action.

      **3.**        **<u>No Transfer Taxes.</u>**

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including the transfer of the Debtor's Assets to the Liquidation  Trust as contemplated herein, and in that the Global Settlement and transfer of the Waters Edge Property was in contemplation of confirmation of the Plan, any subsequent transfer or sale of the Waters Edge Property, in bulk or any portion thereof, by the Lenders to any third party within twenty-four (24) months of the Effective Date, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recordation tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or

governmental assessment.  The Court shall retain jurisdiction to enforce the provisions of this Section 7.3 of the Plan.

**4.      Purpose of the Liquidation Trust.**

The  Liquidation Trust shall be established for the purpose of liquidating the Debtor pursuant to a Plan confirmed by this Court, and for the primary purpose of liquidating the assets transferred to it, but with no objective to engage in the conduct of a trade or business.  Such purposes shall include, among other things, (i) directly, or as the primary trust over the Litigation Trust, to enforce and prosecute the RMSSR Claims, (ii) to satisfy its obligations under the Liquidation Trust Agreement, (iii) after the liquidation of the RMSSR Claims through settlement or prosecution, make distribution of any net proceeds of the RMSSR Claims and remaining Debtor Assets pursuant to the Plan, (iv) file appropriate tax returns, (v) investigate and, if appropriate, pursue claims of the Estate and the Retained Claims, (vi) administer the Liquidation Trust Assets, (vii) pursue, waive or abandon any Avoidance Actions, (viii) resolve all Disputed Unsecured Claims, including objecting, prosecuting, settling and compromising in any manner approved by the Bankruptcy Court for such Disputed Unsecured Claims, except the Trustee may, in its discretion, settle or compromise any Disputed General Unsecured Claim without Bankruptcy Court approval, so long as the settlement amount is less than $50,000 or less than 50% of the Claim; (ix)  resolve Disputed Claims of any nature, including objecting, prosecuting, settling, and compromising in any manner approved by the Bankruptcy Court such Disputed Claims, and (x) make all distributions to the Beneficiaries from the Liquidation Trust as provided for in the Plan and the Liquidation Trust Agreement**.**  The Liquidation Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation section 301.7701-4(d).

**5. Interests in the Liquidation Trust and Dissolution of the Liquidation Trust.**

Interests in the Liquidation Trust shall be uncertified and shall be non-transferable except upon death of the interest holder or by operation of law. Holders of interests in the Liquidation Trust shall have no voting rights with respect to such interests. The Trustee shall seek authority from the Bankruptcy Court to dissolve the Liquidation Trust as soon as practicable after the earlier of the final distribution to the Beneficiaries is made, or if the Lenders determine not to fund the Liquidation Trust budget (such date being referred to herein as the "Termination Date"). The Liquidation Trust will have a term of not more than four (4) years from the Effective Date, unless such term is extended in accordance with the Liquidation Trust Agreement based on facts and circumstances making such extension necessary to accomplish the liquidating purpose of the Liquidation Trust and with the approval of the Bankruptcy Court making a finding of such necessity.

**6. Financing for the Liquidation Trust.**

The Liquidation Trust will be financed by the Exit Financing, as defined in the Plan. The Exit Financing may be used to pay in full the DIP Facility all amounts then due and owing. Under Section 9.22 of the DIP Loan Agreement, the Lenders have the sole and exclusive right, but not the obligation, to provide post-confirmation exit financing ("Post-Confirmation Financing."), for the purpose of, among other things, continuing to pursue the RMSSR Claims. The DIP Loan Agreement further provides that the Lenders shall 10 days prior to an Effective Date provide the Liquidation Trust, as borrower with a good faith written proposal for Lenders to provide the Post Confirmation Financing. The Exit Financing shall provide, as set forth in the Global Settlement Agreement, that the financing shall not impose any duty or liability on the Exit Lenders with respect to the pursuit, settlement, or other disposition of the RMSSR Claims,

34

provided however, that if the Exit Lenders elect not to continue to finance the prosecution of the RMSSR Claims following the entry of an order approving the Exit Financing, they will pay all costs, expenses and fees which have accrued prior to such an election and the Liquidation Trustee shall then be entitled to seek alternative financing or other arrangements to fund and/or prosecute the RMSSR Claims.

### 7. Rights and Powers of the Liquidation Trust and the Trustee.

The Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidation Trust Agreement and the Plan, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code (but only to the extent necessary to liquidate the Debtor's estate) and the right to seek testimony and the production of documents pursuant to Rule 2004 of the Bankruptcy Rules including without limitation, the right to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidation Trust, (2) investigate, and if appropriate, commence, prosecute, appeal, settle, abandon or compromise any Claims, including the RMSSR Claims, provided that, the Trustee will not consent to any settlement of the RMSSR Claims that would produce a net distribution to the Beneficiaries of the Trust of less than $30 million without first consulting with the Agent and taking the Lenders' interests into account, (3) prosecute, settle, abandon or compromise Avoidance Actions; (4) make distributions, if any, contemplated by the Plan and the Liquidation Trust Agreement; (5) establish and administer any necessary reserves for Disputed Claims that may be required; (6) object to Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (7) assume any remaining responsibilities of the Debtor under the Plan upon the dissolution of

the Debtor; (8) employ and compensate professionals and other agents; and (9) file all federal, state and local tax returns if necessary. The Trustee shall be authorized to enter into the Exit Financing or similar financing to provide for the prosecution of the RMSSR Claims and liquidation of the Estate under the terms of this Plan only, and to grant liens on the property of the Trust for the purpose of pursuing the RMSSR Claims and liquidating the estate, but the Trustee shall not be authorized to engage in the general conduct of business unrelated to the liquidation of the Debtor's estate.

**8. Distribution of Liquidation Trust Assets.**

Subject to the terms of the Liquidation Trust Agreement, distributions of the Liquidation Trust Assets to the holders of Claims and Interests as provided under the Plan shall be made by the Trustee when the aggregate proceeds and income available for distribution are sufficient, in the Trustee's discretion (after consultation with the Lenders) to economically distribute monies.

**9. Semi-Annual Reports to Be Filed by the Liquidating Trust**

The Liquidation Trustee shall file semi-annual reports with the Court regarding the liquidation or other administration of property comprising the Liquidation Trust Assets, the distributions made by it and other matters required to be included in such report in accordance with the Liquidating Trust Agreement. In addition, the Liquidation Trust will file tax returns as a grantor trust pursuant to United States Treasury Regulation section 1.671-4(a), with the holders of Claims and Interests treated as the grantors and owners of the Liquidation Trust for federal income tax purposes.

### 10.    Directors and Officers of the Debtors on the Effective Date.

On the Effective Date, the authority, power and incumbency of the persons then acting as directors and officers of the Debtor shall be terminated and such directors and officers shall be deemed to have resigned or to have been removed without cause.

### 11.    Liquidation of the Debtor.

Upon the occurrence of the RMSSR Resolution Date and the final distribution of the proceeds of the RMSSR Claims, the Liquidation Trustee may (a) file a certificate of dissolution, together with all other necessary corporate documents, to effect the Debtor's dissolution under the applicable laws of its state of incorporation, or alternatively, is authorized to treat the Order of Confirmation as any required order of dissolution and to file such Order of Confirmation; (b) complete and file any federal, state and local tax returns required to be filed by the Debtor (excluding returns to be filed by others with respect to the Debtor's operations, such as federal income tax returns) and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of the Debtor or its Estate for any tax incurred during the administration of the Debtor's Chapter 11 Case, as determined under applicable tax laws (the "Dissolution").  The filing by the Trustee of the Debtor's certificate of dissolution or Order of Confirmation shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the board of directors of the Debtor and expressly without the need to pay any franchise or similar taxes in order to effectuate such Dissolution.

**12. Operations of the Debtor Between the Confirmation Date and the Effective Date.**

The Debtor shall continue to operate as Debtor in Possession during the period from the Confirmation Date through and until the Effective Date.

**13. Term of Injunctions or Stays.**

Unless otherwise provided under the Plan or order of the Bankruptcy Court, all injunctions or stays provided for in the Debtor's Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Case is closed.

**D. Treatment of Executory Contracts and Unexpired Leases.**

**1. All Executory Contracts and Unexpired Leases Are Rejected.**

All executory contracts and unexpired leases that (a) the Debtor entered into prior to the commencement of this Chapter 11 Case, (b) are executory as of the Effective Date, and (c) have not been assumed or rejected pursuant to the Sale Order or Section 365 of the Bankruptcy Code prior to the Effective Date, shall be deemed rejected by the Debtor as of the Effective Date, unless any such contract or lease is the subject of a motion to assume as of the Effective Date in which case the Confirmation Order shall constitute an order approving such assumption and as the case may be the sale and assignment thereof.

**2. Bar Date of Claims Resulting from the Rejection of Contracts Under the Plan.**

All Claims arising from the rejection of executory contracts or unexpired leases under the Plan must be filed within twenty (20) days of the Effective Date.

E.     **Distributions**.

    1.     **Time and Method of Distributions.**

All distributions under the Plan will be made by the Trustee.  The record date for distributions shall be the Confirmation Date or any later date established by order of the Bankruptcy Court.  Whenever any distribution to be made under the Plan is due on a day other than a business day, such distribution shall instead be made, without interest, on the immediately succeeding business day, but will be deemed to have been made on the date due.

    2.     **Undeliverable and Unclaimed Distributions; Time Bar to Cash Payments.**

If any distribution is returned to the Trustee as undeliverable, no further distributions shall be made to such holder unless and until the Trustee  is notified in writing of such holder's then current address.  Checks issued by the Trustee on account of allowed Claims that are not returned as undeliverable, but are not negotiated within sixty (60) days from and after the date of issuance thereof shall be null and void.

Any holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a distribution within ninety (90) days from and after the date (a) such distribution is returned as undeliverable, or (b) of the issuance of a check that has not been returned as undeliverable, but is null and void because it was not timely negotiated, shall have such holder's Claim for such distribution discharged and shall be forever barred from asserting any such Claim against the Estate, the Debtor, the Liquidation Trust or its assets or the Waters Edge Property.  In the event that there is more than one distribution under the Plan, any creditor whose funds escheat shall be eliminated from future distributions.

Any claimants ultimately receiving undeliverable cash, voided checks or unclaimed distributions shall not be entitled to interest or other accruals.  Nothing contained in the Plan

shall require the Debtor or the Trustee to attempt to locate any holder of an Allowed Claim. Undeliverable and unclaimed distributions and distributions not made pursuant to Section 10.6 of the Plan shall be distributed to the holder of Class 2.

### 3.  Set-Offs.

Pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Trustee may set-off proposed distributions against claims the Estate may have against payments to be made to a Claimant; provided however, that neither the failure to effect a set-off nor the allowance of any Claim shall constitute a waiver or release of such Claim, right or cause of action.

### 4.  Distributions to Contested Claims.

No distribution shall be required to be made with respect to any portion of a Disputed Claim pending the resolution of the entire Claim.

### 5.  Distributions Under Twenty Dollars.

No distribution of less than $20 shall be made to the holder of any Allowed Claim.

### 6.  Interest on Claims.

Unless otherwise specifically provided by the Plan or the Confirmation Order or by reason of applicable non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claim unless there are sufficient funds to pay in full the principal amount of all Holders of Class 2 and Class 3 Claims.

### F.  Retention of Causes of Action.

### 1.  Reservation.

Except as otherwise provided herein or in any prior order of the Bankruptcy Court, the Debtor and its bankruptcy Estate reserve all of its claims and causes of action arising under the

Bankruptcy Code (including, but not limited to, Sections 510, 542-545, 547-551 and 553 of the Bankruptcy Code) or under other applicable federal or state law, including, but not limited to, any third-party claims, counterclaims, cross-claims, the Avoidance Actions and the Retained Actions, other than with respect to the Agent and the Lenders, as to which all claims of any kind, including but not limited to Avoidance Actions, Retained Claims, or otherwise, have been irrevocably settled and released pursuant to the Global Settlement Agreement. The Lenders, the Debtor, the Litigation Trustee, the Liquidation Trustee and the Estate expressly reserve the RMSSR Claims, as defined herein, and all related claims, causes of action, rights, and entitlements related to or in any connected with the RMSSR Claims, and any amendment, supplement, re-filed claim, or related claim. As of the Effective Date, the Trustee shall have the sole and exclusive authority to prosecute, abandon, settle or adjust the Estate's claims or causes of action without the consent or approval of any third party and without further order of the Bankruptcy Court.

2.      **No Waiver.**

Unless a claim or cause of action against an entity is expressly waived, relinquished, released, compromised or settled by the Litigation Trust, the Debtor and/or the Trustee expressly reserves such claim or cause of action for later adjudication by the Trustee, including, but not limited to, claims and causes of action not specifically identified or which the Debtor and/or Trustee may be presently unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor and/or Trustee at this time or facts or circumstances that may change or be different from those which the Debtor and/or Trustee now believes to exist.

**G.**     <u>Release, Injunctive and Related Provisions.</u>

    **1.**     <u>Releases by Holders of Claims.</u>

Conditioned on the occurrence of the Effective Date, and except for obligations created by, arising under, or expressly preserved in the Plan or Confirmation Order, the Global Settlement Agreement, the DIP Facility, the Exit Facility, or the Pledge Agreement, the distributions to be received by creditors (if any), or contemplated, under the Plan are in full and final satisfaction and settlement of any and all Released Claims (as defined in the Plan) such creditors may have against the Releasees, the Debtor's Estate, the Debtor, the Trustee, the Litigation Trust, the Liquidation Trust, the Estate assets, the Agent, the Lenders, the DIP Lenders, and the assets contemplated under the Plan to satisfy Claims, and all such Released Claims are released, and shall be deemed to have forever, fully and irrevocably been released, other than the rights of the Debtor, the DIP Lenders, the Exit Lenders, the Litigation Trustee or the Liquidation Trustee to enforce the Plan, the DIP Loan Agreement and Pledge Agreement, and the contracts, instruments, and other agreements or documents delivered thereunder, and <u>provided however</u>, that nothing contained in the Plan, nor the confirmation of the Plan, shall release or discharge any obligation under the Global Settlement, the Pledge Agreement, the DIP Loan Agreement, or the Exit Financing and all liens granted to the DIP Lenders, all of which shall survive the confirmation of the Plan. All Claims by any Interest holder are fully released and discharged upon receipt of its distribution under the Plan.

Notwithstanding anything to the contrary in the Plan, nothing in the Plan shall affect, alter, impair or diminish the rights of Wachovia, in its separate capacity as a lender to Calm Waters, LLC, to pursue all rights, claims and remedies it may have with respect to Calm Waters, including but not limited to any rights it may have under the Capital Funding Commitment

Letter, and the assertion of a deficiency claim against Calm Waters as permitted by the Court's order dated July 29, 2009, entitled Order (1) Approving Bidding Procedures in Advance of Auction, (2) Approving Form and Manner of Notice of Proposed Cure Amounts, Auction, and Final Hearing, and (3) Granting Related Relief with Respect to Certain Properties. (the "Bidding Procedures Order," (ECF Dkt. 494).

2. **Injunction.**

Except as otherwise provided herein and in the Plan, from and after the Effective Date, all holders of Claims and Interests shall be permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, on account of any Claim, Interest, obligation, debt, right, cause of action, remedy or liability released or to be released pursuant to the Plan, or the Sale Orders, or against any asset of the Debtor's Estate, the Waters Edge Property, the Litigation Trust or the Liquidation Trust that is subject to administration to pay Claims and Interests, nor take any action against any of the Purchasers under the Sale Orders. Further, notwithstanding Confirmation of the Plan or the Confirmation Order, the automatic stay shall remain in place for the Debtor, its Estate, the Estate assets and the assets contemplated under the Plan to satisfy Claims. Additionally, no holder of a Claim against the Debtor may, on account of such Claim, seek or receive any payment or other distribution from, or seek recourse against, the Debtor, its successors, property of the Estate, the Litigation Trust, the Liquidation Trust, or the Trustee, except as expressly provided in the Plan, provided however, that such injunction shall not pertain in any way to enforcement of any rights under the Global Settlement Agreement, the Pledge Agreement or the DIP Facility.

3. **Exculpation.**

(a)     Neither (1) the Debtor, its officers, directors, current or former employees, or managers  (2) the Trustee, (3) the Agent and Lenders, and their agents, employees, or representatives, nor (4) any professional or advisor retained by the Debtor, the Trustee, the Agent, the DIP Lenders, the Exit Lenders, or  the Lenders, (i) shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of this Chapter 11 Case, formulating, negotiating or implementing the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, Confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan (including the distributions), the Litigation Trust, and the Liquidation Trust, except for their gross negligence or willful misconduct; and (ii) and in all respects shall be entitled to reasonably rely upon the advise of counsel with respect to their duties and responsibilities under the Plan.  Provided however, and for the avoidance of all doubt, the Plan does not exculpate Ruden, McClosky, Smith, Schuster & Russell, P.A., Mark Grant or any other defendant party to the RMSSR Claims, whether presently named or joined at a future date.

Provided, however, and notwithstanding anything to the contrary in the Plan, nothing in the Plan shall affect, alter, impair or diminish the rights of Wachovia, in its separate capacity as a lender to Calm Waters, LLC, to pursue all rights, claims and remedies it may have with respect to Calm Waters, including but not limited to any rights it may have under the Funding Commitment Letter, and the assertion of a deficiency claim against Calm Waters  as permitted by the Court's order dated July 29, 2009, entitled Order (1) Approving Bidding Procedures in

Advance of Auction, (2) Approving Form and Manner of Notice of Proposed Cure Amounts, Auction, and Final Hearing, and (3) Granting Related Relief with Respect to Certain Properties. (the "Bidding Procedures Order," (ECF Dkt. 494).

(b) The foregoing exculpation and limitation on liability shall not, however, limit, abridge or otherwise affect the rights, if any, of the Debtor or the Trustee to enforce, sue on, settle or compromise the claims retained pursuant to Article XII of the Plan.

## V.

## THE PLAN CONFIRMATION PROCESS

**A.      Acceptance and Confirmation.**

At the hearing on Confirmation of the Plan, the Bankruptcy Court will confirm the Plan only if all the requirements of Section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of the Plan are that the Plan is (1) accepted by an impaired Class of Claims or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to the Class, (2) feasible, and (3) in the best interests of creditors whose Claims are impaired under the Plan.

**B.      Acceptance of the Plan.**

For the Plan to be accepted by any Class, it must be accepted by creditors who hold at least two-thirds in dollar amount of the Claims in such impaired Class as to which votes are cast, and who comprise more than one-half of the voting creditors holding Claims in such Class.  A Class is impaired if the legal, equitable or contractual rights attaching to the Claims in that Class are modified, other than by curing defaults, reinstating maturity, and compensating the holder for certain kinds of reliance damages.  Creditors whose Claims are not impaired by the Plan may not vote and are conclusively presumed, pursuant to the Bankruptcy Code, to have accepted the Plan.

If any impaired Class does not accept the Plan, the Agent may nevertheless seek confirmation of the Plan. As set forth in section 1129(b) of the Bankruptcy Code, to obtain such confirmation and "cram-down" on the dissenting Class or Classes, the Agent must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each dissenting Class. A plan does not discriminate unfairly, if among other things, the dissenting Class is treated substantially equally with respect to other Classes of equal rank. The Agent will seek to satisfy the "fair and equitable" test if either (1) each holder of a Claim in the dissenting Classes receives or retains, under the Plan, property of a value equal to the allowed amount of its Claim; or (2) the holders of Claims that are junior to the Claims of the holders of such dissenting Class will not receive or retain any property under the Plan.

## C.     The RMSSR Claims.

The Lenders believe that the RMSSR Claims are valid claims against the defendants named therein, and that the Trustee, or other estate representative, suing on behalf of the Estate, has reasonable prospects to prevail. However, the amount of any recovery remains speculative due to the risks of litigation. The RMSSR defendants may have insurance that covers the RMSSR Claims, although it is believed that the maximum amount of coverage is $30 million, including all defense costs. The Agent is not aware of whether the applicable carrier has agreed to provide coverage or has reserved any of its rights. Before any distribution is made to holders of Claims or Interest, from any recovery under the RMSSR Claims, all amounts advanced, or obligations due and owing, to the DIP Lenders, or otherwise covered by the Pledge Agreement, or required to be advanced hereafter by the Lenders, and all sums due and owing under any Exit Financing must be first repaid. After payment of all liens, costs and expense, the holders of Class 2 and Class 3 Claims will share pro rata in the distribution from the RMSSR Claims. The Lenders' Allowed Unsecured Claim is approximately $39 million, and other general unsecured

claims are estimated to be approximately $500,000 based on the Debtor's Schedules. Accordingly, the Lenders are entitled to receive approximately 99% of the net recovery on the RMSSR Claims. The holders of Class 3 Claims, by way of example, could receive $300,000 from a $30 million recovery. Because the RMSSR Claims are potentially the only significant Estate asset, the potential proceeds from the RMSSR Claims are the primary source of funding to holders of Claims and Interests under the Plan. The Trustee is permitted to settle the RMSSR Claims provided that the Trustee will not consent to any settlement of the RMSSR Claims that would produce a net distribution to the Beneficiaries of less than $30 million without first consulting with the Agent and taking the Lenders' interests into account. The enforcement of the RMSSR Claims is being funded through the DIP Financing Budget and may be funded after the Effective Date by the Exit Financing.

**D.     Feasibility.**

The Plan is feasible as defined in the Bankruptcy Code because it is a liquidating plan, and the Trustee or the estate representative will disburse only what is recovered in pursuit of the RMSSR Claims and any Avoidance Actions or other third party actions. The costs of the Liquidation Trust will be financed by the Lenders under the terms of the DIP Loan, or the Exit Financing.

**E.     Successor Liability.**

The Lenders and Agent, the Trustee and the Purchaser under the Sale Orders, do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other party relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Effective Date. The Liquidation Trust, the Liquidation Trustee and the Lenders are not, and shall not be, successors to the Debtors by reasons of any theory of law or equity, and none shall

have any successor or transferee liability of any kind or character, except that the Trustee and the Liquidation Trust shall assume the obligations specified in the Plan, the Liquidation Trust Agreement and the Confirmation Order.

## F. Risk Factors.

Certain risk factors are inherent in the Chapter 11 plan confirmation process. If a plan is accepted by creditors, it is usually because the proposal represents a greater return to creditors than would be available in liquidation. The Agent believes that the Plan and this Disclosure Statement accurately reflect the values of the Debtor's assets and liabilities as stated by the Debtors Schedules (although the Debtor's Schedules do not indicate a dollar valuation of the RMSSR Claims) and that the Agent's proposed treatment of Allowed Claims, based on such values, is fair and equitable with respect to each Class of creditors and Interest holders.

However, the Agent and Lenders cannot guarantee the Debtor's creditors that its assumptions will prove to be correct, that the Liquidation Trust will be able to make any distribution or if any issues with this Disclosure Statement or the Plan are raised and litigated, the Trustee will prevail on each issue. Therefore, there is some risk that even if the Debtor's creditors vote to accept the Plan, it may not be confirmed, and if it is confirmed, such creditors may not receive the projected recovery or any recovery at all. If the Plan is not confirmed, the Lenders may have the right under the Bankruptcy Code to make modifications to the Plan consistent with the Bankruptcy Court's rulings, and, if required, solicit acceptances to the Plan as modified.

Additionally, there is a risk that the pursuit of the RMSSR Claims will not succeed. If that occurs the Plan would fail and the Debtor's Chapter 11 Case would likely either be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

# VI.

## BEST INTEREST TEST

Confirmation of the Plan also requires that each claimant or Interest holder either (a) accept the Plan, or (b) receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such person would receive or retain if the Debtor was liquidated on the effective date under Chapter 7 of the Bankruptcy Code. In order to make this determination, the Bankruptcy Court must compare the treatment accorded creditors and equity security holders under the Plan with the treatment such creditors and equity security holders would be entitled to under Chapter 7 of the Bankruptcy Code.

The Plan provides for a recovery which should exceed what creditors would receive in a Chapter 7 proceeding. The Debtor's Schedules reflect that the Debtor no longer has any significant assets and therefore any potential proceeds from the RMSSR Claims litigation are the only source for distribution of any meaningful recovery to unsecured creditors on their Allowed Claims. The costs of the pursuing the RMSSR Claims has been funded by the DIP Facility and it is anticipated, will continued to be funded by the Exit Financing. The RMSSR Claims are being pursued on a normal hourly rate for legal counsel, as opposed to contingency fee arrangement, which it is believed would be substantially more costly to the Estate. Accordingly, the Plan should provide a greater opportunity to maximize the value of the Estate than a liquidation under Chapter 7.

To determine what creditors and the holders of Interests would receive if the Debtor was to be liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the Debtor's assets in the context of a Chapter 7 case. Such amount would then be reduced by the cost and expenses of liquidation and by additional administrative claims that would be incurred in a Chapter 7 liquidation. Such liquidation costs include the fees

payable to a Chapter 7 trustee, as well as those payable to attorneys and other professionals that a Chapter 7 trustee may engage, plus any unpaid expenses incurred by the Debtor during this bankruptcy case. It is likely that any attorney who sought recovery of the RMSSR Claims would ask that the Trustee award it a contingent fee; if such fee was approximately 25% to 33% of the recovery, the recovery to unsecured creditors would be significantly reduced. The fees of a Chapter 7 trustee on the recovery could also be 3% of any settlement of the RMSSR Claims.

Based upon the foregoing analysis and given that the Debtor has no other known valuable assets, the Agent believes that creditors will receive at least as much value under the Plan as they would receive in a Chapter 7 liquidation and, as a result, the Plan satisfies the best interests test.

Therefore, the Lenders believe the Plan maximizes the potential for a return to all creditors and the holders of Interests. In any event, the Plan does not provide for distributions less than the amount available to creditors in a Chapter 7 liquidation, which could be zero. Therefore, the best interest test is satisfied with respect to the Debtor's creditors and Interest holder, and, accordingly, the confirmation of the Plan is in the best interest of the Debtor's Estate.

**VII.**

**GENERAL FEDERAL INCOME TAX CONSIDERATIONS**

The confirmation and execution of the Plan may have tax consequences to holders of Claims and Interests. The transfer of the Debtor's Assets, including the RMSSR Claims, to the Liquidation Trust will be treated for federal income tax purposes as a transfer of such assets to the holders of Claims and Interests followed by a transfer by them of such assts to the Liquidation Trust. The holders of Claims and Interests will be treated as the grantors and deemed owners of the Liquidation Trust. The valuations of the transferred assets by the Liquidation Trustee and the holders of Claims and Interests shall be consistent and used for all

federal income tax purposes. Depending on the circumstances, a holder of Claims or Interests may recognize taxable income as a result of transfers to and activities of the Liquidation Trust. The Agent does not offer any opinion as to any federal, state, local or other tax consequences to holders of Claims and Interests as a result of the Confirmation of the Plan. All holders of Claims and Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of the Plan. THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY HOLDER OF CLAIMS OR INTERESTS.

## VIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include (a) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code, or (b) dismissal of the bankruptcy case. Each of which would likely result in a lesser or no recovery for creditors.

**A.**      **Liquidation Under Chapter 7.**

If no plan can be confirmed, the bankruptcy case may be converted to a case under Chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Lenders believe that conversion of this case to a case under Chapter 7 of the Bankruptcy Code would result in zero distributions to all unsecured creditors.

**B.**      **Dismissal of the Bankruptcy Case.**

If the Plan is not confirmed, the bankruptcy case could be dismissed and all unsecured creditors would likely receive nothing.

## IX.

### <u>CONCLUSION</u>

While the successful implementation of the Plan contemplates a settlement or successful litigation of the RMSSR Claims and a liquidation of the Debtor under Chapter 11 of the Bankruptcy Code, the Agent believes that the Plan provides for the maximum recovery for all of its creditors and the Interest holder.  Accordingly, the Agent believes that approval of the Plan is in the best interests of the Estate, and holders of the Claims and Interests and recommends that all of the impaired creditors and Interest holder vote to accept the Plan.

[signature page follows]

Respectfully submitted,

WACHOVIA BANK, NATIONAL
ASSOCIATION by and on behalf of the Lenders,

By: _____

One of its Attorneys

Steven K. Kortanek, (Del. Bar No. 3106)
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4363
Email: skortanek@wcsr.com

David R. Kuney
Bridget J. Hauserman
SIDLEY AUSTIN, LLP
1501 K. St. N.W.
Washington, D.C. 20005
Telephone:  (202) 736-8650
Email: dkuney@sidley.com

**EXHIBIT A**

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) **Chapter 11** |
| | ) |
| | ) **Case No. 09-11390 (MFW)** |
| OPUS SOUTH CORPORATION, et al., | ) |
| | ) |
| Debtors. | ) **Jointly Administered** |
| | ) |
| | ) |

## WACHOVIA BANK, NATIONAL ASSOCIATION, AGENT'S FIRST AMENDED PLAN OF LIQUIDATION FOR WATERS EDGE ONE, L.L.C. PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

David R. Kuney
Sidley Austin, LLP
1501 K. Street N.W.
Washington, D.C. 20005
(202) 736-8650

Bridget J. Hauserman
Sidley Austin LLP
787 Seventh Avenue
New York, N.Y.
(212) 839-5599

-and-

Steven K. Kortanek
Womble Carlyle Sandridge & Rice, PLLC
222 Delaware Avenue
Wilmington, DE 19801
(302) 252-4363

Counsel to Wachovia Bank, National Association

## INTRODUCTION

Wachovia Bank, National Association, in its capacity as administrative agent for itself and the other Lenders (as defined herein)(the "Agent") hereby proposes the following plan of liquidation (as amended, modified or supplemented, the "Plan") for Waters Edge One, L.L.C. (the "Debtor") in its reorganization case (the "Chapter 11 Case") pursuant to chapter 11, title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") for the resolution of the outstanding claims against and interests in the Debtor. Reference is made to the Disclosure Statement (as defined herein), distributed contemporaneously herewith, for a discussion of the Debtor's history, business, properties and operations, risk factors, a summary and analysis of the Plan, and certain related matters including, among other things, the proceeds from recovery from the RMSSR Claims (as defined herein), if any, to be issued and distributed under the Plan. Under the Terms of the Global Settlement Agreement (as defined herein), the Debtor agreed that its exclusive period to file a plan would expire on October 31, 2009. The Debtor did not file a plan by such date. The Global Settlement Agreement provides that the Lenders may file a plan after such date. The Global Settlement Agreement and the Order of this Court approving such (see below) are incorporated into this Plan and all of their terms and conditions shall survive the confirmation of the Plan. Subject to certain restrictions and requirements set forth herein and in section 1127 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3019, the Agent reserves the right to alter, amend, modify, revoke or withdraw the Plan prior to the confirmation of the Plan.

1584121v.15

# TABLE OF CONTENTS

Page

**ARTICLE I** GENERAL PROVISIONS........................................................................4

    **1.1**    Rules of Interpretation and Construction..................................4
    **1.2**    Entire Agreement ....................................................................4
    **1.3**    Governing Law ........................................................................4
    **1.4**    Binding Effect.........................................................................4
    **1.5**    Severability ............................................................................5
    **1.6**    Headings .................................................................................5
    **1.7**    Notices ...................................................................................5
    **1.8**    Modification of the Plan ........................................................6
    **1.9**    Revocation or Withdrawal ......................................................6
    **1.10**   Time Periods ..........................................................................6

**ARTICLE II** DEFINITIONS ......................................................................................6

**ARTICLE III** DESIGNATION OF CLAIMS AND INTERESTS...........................14

    **3.1**    Classification in General.......................................................14
    **3.2**    Unclassified Claims ..............................................................14
    **3.3**    Designation of Classes .........................................................15

**ARTICLE IV** TREATMENT OF UNCLASSIFIED AND UNIMPAIRED CLAIMS ..............15

    **4.1**    Unclassified Claims ..............................................................15
    **4.2**    Classes of Claims Not Impaired by the Plan ........................17
    **4.3**    Special Provision Governing Unimpaired Claims.................17

**ARTICLE V** TREATMENT OF IMPAIRED CLASSES..........................................18

    **5.1**    Class 2....................................................................................18
    **5.2**    Class 3....................................................................................18
    **5.3**    Class 4....................................................................................19

**ARTICLE VI** ACCEPTANCE OR REJECTION OF THE PLAN ...........................19

    **6.1**    Voting Classes ......................................................................19
    **6.2**    Acceptance by Impaired Classes of Claims...........................19
    **6.3**    Acceptance by Class of Interest Holders. ..............................20
    **6.4**    Presumed Acceptance of the Plan.........................................20
    **6.5**    Non-Consensual Confirmation .............................................20

Page

**ARTICLE VII** IMPLEMENTATION OF THE PLAN ............................................................20

    7.1    Formation of the Liquidation Trust and Appointment of the Trustee. .................20
    7.2    Transfer of the Debtor's Assets to the Liquidation Trust. ....................................22
    7.3    No Transfer Taxes............................................................................................23
    7.4    Purpose of the Liquidation Trust. .....................................................................23
    7.5    Interests in the Liquidation Trust and Dissolution of the Liquidation Trust. ........24
    7.6    Financing of the Liquidation Trust. ...................................................................25
    7.7    Rights and Powers of the Liquidation Trust and the Trustee................................25
    7.8    Distribution of Liquidation Trust Assets. ...........................................................26
    7.9    Semi-Annual Reports to Be Filed by the Liquidation Trust. .................................27
    7.10    Directors/Officers/Equity/Assets of the Debtor on the Effective Date.................27
    7.11    Liquidation of the Debtor..................................................................................27
    7.12    Operations of the Debtor Between the Confirmation Date and the
           Effective Date. .................................................................................................28
    7.13    Term of Injunctions or Stays.............................................................................28
    7.14    Enterprise Zone and Development Rights Settlement ..........................................28
    7.15    Certain Tax Matters Related to the Liquidation Trust. ........................................30

**ARTICLE VIII** TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
    LEASES .........................................................................................................................30

    8.1    All Executory Contracts and Unexpired Leases Are Rejected ..............................30
    8.2    Bar Date of Claims Resulting from the Rejection of Contracts Hereunder...........31

**ARTICLE IX** PROCEDURE FOR RESOLVING CONTESTED CLAIMS ............................31

    9.1    Bar Date ..........................................................................................................31
    9.2    Objection to Claims; Prosecution of Contested Claims........................................31
    9.3    Allowance of Claims.........................................................................................32
    9.4    Disallowance of Claims of Entities from Whom Property is Recoverable ...........32

**ARTICLE X** PROVISIONS REGARDING DISTRIBUTIONS .................................................32

    10.1    Time and Method of Distributions......................................................................32
    10.2    Delivery of Distributions ..................................................................................33
    10.3    Undeliverable and Unclaimed Distributions; Time Bar to Cash Payments...........33
    10.4    Set-Offs ...........................................................................................................34
    10.5    Distributions to Contested Claims ......................................................................34
    10.6    Distributions Under Twenty Dollars....................................................................34
    10.7    Interest on Claims ............................................................................................34

# TABLE OF CONTENTS
(Continued)

Page

**ARTICLE XI** CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .............................34

    **11.1** Conditions Precedent to Effective Date of the Plan................................................34
    **11.2** Waiver of Conditions Precedent ........................................................................35
    **11.3** Effect of Non-Occurrence of Conditions to the Effective Date............................35
    **11.4** Limited Scope ...................................................................................................36

**ARTICLE XII** RETENTION OF CAUSES OF ACTION ..........................................................36

    **12.1** Reservation ......................................................................................................36
    **12.2** No Waiver .........................................................................................................37

**ARTICLE XIII** RELEASE, INJUNCTIVE AND RELATED PROVISIONS ..........................37

    **13.1** Releases by Holders of Claims ..........................................................................37
    **13.2** Injunction .........................................................................................................38
    **13.3** Exculpation ......................................................................................................40
    **13.4** Global Release. .................................................................................................40
    **13.5** Successor Liability............................................................................................42

**ARTICLE XIV** RETENTION OF JURISDICTION ....................................................................43

**ARTICLE XV** DISCLOSURE STATEMENT ...........................................................................44

## ARTICLE I

## GENERAL PROVISIONS

**1.1**     **Rules of Interpretation and Construction.**

        The rules of construction applicable to the Bankruptcy Code and the Bankruptcy Rules are applicable to the Plan. The words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than a particular portion of the Plan.

**1.2**     **Entire Agreement.**

        This Plan, together with the Global Settlement Agreement incorporated herein, supersedes all prior plans, discussions, understandings, agreements and documents pertaining or relating to any subject matter of the Plan other than prior orders of the Bankruptcy Court.[1]

**1.3**     **Governing Law.**

        Except to the extent the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of the State of Delaware.

**1.4**     **Binding Effect.**

        Pursuant to section 1141 of the Bankruptcy Code confirmation of this Plan will bind all creditors and Interest holders to the terms and conditions of the Plan, without regard to whether any such person voted, or voted to accept or reject the Plan. The rights and obligations of any entity named or referred to in the Plan shall be binding upon and shall inure to the benefit of the successors, heirs and assigns of such entity.

---

[1] A copy of the Global Settlement Agreement can be obtained from counsel for the Agent, at the address shown on the cover to this Plan or may be downloaded from the Pacer electronic docket for the U.S. Bankruptcy Court for Delaware.

**1.5**     **Severability.**

       Should any provision or section of the Plan be determined to be unenforceable, such determination shall not impair, limit or otherwise effect the enforceability of any other provision or section of the Plan; provided, however, court shall modify any such term to give effect as closely as possible to the original intent of such severed provision.

**1.6**     **Headings.**

       Headings of the articles, paragraphs and sections of the Plan are inserted for convenience only and shall not affect the meaning of any Plan provision.

**1.7**     **Notices.**

       All notices given in connection with the Plan shall be made in writing and shall, with respect to the Agent, be deemed to have been given when received by (or if mailed, five business days from the date of mailing, first class postage prepaid) counsel for the Agent (David R. Kuney, Sidley Austin LLP, 1501 K St., N.W. Washington, D.C. 20005). All payments, distributions, notices and requests to holders of Claims shall be sent to (a) the address of each such holder as set forth on the Debtor's schedules of liabilities filed with the Bankruptcy Court unless superseded by the address set forth on any proof[s] of claim filed by such holders, or (b) the last known address of such holder if no proof of claim is filed, such claimant is not listed on the Debtor's schedules or if the Debtor has been notified in writing of a change of address. Any holder of a Claim may designate in writing any other address which designation shall be effective upon receipt. Each holder of a Claim bears exclusive responsibility to notify the Agent and Trustee in writing of any change of address. None of the Agent, Lenders, Trustee nor any successor shall have any duty or obligation to research or otherwise investigate the correct

address of any holder of a Claim when any item addressed to the last-known address of record and deposited in the U.S. Mail with sufficient postage is returned as undeliverable.

**1.8    Modification of the Plan.**

The Agent reserves the right to amend or modify the Plan at any time prior to the entry of the Confirmation Order so long as the amendments or modifications comply with the Bankruptcy Code and Bankruptcy Rules.  Upon Confirmation, the Agent may, upon order of the Bankruptcy Court, amend or modify the Plan to remedy any defect or omission or reconcile any inconsistency in the Plan as necessary to carry out the purpose and intent of the Plan.  A holder of a Claim or an Interest that has accepted, or is deemed to have accepted, the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the holder of such Claim or Interest.

**1.9    Revocation or Withdrawal.**

The Plan may be revoked or withdrawn by the Agent prior to the Confirmation Date.  If the Plan is revoked or withdrawn prior to the  Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor, the Agent, or any other entity.

**1.10    Time Periods.**

In computing any period of time prescribed or allowed hereby, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II

## DEFINITIONS

A term used but not defined in the Plan shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

The following definitions shall apply for purposes of the Plan:

1.    "Administrative Claim" shall mean a Claim that has been timely filed, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), for any cost or expense of the administration of this Chapter 11 Case entitled to priority in accordance with Sections 503(b), 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including without limitation:

       (a)    actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate;

       (b)    all compensation for legal and other services and reimbursement of expenses awarded or allowed under Sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise;

       (c)    any fees or charges, including fees due the United States Trustee and assessed against the Debtor pursuant to 28 U.S.C. §§ 1911-1930; and

       (d)    any Claim afforded priority status under Sections 503(b), 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code pursuant to Final Order of the Bankruptcy Court.

2.    "Allowed" shall mean, with respect to any Claim or Interest, or portion thereof except as otherwise provided herein:

       (a)    any Claim of Interest for which a proof of claim or Interest has been filed with the Bankruptcy Court on or before the Bar Date:

              (i)     as to which no objection has been made to its allowance by the Bar Date, or

              (ii)    as to which an objection was filed and the Claim has been allowed by a Final Order;

       (b)    any Claim that is deemed to be Allowed pursuant to:

              (i)     any provision of the Plan,

              (ii)    in any stipulation with the Debtor of amount and nature of Claim executed prior to the Confirmation Date and approved by the Bankruptcy Court, or

              (iii)   in any stipulation with the Agent of Trustee of amount and nature of Claim executed on or after the Confirmation Date; and

       (c)    any Claim that has been scheduled by the Debtor in its schedules of liabilities as other than disputed, contingent and unliquidated and as to

which the Debtor or other party in interest has not filed an objection by the Claims Objection Bar Date.

Unless otherwise specified by the Plan or by order of the Bankruptcy Court, Allowed Claims shall not include interest for the period from and after the Petition Date, nor shall they include any Claim which may be disallowed under Section 502(d) of the Bankruptcy Code.

3.  "Agent" shall mean Wachovia Bank, National Association, in its capacity as administrative Agent for the Lenders.

4.  "Avoidance Action" shall mean any and all avoidance, recovery, subordination or other similar actions or remedies against persons that may be brought by or on behalf of the Debtor or its Estate under Chapter 5 of the Bankruptcy Code or similar, applicable non-bankruptcy law, including, actions, settlements or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

5.  "Bankruptcy Code" or the "Code" shall mean title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in Sections 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

6.  "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware or other court exercising competent jurisdiction over the Debtor and the Estate .

7.  "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure promulgated under Section 2075 of title 28 of the United States Code, as amended from time to time, and any and all applicable local rules of the Bankruptcy Court, as the same may from time to time be in effect and applicable to this bankruptcy case and other related proceedings.

8.  "Bar Date" shall mean the applicable date set by the Bankruptcy Court, if any, as the last date for timely submission of a proof of claim on account (i) of all Claims against the Debtor including Administrative Claims and (ii) Claims by governmental units (as defined in Section 101(27) of the Bankruptcy Code), as applicable.

9.  "Beneficiaries" shall mean holders of Allowed Claims and Interests in Classes 1, 2, 3 and 4.

10. "Calm Waters" means Calm Waters, L.L.C., a debtor in the consolidated proceedings of Opus South Corporation, et al.

11. "Capital Funding Commitment Letter" shall mean that certain letter agreement dated on or about May 29, 2008 and any amendments, pursuant to which, among

8

other things, Opus Corporation agreed to fund amounts sufficient to satisfy certain obligations of Waters Edge and Calm Waters.

12. "Chapter 11 Case" or "Bankruptcy Case" means the case commenced when the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on the Petition Date in the United States Bankruptcy Court for the District of Delaware, with a case number of 09-11394.

13. "Claim" shall mean (a) a right to payment whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

14. "Class" shall mean a Class of Claims or Interests, as described in Article III of the Plan in accordance with Section 1123(a)(1) of the Bankruptcy Code.

15. "Confirmation" shall mean the entry of the Confirmation Order in form and substance satisfactory to the Agent.

16. "Confirmation Date" shall mean the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

17. "Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan.

18. "Contested Claim" shall mean any Claim against the Debtor (a) subject to a timely objection or request for estimation, or (b) that is otherwise disputed by the Debtor in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order, or (c) that is not an Allowed Claim.

19. "Debtor" or "Debtor In Possession" shall mean Waters Edge One, L.L.C., a Delaware limited liability company.

20. "Debtor Assets" shall mean all assets of the Debtor and the Debtor's Estate prior to the Effective Date, including those in the Litigation Trust.

21. "Debtor's Schedules" or "Schedules" shall mean the Statement of Financial Affairs filed by the Debtor in this Chapter 11 Case, along with its Schedule of Assets and Liabilities. (ECF Dkt. 248).

22. "DIP Budget" shall mean that budget most recently in effect, governing the amount of distributions and payments to be made under the DIP Facility.

9

23. "DIP Facility" shall mean the financing facility, including the DIP Loan Agreement, approved by the Final Order (I) Authorizing Waters Edge One, L.L.C. to Obtain Postpetition Financing and (II) Granting Related Relief entered by the Court on September 9, 2009, (Dkt. No. 609), and any amendments and modifications thereto.

24. "DIP Lenders" shall mean the Lenders when acting in their capacity as the lenders under the DIP Loan Agreement.

25. "DIP Loan Agreement" shall mean that certain Debtor-in-Possession Loan Agreement dated as of August 21, 2009, by and among the Debtor, the Agent and the Lenders (as amended, restated, supplemented or otherwise modified from time to time).

26. "Disclosure Statement" shall mean the Disclosure Statement for the Agents' Plan of Liquidation Pursuant to Chapter 11 of the United States Bankruptcy Code, together with all exhibits and supplements thereto, as amended, supplemented or modified, that is prepared and distributed in accordance with Sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code and/or other applicable law.

27. "Disputed" shall mean, with respect to any Claim or Interest: (a) listed on the Debtor's Schedules as unliquidated, disputed or contingent, unless a proof of Claim has been timely filed; (b) as to which the Debtor, Agent, Trustee, or any other entity has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules; or (c) as otherwise disputed by the Debtor or the Trustee in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

28. "Effective Date" shall mean the date selected by the Agent which is a business day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Section 11.1 hereof have been (i) satisfied, or (ii) waived pursuant to Section 11.2 hereof.

29. "Estate" shall mean the estate of the Debtor created on the Petition Date by section 541 of the Bankruptcy Code.

30. "Exit Financing" or, alternatively, "Post Confirmation Financing," shall mean the loan or loans contemplated to be made hereunder by the Lenders (the "Exit Lenders" in such capacity) in order to fund the necessary costs of the Liquidation Trust, or other estate representative, including any funds which may be needed to pursue the RMSSR Claims The terms and conditions of the Exit Financing are to be agreed upon hereafter, but shall grant to the Exit Lenders a first lien on the proceeds of RMSSR Claims, junior only to the lien of the DIP Lenders unless the DIP Loan is paid in full by the Exit Financing, and a lien on all assets of the Debtor.

10

31. "Exit Lenders" shall mean Wachovia Bank, National Association, Regions Bank, PNC Bank, National Association,[2] and Bank of America,[3] or their successor or assigns, in their capacity as lenders under the Exit Financing.

32. "Final Order" shall mean an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, that has become final for purposes of 28 U.S.C. §§ 158 and 1291 and:

    (a)    that is no longer subject to appeal;

    (b)    as to which no appeal or certiorari proceeding is pending; or

    (c)    as to which any appeal has been rendered moot, or determined by dismissal or affirmance.

33. "Global Settlement Agreement" means that certain agreement by and among the Debtor, the Lenders, the Agent and other parties, dated August 21, 2009 and approved by a Final Order by the Court on September 9, 2009 (Dkt. No. 611).

34. "Interest" shall mean any equity ownership interest in the Debtor.

35. "Lenders" shall mean Wachovia Bank, National Association, Regions Bank, PNC Bank, National Association, and Bank of America, or their respective successors or assigns, in their capacity either as pre-petition lenders to the Debtor, and in their respective capacities as the DIP Lenders or the Exit Lenders.

36. "Lenders' Allowed Claim" means the Allowed Claim of the Agent on behalf of the Lenders, as determined prior to the sale of the Lenders' collateral, in an amount not less than $70,796,928.98, plus other amounts permitted by the Bankruptcy Code and other applicable law, costs and attorneys fees allowable under the Bankruptcy Code as provided in the Global Settlement and approved by the Court in the "Sale Order," below. The remaining liability of the Estate to the Lenders of the Allowed Claim is the "Allowed Unsecured Claim," below.

37. "Lenders' Allowed Unsecured Claim" shall mean the Allowed unsecured Claim of the Agent on behalf of the Lenders against the Debtor which shall be deemed Allowed without the need to file any proof of claim, in the approximate amount of $39,089,852.72, calculated as set forth in the Court's Sale Order dated October 7, 2009, entitled Order (1) Approving Sale of Certain Assets of the Debtor Waters Edge One, L.L.C. Free and Clear of All Liens, Claims, Encumbrances, and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), (f), and (m) and (2) Granting Related Relief (the "Sale Order") (Dkt. No. 703).

38. "Liquidation Trust" and "Liquidation Trust Agreement" shall have the meanings ascribed to them in Article 7.1 of the Plan.

---

[2] PNC Bank, National Association is the successor in interest of National City Bank.
[3] Bank of America is the successor in interest of LaSalle Bank, National Association.

39. "Liquidation Trust Assets" shall mean all assets to be transferred to and owned by the Liquidation Trust pursuant to the Plan, including Avoidance Actions, the RMSSR Claims and the proceeds of any of the foregoing. Notwithstanding anything to the contrary herein, the Liquidation Trustee may abandon, waive, settle, or prosecute the Avoidance Actions.

40. "Litigation Trust" shall mean the litigation trust established pursuant to the terms of the Litigation Trust Agreement in accordance with the Global Settlement Agreement.

41. "Litigation Trust Agreement" shall mean that certain Litigation Trust Agreement between the Debtor and the Trustee dated as of December 7, 2009.

42. "Litigation Trust Budget" shall mean the budget attached as Exhibit B to The Motion of Waters Edge One, L.L.C. Requesting Entry of Interim and Final Orders Authorizing Borrowing with Priority Over Administrative Expenses and Secured by Liens on Property of the Estates Pursuant to Section 364(c) and (d) of the Bankruptcy Code and Scheduling of a Final Hearing on Requested Final Relief, and all amendments and supplements thereto. (Dkt. No. 557).

43. "Loan Agreements" or "Loan" shall mean that certain Construction Loan Agreement, dated as of October 26, 2005 (as amended and supplemented from time to time), those certain Promissory Notes dated as of May 30, 2008, that certain Mortgage, Assignment of Rents and Security Agreement dated as of October 26, 2005 as amended by a Modification of Mortgage dated as of October 2, 2007 and May 30, 2008 among the Agent, the Lenders and the Debtor, together with any and all other documents, instruments, and notices executed, delivered or recorded from time to time in connection therewith, unless otherwise set forth in this Plan with respect to the Capital Funding Commitment Letter or Guaranty..

44. "Petition Date" shall mean April 22, 2009.

45. "Plan" shall mean the Agent's Plan of Liquidation Pursuant to Chapter 11 of the United States Bankruptcy Code, or any amendment or modification thereto.

46. "Pledge Agreement" shall mean that certain Pledge and Security Agreement dated on or about August 21, 2009 by and between the Debtor and Agent which Pledge Agreement is attached to the DIP Loan Agreement, to secure any and all obligations of Waters Edge arising under the DIP Loan Agreement. The Pledge Agreement shall survive confirmation of this Plan, notwithstanding any other provision to the contrary.

47. "Priority Claim" shall mean any Claim, other than a Tax Claim or an Administrative Claim, which is entitled to priority in payment under Section 507(a) of the Bankruptcy Code.

48. "Property Tax Claims" shall mean all amounts owed to the State of Florida, or any of its political subdivisions, on account of real property taxes assessed against the Waters Edge Property, prior to the closing date of October 16, 2009.

49. "Releasees" shall mean the Debtor, its attorneys, officers, directors, employees, representatives, agents, all in their respective capacities as such, the Trustee, and any professionals retained by the Trustee.

50. "Released Claims" means any and all Claims, obligations, demands, actions, suits, judgments, causes of action, liabilities, costs, expenses and damages of any kind whatsoever in law or in equity, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence, in connection with, relating to, or arising from (i) the Chapter 11 Case, the DIP Facility, the formulation and pursuit of the Plan, (ii) any pre-petition credit agreements related to any portion of the Waters Edge Property and involving the Agent or the Lenders, in their capacity as such, (iii) any transactions, dividends and distributions contemplated by such credit agreements, or (iv) any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Waters Edge Property or the Chapter 11 Case.

51. "Retained Actions" or "Retained Claims" shall mean any actions arising under Chapter 5 of the Bankruptcy Code, or any other claim, demand, or causes of action of the Debtor against any third party, including, without limitation, those described in Section 12.1 of the Plan.

52. "RMSSR Claims" shall mean the claims currently being pursued by the Litigation Trust against Ruden, McClosky, Smith, Schuster & Russell, P.A. and Mark Grant, in the Circuit Court of the Six Judicial Circuit in and for Pinellas County, Florida, (together with any and all actions, proceedings, cases and appeals arising from the same facts and circumstances, but shall not include any claims against the Debtor's officers, directors or employees)

53. "RMSSR Resolution Date," shall mean that date upon which the RMSSR Claims have been fully litigated to a Final Order, and all proceedings have been fully and finally resolved.

54. "Tax Claim" shall mean a Claim of a kind specified in and entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code other than Property Tax Claims.

55. "Trust Expenses" shall mean all expenses incurred by the Liquidation Trust.

56. "Trustee" or "Liquidation Trustee" shall mean either Executive Sounding Board Associates, or that entity or person hereafter designated by the Agent and Lenders to serve as Trustee for the Liquidation Trust (and Litigation Trust should the

13

Litigation Trust become a sub-trust upon the Effective Date)or any successor as determined in the sole discretion of the Agent and Lenders.

57. "Unsecured Claims" shall mean any Claims, or portion thereof against the Debtor that are neither Allowed Administrative Claims, Allowed Priority Claims, Allowed Tax Claims, Allowed Property Tax claims, nor Interests.

58. "Wachovia" shall mean Wachovia Bank, National Association.

59. "Waters Edge Property" shall mean the real property commonly known as Waters Edge located in Clearwater, Florida and that contains a condominium building with approximately 153 residential units and 10,000 square feet of retail space and all appurtenances thereto, including without limitation any and all common and other elements of such condominium and all liens and other encumbrances running in favor thereof formerly owned by the Debtor, including certain refunds described below under "Enterprise Zone and Development Rights Refund."

## ARTICLE III

## DESIGNATION OF CLAIMS AND INTERESTS

### 3.1    Classification in General.

A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. The Bankruptcy Court shall have exclusive jurisdiction over disputes concerning the classification of Claims or Interests. Resolution of any such disputes shall not be a condition precedent to Confirmation or the Effective Date of the Plan. A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

### 3.2    Unclassified Claims.

Unclassified Claims shall consist of all Administrative Claims, Tax Claims and the DIP Facility.

**3.3**     <u>Designation of Classes.</u>

        The Classes of Claims and Interests are designated as follows:

        **1.**     <u>Class 1.</u> Priority Claim are those claims that arise under Code section 507(a)(4), (a)(5) and (a)(7). The Debtor's Schedules do not disclose the existence of any such claims. Class 1 Claims are not impaired under the Plan.

        **2.**     <u>Class 2.</u> Lenders' Allowed Unsecured Claim. Class 2 Claims are impaired under the Plan.

        **3.**     <u>Class 3.</u> All other Allowed unsecured Claims, other than the Class 2 claims, against the Debtor of whatever nature or description. Class 3 Claims are impaired under the Plan.

        **4**.     <u>Class 4.</u> Interests in the Debtor held by Opus South Development, L.L.C., or other person. Class 4 Interests are impaired under the Plan.

<u>ARTICLE IV</u>

**<u>TREATMENT OF UNCLASSIFIED AND UNIMPAIRED CLAIMS</u>**

**4.1**     <u>Unclassified Claims.</u>

        (a)     <u>Administrative claims.</u> The Agent has been informed by the Debtor that most administrative claims incurred to date have been paid during the course of the case from the DIP Facility. Any remaining unpaid administrative expenses, which become Allowed Administrative Expenses, shall be paid from the DIP Facility, provided that there are funds remaining in the DIP Budget, including fees and reimbursable costs of the Debtor's professionals, and shall be paid in cash (i) on the Effective Date, or (ii) if such Claim is Allowed after the Effective Date, when such Claim is Allowed, or (iii) upon such terms as may be agreed upon by the claimant and the Trustee. If there are additional significant Administrative Claims asserted as being due by the

15

Debtor, its professionals, or others, which are not within the DIP Budget, then the Agent reserves its right to dispute such amounts and the Allowability of such Claims, and or to withdraw the Plan. Professional fees and expenses shall be paid after allowance on notice and hearing after filing of such professional's application, in accordance with the DIP Budget and the DIP Facility and after any order approving such has become a Final Order. United States Trustee and other bankruptcy fees shall be paid in full on or before the Effective Date or as they become due thereafter.

(b) **Allowed Tax Claims.** Allowed Tax Claims are Claims arising under and Allowed to the extent set forth under section 507(a)(8) of the Bankruptcy Code. The Debtor's Schedules have identified one Priority Tax Claim in the amount of $800 due to the U.S. Treasury. This Tax Claim will be deemed to be an Allowed Priority Tax Claim to such extent and will be paid in full on the Effective Date. Notwithstanding any other provision in the Plan or Disclosure Statement, the Lenders are not agreeing to make any payments or assume any liability for pre-petition or post-petition income taxes due or to be due and owing with respect to the Debtor's operations and the Plan does not contemplate any such payments.

(c) **The DIP Loan Agreement and DIP Lenders.** The DIP Loan Agreement is incorporated herein and expressly made a part of this Plan. The DIP Lenders shall receive, in satisfaction of all obligations due and owing to the Lenders under the DIP Loan Agreement, payment in full, including but not limited to accrued interest, expenses, legal fees as permitted under the DIP Loan Agreement, exit fees and other charges, at the closing on the Exit Financing, as provided herein. In the event that such Exit Financing is not provided, then the DIP Lenders shall be paid from their first lien on the proceeds of the RMSSR Claims, as more fully described in the Pledge Agreement, and shall be entitled to be paid in full before any other distributions are

16

made from or in connection with the RMSSR Claims, subject only to the payment of the costs and expenses of the Litigation Trust or any Liquidation Trust.  No provision of this Plan shall impair, alter or diminish the rights of the DIP Lenders under the DIP Loan Agreement.  Any undisbursed funds from the DIP Loan, which are still held by the Debtor on the Effective Date, shall be returned to the DIP Lenders, other than amounts which are for costs and expenses invoiced or due prior to the Effective Date, but all of which amounts shall constitute obligations under the DIP Facility and repaid pursuant to and under the Exit Financing.

**4.2     Classes of Claims Not Impaired by the Plan.**

Priority Claims (Class 1).  This class consists of claims arising under 507(a)(4), (a)(5) and (a)(7) of the Bankruptcy Code..  The Debtor's Schedules do not disclose the existence of any such Priority Claims.  Unless the holders of Allowed Priority Claims agree otherwise, to the extent such Claims exist, if any, then such Allowed Priority Claims shall be paid in full on the Effective Date, or as soon as practicable after any such Priority Claims that are Disputed Claims become Allowed Priority Claims following the Effective Date.  Class 1 Claims are not impaired by the Plan.  Under § 1126(f) of the Bankruptcy Code, holders of such Claims are conclusively presumed to accept the Plan, and the votes of such holders will not be solicited.  Alternatively, the Agent reserve the right to seek the consent of any such claimants to agree to accept payment from the proceeds of the RMSSR Claims.

**4.3     Special Provision Governing Unimpaired Claims.**

Nothing in the Plan shall affect the Debtor's or the Trustee's rights, as the case may be, in respect of any unimpaired Claim, including, but not limited to, the right to dispute or

17

object to any such Priority Claim, including the right to assert legal and equitable defenses to or setoff or recoupment against such unimpaired Claims.

## ARTICLE V

## TREATMENT OF IMPAIRED CLASSES

**5.1** **Class 2.**

The Lenders' Allowed Unsecured Claim shall receive its' pro rata distribution from the net proceeds of the RMSSR Claim, after payment of Allowed Administrative Expenses, the payment to the DIP Lenders' on account of their first lien on the proceeds of the RMSSR Claim, and the indefeasible, full repayment of any Exit Financing and any monies which may be due to the Litigation Trust. The Class 2 Claimants shall not share in the distribution of any proceeds from any avoidance actions under Chapter 5 of the Code. No holder of a Class 2 Claim shall be entitled to any postpetition interest on account of its Claim, unless the RMSSR Claims generate sufficient funds for repayment of all sums due and owing, in which case the Class 2 Claimant shall be entitled to post petition interest on its claim, plus other expenses and charges.

**5.2** **Class 3.**

Each holder of an Allowed Class 3 Claim shall receive its pro rata share of the net proceeds of the RMSSR Claim, and any recoveries from any Avoidance Action, after payment in full of all Allowed Administrative Claims, the sums due to the DIP Lenders under the DIP Facility and the Pledge Agreement, all amounts advanced by the Lenders, the indefeasible, full repayment of any Exit Financing, Allowed Tax Claims and the Allowed Claims in Classes 1, until paid in full in cash upon the later of (a) the Effective Date, (b) when such Claim becomes an Allowed Claim, or (c) thirty (30) days after the date the RMSSR Resolution Date. The holders of Class 3 Claims shall only be entitled to receive post petition interest on their Claims to

the extent there are sufficient funds to pay in full the holders of Class 2 Claims and Class 3 Claims from the net proceeds of the RMSSR Claims.  In addition, the holders of Class 3 Claims may be paid post petition interest if there are monetary recoveries from sources other than the RMSSR Claims which pay the Class 3 claims in full.

**5.3     Class 4.**

Holders of the Class 4 Interests shall not receive or retain any property under the Plan on account of such Interests, unless and until the Class 2 and Class 3 Claimants are paid in full all sums due and owing in respect of their Allowed Claims, plus pre and post petition interest and other charges permitted under applicable law.  The holders of Class 4 Interests may also receive excess proceeds from other recoveries, excluding the RMSSR Claims, only after the holders of the Class 3 Claims have been paid in full, including all post petition interest.  The Interests will not be cancelled and the Debtor may not be dissolved pursuant to 11 Del. Code § 303, until after the RMSSR Resolution Date unless the Agent and the Interest holders consent to an earlier dissolution.

**ARTICLE VI**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**6.1     Voting Classes.**

Each holder of an Allowed Claim in Classes 2 and 3 and the Interest holder in Class 4 shall be entitled to vote to accept or reject the Plan.

**6.2     Acceptance by Impaired Classes of Claims.**

An impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.  A class of

19

interests shall have accepted the Plan if the plan has been accepted by holders of at least two-thirds in amount of the allowed interest. All Claims and Interests shall be allowed for voting purposes only unless objected to prior to the hearing on Confirmation of the Plan.

**6.3**     **Acceptance by Class of Interest Holders.**

An impaired Class of holders of Interests shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount of the Allowed Interests of such Class that have voted to accept or reject the Plan.

**6.4**     **Presumed Acceptance of the Plan.**

Class 1 is unimpaired under the Plan and, therefore, is presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

**6.5**     **Non-Consensual Confirmation.**

In the event that any impaired Class of Claims or Equity Interests shall fail to accept the Plan in accordance with Section 1129(a) of the Bankruptcy Code, the Agent reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code or amend the Plan.

**ARTICLE VII**

**IMPLEMENTATION OF THE PLAN**

**7.1**     **Formation of the Liquidation Trust and Appointment of the Trustee.**

On the Effective Date, a Liquidation Trust shall be formed. The assets and functions of the Litigation Trust will be transferred to the Liquidation Trust, which pursuant to Bankruptcy Code section 1123(b)(3) will serve as a representative of the Debtor's estate, (the "Liquidation Trust") and will continue to pursue the RMSSR Claims on essentially the same terms and conditions as the existing Litigation Trust, and in addition, will liquidate and distribute

20

all of the Debtor's Assets pursuant to the terms of the Plan. Alternatively, the Litigation Trust serve as a "sub-trust" of the Liquidation Trust. The Trustee of the Litigation Trust, will, if requested by the Agent, serve as the Trustee for the Liquidation Trust. Following the transfer of the Debtor's Assets to the Liquidation Trust pursuant to section 7.2 of the Plan, the Trustee shall succeed to all of the Debtor's right, title and interest in and to the Debtor's Assets, and the Debtor, as grantor, shall have no interest in, or with respect to, the Debtor's Assets, the Litigation Trust or the Liquidation Trust.

The Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the agreement establishing the Liquidation Trust (the "Liquidation Trust Agreement") and the Plan. The Lenders may remove the Trustee at any time in accordance with the provisions of the Liquidation Trust Agreement. The Lenders shall be entitled to select the Trustee's counsel for all Avoidance Actions and claims, and the RMSSR Claims.

Pursuant to the Bankruptcy Court Order entitled, "Order Approving Certain Debtors' Motion for an Order Authorizing Debtors To Enter into a Settlement Agreement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure," dated September 9, 2009, (the "Settlement Order," ECF Dkt. 611), the Court approved the Global Settlement Agreement and the creation of a Litigation Trust to pursue the RMSSR Claims with the appointment of Executive Sounding Board Associates as Trustee. The Court further found and declared that the pursuit of the RMSSR Claims by the Litigation Trust as an estate representative did not violate any Florida state law provision, or public policy, or other applicable law or rule that limits or restricts the assignment of a tort claim by a plaintiff to a third party and that the Estate Representative will be pursuing the RMSSR Claims solely for the benefit of Waters Edge's creditors, and such designation shall not be a defense to the RMSSR Claims by any party. This

21

Plan, if confirmed by the Court, and the entry of a Confirmation Order, shall operate as a judicial determination that the transfer of the right to pursue the RMSSR Claims to the Liquidation Trust did not and does not violate any Florida state law provision, or public policy, or other applicable law or rule that limits or restricts the assignment of a tort claim by a plaintiff to a third party and that the creation of the Liquidation Trust shall not be a defense to the RMSSR Claims by any party.

**7.2**     **Transfer of the Debtor's Assets to the Liquidation Trust.**

To the extent that a Liquidation Trust is created, then on the Effective Date, the Debtor's Estate and the Litigation Trust, as applicable, shall transfer and shall be deemed to have irrevocably transferred to the Liquidation Trust, for and on behalf of the Beneficiaries, with no reversionary interest in the Debtor, the Debtor's Assets including without limitation, the Debtor's beneficial interest in the Litigation Trust, which shall become part of the Liquidation Trust's assets. In addition, the Debtor shall transfer to the Trustee for the Liquidation Trust, the Debtor's evidentiary privileges, including the attorney/client privilege, solely as they relate to the Claims, the RMSSR Claims, the Retained Claims and Avoidance Actions, and shall also transfer to the Trustee for the Liquidation Trust all of its books and records relating to the Claims, Avoidance Actions and Disputed Claims. The Trustee shall make the Debtor's books and records available to the Debtor or its representatives upon reasonable request. The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief. Upon such transfer, the Debtor, and the Debtor's Estate shall have no other further rights or obligations with respect thereto.

22

**7.3     No Transfer Taxes.**

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including the transfer of the Debtor's Assets to the Liquidation Trust as contemplated herein, and in that the Global Settlement and transfer of the Waters Edge Property was in contemplation of confirmation of the Plan, any subsequent transfer or sale of the Waters Edge Property, in bulk or any portion thereof, by the Agent to any third party within twenty-four (24) months of the Effective Date, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real Estate transfer tax, mortgage recording tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  The Court shall retain jurisdiction to enforce the provisions of this Section 7.3 of the Plan.

**7.4     Purpose of the Liquidation Trust.**

The Liquidation Trust shall be established for the purpose of liquidating the Debtor pursuant to a Plan confirmed by this Court, and for the primary purpose of liquidating the assets transferred to it, but with no objective to continue or engage in the conduct of a trade or business.  Such purposes shall include, among other things, (i) directly, or as the primary trust over the Litigation Trust, to enforce and prosecute the RMSSR Claims, (ii) to satisfy its obligations under the Liquidation Trust Agreement, (iii) after the liquidation of the RMSSR Claims through settlement or prosecution, make distribution of any net proceeds of the RMSSR Claims and remaining Debtor Assets pursuant to the Plan, (iv) file appropriate tax returns in

23

accordance with the Liquidation Trust Agreement, (v) investigate and, if appropriate, pursue the

claims and the Retained Claims, (vi) administer the Liquidation Trust assets, (vii) pursue, settle,

waive or abandon the Avoidance Actions, (viii) resolve all Disputed Unsecured Claims,

including objecting, prosecuting, settling and compromising in any manner approved by the

Bankruptcy Court such Disputed Unsecured Claims, except the Trustee may, in its discretion,

settle or compromise any Disputed Unsecured Claim without Bankruptcy Court approval so long

as the amount being resolved is the lesser $50,000 or 50% of the disputed amount, (ix)

resolve any Disputed Claim, of any nature, including objecting, prosecuting, settling, and

compromising in any manner approved by the Bankruptcy Court such Disputed Claims, and

(x) make all distributions to the Beneficiaries from the Liquidation Trust as provided for in the

Plan and the Liquidation Trust Agreement. The Liquidation Trust is intended to qualify as a

liquidating trust pursuant to United States Treasury Regulation section 301.7701-4(d).

**7.5**    **Interests in the Liquidation Trust and Dissolution of the Liquidation Trust.**

     Interests in the Liquidation Trust shall be uncertified and shall be

non-transferable except upon death of the interest holder or by operation of law. Holders of

interests in the Liquidation Trust shall have no voting rights with respect to such interests. The

Trustee shall seek authority from the Bankruptcy Court to dissolve the Liquidation Trust as soon

as practicable after the earlier of the final distribution to the Beneficiary is made, or if the Exit

Lenders determine not to continue to fund the Liquidation Trust Budget, as the same may from

time to time be amended (such date being referred to herein as the "Termination Date"),

provided that, the Liquidation Trust shall have a term of not more than four (4) years from the

Effective Date, unless such term is extended in accordance with the Liquidation Trust Agreement

based on facts and circumstances making such extension necessary to accomplish the liquidating

24

purpose of the Liquidation Trust and with the approval of the Bankruptcy Court making a finding of such necessity.

**7.6     Financing  of the Liquidation Trust.**

   The Liquidation Trust shall be financed by the Exit Financing.  Under Section 9.22 of the DIP Loan Agreement, the Lenders have the sole and exclusive right, but not the obligation, to provide post-confirmation exit financing ("Post-Confirmation Financing."), for the purpose of, among other things, continuing to pursue the RMSSR Claims.  The DIP Loan Agreement further provides that the Lenders shall, 10 days prior to an Effective Date provide Borrower with a good faith written proposal for Lenders to provide the Post Confirmation Financing.  The Exit Financing shall be on substantially the same terms and conditions as the DIP Facility, and shall include a first lien on the RMSSR Claims, subject to the prior rights of the DIP Lenders, unless the DIP Facility is paid in full from the Exit Financing.  The Exit Financing shall provide, as set forth in the Global Settlement Agreement, that the financing shall not impose any duty or liability on the Exit Lenders with respect to the pursuit, settlement, or other disposition of the RMSSR Claims, provided however, that if the Exit Lenders elect not to continue to finance the prosecution of the RMSSR Claims following the entry of an order approving the Exit Financing, they will pay all costs, expenses and fees which have accrued prior to such an election and the Liquidating Trustee shall then be entitled to seek alternative financing or other arrangements to fund and/or prosecute the RMSSR Claims.

**7.7     Rights and Powers of the Liquidation Trust and the Trustee.**

   The Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidation Trust Agreement and the Plan, including, without limitation, the powers of a trustee

under sections 704 and 1106 of the Bankruptcy Code (but only to the extent necessary to liquidate the Estate) and the right to seek testimony and the production of documents pursuant to Rule 2004 of the Bankruptcy Rules (including without limitation, the right to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidation Trust Agreement; (2) investigate, and if appropriate, commence, prosecute, appeal, settle, abandon or compromise any Retained Claims and the RMSSR Claims, provided that, the Trustee will not consent to any settlement of the RMSSR Claims which would produce a net distribution to the Beneficiaries of less than $30 million without first consulting with the Agent and taking the Lenders' interests into account,

(3) prosecute, settle, abandon or compromise Avoidance Actions; (4) make distributions, if any, contemplated by the Plan and the Liquidation Trust Agreement, (5) establish and administer any necessary reserves for Disputed Claims that may be required; (6) object to Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (7) assume any remaining responsibilities of the Debtor under the Plan upon the dissolution of the Debtor; (8) employ and compensate professionals and other agents; and (9) file any federal, state and local tax returns as appropriate. The Trustee shall be authorized to enter into the Exit Financing or similar financing to provide for the prosecution of the RMSSR and liquidation of the Estate under the terms of this Plan only, and to grant liens on the assets of the Trust for the purpose of pursuing the RMSSR Claims and liquidating the Estate.

**7.8**     **Distribution of Liquidation Trust Assets.**

Subject to the Liquidation Trust Agreement, distributions of the Liquidation Trust Assets to the holders of Claims and Interests as provided under the Plan shall be made by the

1584121v.15

Trustee when the aggregate proceeds and income available for distribution are sufficient, in the Trustee's discretion (after consultation with the Lenders) to economically distribute monies.

**7.9**     **Semi-Annual Reports to Be Filed by the Liquidation Trust.**

The Trustee shall file with the Court semi-annual reports regarding the liquidation or other administration of property comprising the Liquidation Trust Assets, the distributions made by it and other matters required to be included in such report in accordance with the Liquidation Trust Agreement. In addition, the Liquidation Trust will file tax returns as a grantor trust pursuant to United States Treasury Regulation section 1.671-4(a), with the holders of Claims and Interests treated as the grantors and owners of the Liquidation Trust for federal income tax purposes.

**7.10**    **Directors/Officers/Equity/Assets of the Debtor on the Effective Date.**

On the Effective Date, the authority, power and incumbency of the persons then acting as directors and officers of the Debtor shall be terminated and such directors and officers shall be deemed to have resigned or to have been removed without cause and any Claims resulting therefrom shall be deemed not Allowed.

**7.11**    **Liquidation of the Debtor.**

Upon the occurrence of the RMSSR Resolution Date and the final distribution of the proceeds of the RMSSR Claims, the Liquidation Trustee may (a) file its certificate of dissolution, together with all other necessary corporate documents, to effect the Debtor's dissolution under the applicable laws of its state of incorporation; or alternatively, may treat and file the Confirmation Order as its certificate of dissolution; and (b) complete and file its final federal, state and local tax returns, (excluding returns to be filed by others with respect to the Debtor's operations, such as federal income tax returns) and pursuant to section 505(b) of the

27

Bankruptcy Code, request an expedited determination of any unpaid tax liability of the Debtor or its Estate for any tax incurred during the administration of the Debtor's Chapter 11 Case, as determined under applicable tax laws (the "Dissolution"). The filing by the Liquidation Trustee of the certificate of dissolution of the Debtor or the Order of Confirmation shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the board of directors of the Debtor and expressly without the need to pay any franchise or similar taxes in order to effectuate such Dissolution.

**7.12    Operations of the Debtor Between the Confirmation Date and the Effective Date.**

The Debtor shall continue to operate as Debtor in Possession during the period from the Confirmation Date through and until the Effective Date.

**7.13    Term of Injunctions or Stays.**

Unless otherwise provided under the plan or order of the Bankruptcy Court, all injunctions or stays provided for in the Debtor's Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Case is closed.

**7.14    Enterprise Zone and Development Rights Settlement**

In addition certain adjustments have been made to the Lenders' Allowed Unsecured Claim as a result of an agreement and compromise between the Debtor and the Lenders. Prior to closing the sale of the Waters Edge Property (the "Closing"), Lenders were made aware of two potential refunds (collectively, the "Refunds") owed to the owner of the Waters Edge Property resulting from the participation by Waters Edge in various government incentives programs. The Lenders asserted that they were entitled to all of the assets related to

28

the property of Waters Edge. Waters Edge agreed to assign all of its rights to such Refunds to Lenders at Closing pursuant that certain Assignment of Licenses, Permits, Warranties and Intangibles dated October 16, 2009 (the "Assignment").

The first Refund is a refund of sales taxes on construction materials used in the construction of the Waters Edge Property by virtue of the Waters Edge Property being in a State of Florida "Enterprise Zone" (specifically, City of Clearwater Enterprise Zone #5202). The total amount of this Refund was $807,076.22. This amount was paid to Waters Edge directly by the State of Florida and was subsequently transferred by Waters Edge to Agent for the benefit of the Lenders on November 3, 2009. Pursuant to the Assignment, Lenders agreed that their allowed unsecured claim would be reduced by one dollar ($1) for every one dollar ($1) actually received by Lenders from the State of Florida in connection with the Enterprise Zone Program for the Waters Edge Property. Accordingly, Lenders have reduced the amount of their allowed unsecured claim by $807,076.22 as a result of the payments received from the State of Florida in connection with the Enterprise Zone Program.

The second Refund is a refund for certain impact fees and public infrastructure improvements that is owed by the City of Clearwater in connection with that certain Development Agreement (Waters Edge Development) by and between the Community Redevelopment Agency of the City of Clearwater, Florida, a public body corporate and politic of the State of Florida created pursuant to Part III, Chapter 163, Florida Statutes (the "City"), and OSD, dated December 19, 2006 (the "Development Agreement"). Pursuant to the Assignment, Lenders agreed that their allowed unsecured claim would be reduced by $300,000 in exchange for the assignment to Lenders of all of OSD's rights under the Development Agreement at Closing. This was done instead of a $1/$1 reduction as funds are actually received by the

29

Lenders (as was done with the Enterprise Zone Program payments described in the previous paragraph) because it may take some time for the City to make its reimbursement payments under the Development Agreement. No amounts have been received by Lenders from the City pursuant to the Development Agreement as of the date hereof.

Unless a prior Order is entered, the Agent will request that the entry of an Order by the Court confirming the Plan shall constitute a good faith settlement of these payments pursuant to Bankruptcy Rule 9019, if required.

**7.15    Certain Tax Matters Related to the Liquidation Trust.**

The transfer of the Debtor's Assets, including the RMSSR Claims, to the Liquidation Trust will be treated for federal income tax purposes as a transfer of such assets to the holders of Claims and Interests followed by a transfer by them of such assts to the Liquidation Trust. The holders of Claims and Interests will be treated as the grantors and deemed owners of the Liquidation Trust. The valuations of the transferred assts by the Liquidation Trustee and the holders of Claims and Interests shall be consistent and used for all federal income tax purposes. Depending on the circumstances, a holder of Claims or Interests may recognize taxable income as a result of transfers to the Liquidation Trust.

**ARTICLE VIII**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**8.1    All Executory Contracts and Unexpired Leases Are Rejected.**

All executory contracts and unexpired leases that (a) the Debtor entered into prior to the commencement of this Chapter 11 Case, (b) are executory as of the Effective Date, and (c) have not been assumed or rejected pursuant to the Sale Order or Section 365 of the Bankruptcy

30

Code prior to the Effective Date, shall be deemed rejected by the Debtor as of the Effective Date, unless any such contract or lease is the subject of a motion to assume as of the Effective Date in which case the Confirmation Order shall constitute an order approving such assumption and as the case may be the sale and assignment thereof.

**8.2     Bar Date of Claims Resulting from the Rejection of Contracts Hereunder.**

All Claims arising from the rejection of executory contracts or unexpired leases under the Plan must be filed within twenty (20) days of the Effective Date.

**ARTICLE IX**

**PROCEDURE FOR RESOLVING CONTESTED CLAIMS**

**9.1     Bar Date.**

Unless the Bankruptcy Court orders otherwise, all objections, disputes or challenges to the allowance of any Claim shall be filed on or before the Bar Date.  If no such objection is filed on or before the Bar Date with respect to a particular Claim that otherwise could be an Allowed Claim, such Claim shall be deemed an Allowed Claim and any distribution due on account of that Claim shall be paid in accordance with the Plan.  Any Claim that is a Disputed Claim shall be deemed not an Allowed Claim unless the Court enters an order that becomes a Final Order allowing such Claim or portion thereof.  The Trustee reserves the right to seek extensions of the Bar Date.

**9.2     Objection to Claims; Prosecution of Contested Claims.**

The Trustee may, in his discretion, object to the allowance of any Claim or Interest  filed with the Bankruptcy Court and any claim listed on the Debtor's schedules, regardless of whether such Claim is listed as contingent, unliquidated, or undisputed.  All of the Trustee's objections shall be litigated to a Final Order; provided however, that the Trustee shall

31

have authority to file, settle, compromise or withdraw any objections to Claims without the consent or approval of any third party and without further order of the Bankruptcy Court after the Effective Date.

**9.3**     **Allowance of Claims.**

Except as otherwise provided in the Plan or any order entered in this Chapter 11 Case prior to the Effective Date (including the Confirmation Order), the Debtor will assign to the Liquidation Trust, and the Trustee will retain all rights and defenses the Debtor had with respect to the allowance of any Claim.

**9.4**     **Disallowance of Claims of Entities from Whom Property is Recoverable.**

Pursuant to Section 502(d) of the Bankruptcy Code, the Bankruptcy Court shall disallow any Claim of any entity: (a) from which property is recoverable under Sections 542, 543, 550 or 553 of the Bankruptcy Code, or (b) that is a transferee of a transfer avoidable under Sections 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code.  Such Claims may be Allowed in the event that the entity or transferee has turned over such property, or paid such amount, to the Liquidation Trust. Any and all potential claims including, without limitation, Avoidance Actions against the Agent and Lenders have been irrevocably released under the Global Settlement and such release is incorporated herein.

**ARTICLE X**

**PROVISIONS REGARDING DISTRIBUTIONS**

**10.1**     **Time and Method of Distributions.**

All distributions under the Plan will be made by the Trustee.  The record date for distributions shall be the Confirmation Date or any later date established by order of the Bankruptcy Court.  Whenever any distribution to be made under the Plan is due on a day other

32

than a business day, such distribution shall instead be made, without interest, on the immediately succeeding business day, but will be deemed to have been made on the date due.

**10.2    Delivery of Distributions.**

Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided herein, distributions and deliveries to holders of Allowed Claims shall be made in accordance with the notice provisions in Section 1.7.

**10.3    Undeliverable and Unclaimed Distributions; Time Bar to Cash Payments.**

If any distribution is returned to the Trustee as undeliverable, no further distributions shall be made to such holder unless and until the Trustee is notified in writing of such holder's then current address.  Checks issued by the Trustee on account of Allowed Claims that are not returned as undeliverable, but are not negotiated within sixty (60) days from and after the date of issuance thereof shall be null and void.

Any holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a distribution within ninety (90) days from and after the date (a) such distribution is returned as undeliverable, or (b) of the issuance of a check that has not been returned as undeliverable, but is null and void because it was not timely negotiated, shall have such holder's Claim for such distribution discharged and shall be forever barred from asserting any such Claim against the Estate, the Debtor, the Liquidation Trust or its assets or the Waters Edge Property, the Agent or the Lenders.  In the event that there is more than one distribution under the Plan, any creditor whose funds escheat shall be eliminated from any future distributions.

Any entities ultimately receiving undeliverable cash, voided checks or unclaimed distributions shall not be entitled to interest or other accruals of any kind.  Nothing contained in the Plan shall require the Trustee to attempt to locate any holder of an Allowed Claim or an

33

Allowed Interest. Any undeliverable and unclaimed distributions and distributions not made pursuant to Section 10.6 shall be redistributed to the holder of Class 2.

**10.4    Set-Offs.**

Pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Trustee or Debtor, as applicable, may set-off the distributions to be made pursuant to the Plan against any Allowed Claim; provided however, that neither the failure to effect a set-off nor the allowance of any Claim shall constitute a waiver or release of such Claims, right or cause of action.

**10.5    Distributions to Contested Claims.**

No distribution shall be required to be made with respect to any portion of a Disputed Claim pending the resolution thereof in the manner prescribed herein.

**10.6    Distributions Under Twenty Dollars.**

No distribution of less than $20 shall be made to the holder of any Allowed Claim.

**10.7    Interest on Claims.**

Unless otherwise specifically provided for in the Plan, including Section V, above, the Confirmation Order or by reason of applicable non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claim.

## ARTICLE XI

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**11.1    Conditions Precedent to Effective Date of the Plan.**

The occurrence of the Effective Date of the Plan shall be subject to the satisfaction or the Agent's waiver of the following conditions precedent:

(a)     (i) The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Agent in their sole discretion, and (ii) except as provided below, the Confirmation Order is in full force and effect and is not stayed;

(b)     All actions, documents and agreements necessary to implement the Plan and the Liquidation Trust Agreement shall have been effected or executed;

(c)     The entry of a Final Order satisfactory to the Exit Lenders, the Lenders, and the Trustee, approving the Exit Financing, which shall pay the existing DIP Facility in full, and provide for the pursuit of the RMSSR Claims, and funding of the Liquidating Trust.

Notwithstanding the foregoing, the Effective Date may occur notwithstanding the pendency of an appeal of the Confirmation Order so long as no stay in effect. The Effective Date may occur before the expiration of time to take an appeal or to seek reconsideration of the Confirmation Order without notice to any objecting party. The Agent may seek the dismissal of any appeal as moot following the Effective Date.

## 11.2     <u>Waiver of Conditions Precedent.</u>

To the extent practicable or legally permissible, the Agent may at any time waive, in whole or in part, in its sole discretion, each of the conditions precedent above without notice or order of the Bankruptcy Court and without any formal action other than proceeding as if such condition did not exist.

## 11.3     <u>Effect of Non-Occurrence of Conditions to the Effective Date.</u>

If the Effective Date of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement (other than the Global Settlement which shall remain in full force and effect) shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor, (b) prejudice in any manner the rights of the Debtor or the Lenders, or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtor or the Lenders in any respect.

35

**11.4    Limited Scope.**

Nothing in the Plan is intended, nor should it be construed, to enlarge or diminish the liability of the officers, director, member or manager of the Debtor, or the members of the Debtor's current owner, for any of the obligations of the Debtor.  Any such liability shall be determined in accordance with applicable non-bankruptcy law.

**ARTICLE XII**

**RETENTION OF CAUSES OF ACTION**

**12.1    Reservation.**

Except as otherwise provided herein or in any prior order of the Bankruptcy Court, the Debtor and its bankruptcy Estate reserve all of its claims and causes of action arising under the Bankruptcy Code (including, but not limited to, Sections 510, 542-545, 547-551 and 553 of the Bankruptcy Code) or under other applicable federal or state law, including, but not limited to, any third-party claims, counterclaims, cross-claims, and the Retained Actions, other than with respect to the Lenders and Agent, which claims have been irrevocably settled and released pursuant to the Global Settlement.  The Lenders, the Agent, the Debtor, the Litigation Trustee and the Estate expressly reserve the RMSSR Claims, as defined herein, and all related claims, causes of action, rights, and entitlements related to or in any connected with the RMSSR Claims, and any amendment, supplement, re-filed claim, or related claim. As of the Effective Date, the Trustee shall have the sole and exclusive authority to prosecute, abandon, settle or adjust the Retained Actions without the consent or approval of any third party and without further order of the Bankruptcy Court.

The Confirmation Order shall also operate to extend the Debtor's right of removal under 28 U.S.C. sections 1441, 1452 or other applicable law through and including the date that

36

is sixty (60) days after the effective date, and the Liquidation Trustee shall have all of the Debtor's rights to seek removal permitted by law.

**12.2    No Waiver.**

Unless a claim or cause of action against an entity is expressly waived, relinquished, released, compromised or settled by the Liquidation Trustee, Trust, the Debtor and/or the Trustee expressly reserves such claim or cause of action for later adjudication by the Trustee, as applicable in accordance with the Plan, including, but not limited to, claims and causes of action not specifically identified or which the Debtor and/or Trustee may be presently unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor and/or Trustee at this time or facts or circumstances that may change or be different from those which the Debtor and/or Trustee now believes to exist.

**ARTICLE XIII**

**RELEASE, INJUNCTIVE AND RELATED PROVISIONS**

**13.1    Releases by Holders of Claims or Interest Holders; preservation of Pledge Agreement.**

Conditioned on the occurrence of the Effective Date, and except for obligations created by, arising under, or expressly preserved in the Plan, the Global Settlement Agreement, the DIP Facility, the Exit Facility, the Pledge Agreement, or Confirmation Order, the distributions to be received by creditors (if any) or Interest holders, or contemplated, under the Plan are in full and final satisfaction and settlement of any and all Released Claims such creditors may have against the Releasees, the Debtor's Estate, the Debtor the Trustee, the Litigation Trust, the Liquidation Trust, the Estate assets, the Agent or the Lenders, the DIP Lenders, and each of their professionals, attorneys, agents, representatives and employees, and the assets contemplated under the Plan to satisfy Claims, and all such Released Claims are

37

released, and shall be deemed to have forever, fully and irrevocably been released other than the

rights of the Debtor, the DIP Lenders or the Liquidation Trustee to enforce the Plan, the DIP

Loan Agreement and Pledge Agreement, and the contracts, instruments, and other agreements or

documents delivered thereunder, and provided however, that nothing contained in this Plan, nor

the confirmation of this Plan, shall release or discharge any obligation under the Global

Settlement Agreement, the Pledge Agreement, and the DIP Loan Agreement, or the Exit

Financing, and all liens granted to the DIP Lenders, all of which shall survive the confirmation of

the Plan and which may be assigned to the Exit Lenders.  All claims by any Interest Holder are

fully released and discharged.  In addition, and for the avoidance of doubt, all releases previously

granted pursuant to the Global Settlement Agreement are confirmed and preserved by this Plan.

Notwithstanding anything to the contrary in this Plan, nothing in this Plan shall

affect, alter, impair or diminish the rights of Wachovia, in its separate capacity as a lender to

Calm Waters, LLC, to pursue all rights, claims and remedies it may have with respect to Calm

Waters, including but not limited to any rights it may have under the Capital Funding

Commitment Letter, and the assertion of a deficiency claim against Calm Waters  as permitted

by the Court's order dated July 29, 2009, entitled Order (1) Approving Bidding Procedures in

Advance of Auction, (2) Approving Form and Manner of Notice of Proposed Cure Amounts,

Auction, and Final Hearing, and (3) Granting Related Relief with Respect to Certain Properties

(the "Bidding Procedures Order," (ECF Dkt. 494).

**13.2** **Injunction.**

Except as otherwise provided herein, from and after the Effective Date, all holders

of Claims and Interests shall be permanently enjoined from commencing or continuing in any

manner, any suit, action or other proceeding, on account of any Claim, Interest, obligation, debt,

right, cause of action, remedy or liability released or to be released pursuant to the Plan or against any asset of the Debtor's Estate, the Waters Edge Property, the Litigation Trust or the Liquidation Trust which is subject to administration to pay Claims and Interests or contrary to the terms of the Sales Orders, and the sale free and clear of the Debtors' properties.  The "Sale Orders"  shall mean the Order entered on or about October 7, 2009, entitled, Order (1) Approving Sale of Certain Assets of the Debtor Waters Edge One, L.L.C. Free and Clear of All Liens, Claims, Encumbrances, and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), (f), and (m) and (2) Granting Related Relief (the "Sale Order.") (Dkt. No. 703) and the orders approving the sale of the assets of the Debtor 400 Beach (Dkt. No. 704) and Clearwater (Dkt. No. 705)(collectively with the Sale Order, the "Sale Orders.")  The Plan incorporates and adopts the provisions of the Sale Orders and enjoins any person or entity from taking any action, or pursuing any claim, in contravention of such Sale Orders.

Further, notwithstanding Confirmation of the Plan or the Confirmation Order, the automatic stay shall remain in place for the Debtor, its Estate, the Estate assets and the assets contemplated under the Plan to satisfy Claims.  Additionally, no holder of a Claim against the Debtor may, on account of such Claim, seek or receive any payment or other distribution from, or seek recourse against, the Debtor, its successors, property of the Estate or its property, the Litigation Trust, the Liquidation Trust, the Purchasers under the Sale Orders, or the Trustee, except as expressly provided in the Plan.  Provided however, that this injunction shall not pertain to nor affect any right under the Global Settlement Agreement, the Pledge Agreement or the DIP Facility, the Exit Financing, nor any lien granted thereunder.

1584121v.15

**13.3    Exculpation.**

(a)    Except for the obligations created, preserved or incorporated under the Plan, neither (1) the Debtor, its officers, and managers, (2) the Trustee, (3) the Agent, Lenders, the DIP Lenders, the  Exit Lenders, nor (4) any professional or advisors retained by the Debtor, the Trustee, the Agent, the Lenders or the Exit Lenders, (i) shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of this Chapter 11 Case, formulating, negotiating or implementing the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, Confirmation of the Plan, the Consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan (including the distributions), except for their gross negligence or willful misconduct, and (ii) in all respects shall be entitled to reasonably rely upon the advise of counsel with respect to their duties and responsibilities under the Plan.  Provided however, and for the avoidance of all doubt, the Plan does not exculpate Ruden, McClosky, Smith, Schuster & Russell, P.A., Mark Grant or any other defendant party to the RMSSR Claims, whether presently named or joined at a future date (except with respect to the parties named in clauses (1) through and including (4) above), nor does it exculpate any party from its obligations and duties under the Global Settlement.

(b)    The foregoing exculpation and limitation on liability shall not, however, limit, abridge or otherwise affect the rights, if any, of the Trustee to enforce, sue on, settle or compromise the Claims retained pursuant to Article XII of the Plan.

**13.4    Global Release.**

(a)    Pursuant to the terms of the Global Settlement, incorporated into this Plan, and restated and affirmed herein, Waters Edge One, L.L.C., 400 Beach Drive L.L.C., Clearwater

Bluff, L.L.C., Opus South Corporation (collectively the "Debtors") and Opus South Developers ("OSD"), on the one hand, and the Lenders and Wachovia, as the Administrative Agent of the Lenders on the other; and Waters Edge One, L.L.C., 400 Beach Drive L.L.C., Clearwater Bluff L.L.C., Opus South Corporation, OSD among and between one another, have, under the terms of the Global Settlement, mutually released each other from all claims arising with respect to the transactions related to Waters Edge, to any pledge of the properties of the Debtors (the "Subject Properties,") or to any other claims (including deficiency claims, except as provided below) related to the Subject Properties or the respective estates of the Debtors, which release were previously effective upon the entry of the order approving the Global Settlement Agreement, other than the covenants and promises contained in the Global Settlement Agreement, and other than the exceptions set forth below and the OSD Transfer, OSD Note and OSD Mortgage in order to preserve the benefit of the OSD Transfers, as such terms are defined in the Global Settlement Agreement. The claims previously released include, without limitation, all Avoidance Actions under section 544, 545, 547, 548, 549, 550, and 553(b) of the Bankruptcy Code, and any similar applicable state law, and "equities of the case" under sections 105, 506(c) and 552(b). The release provided herein shall be binding on any chapter 7 or chapter 11 trustee appointed in these cases, provided however, that (a) such release shall not release any and all obligations due and owing to the DIP Lenders nor any obligation under the Global Settlement, which shall survive the confirmation of this Plan; (b) that the release of any residual deficiency claims against the Debtors' bankruptcy estates shall not apply to any claim arising under 502(h) or any right of set off or recoupment arising from the pursuit of any avoidance action, although all such claims have been irrevocably released and settled; and (c) that the release of any residual deficiency claims against the Waters Edge bankruptcy estate shall not apply to the extent of the

41

proceeds from both (i) the sale of the Subject Properties, and (ii) the RMSSR Claims. Notwithstanding anything to the contrary set forth herein, the parties have expressly acknowledged and this Plan shall further confirm, that Wachovia has not and does not waive any rights it may have under the Capital Funding Commitment Letter other than as set forth in the Global Settlement under "Release of Guaranty and Funding Letter," including with respect to the debtor Calm Waters, L.L.C., provided further, that with respect to the debtor Calm Waters, L.L.C., Opus South Corporation shall not be deemed to have released Opus Corporation of any obligations under the Capital Commitment Funding Letter and that nothing herein shall limit or impair the rights of Calm Waters with respect to such Capital Funding Commitment Letter. Notwithstanding anything to the contrary in this Plan, nothing in this Plan shall affect the rights of Wachovia, in its separate capacity as a lender to Calm Waters, LLC, to pursue all rights, claims and remedies it may have with respect to Calm Waters, including but not limited to any rights it may have under the Capital Commitment Funding Letter, and the assertion of a deficiency claim against Calm Waters as permitted by the Court's order dated July 29, 2009, entitled Order (1) Approving Bidding Procedures in Advance of Auction, (2) Approving Form and Manner of Notice of Proposed Cure Amounts, Auction, and Final Hearing, and (3) Granting Related Relief with Respect to Certain Properties. (the "Bidding Procedures Order," (ECF Dkt. 494).

**13.5    Successor Liability.**

The Lenders and Agent, and any Purchaser under any of the Sale Orders, and the Trustee do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other party relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Effective Date. The Liquidation Trust, the Trustee the Agent, and the Lenders

are not, and shall not be, successors to the Debtor by reasons of any theory of law or equity, and

none shall have any successor or transferee liability of any kind or character, except that the

Trustee and the Liquidation Trust shall assume the obligations specified in the Plan, the

Liquidation Trust Agreement, the other Liquidation Trust Documents, and the Confirmation

Order.

## ARTICLE XIV

## RETENTION OF JURISDICTION

Until entry of the final decree closing the Debtor's bankruptcy case pursuant to

Bankruptcy Rule 3022, the Bankruptcy Court shall retain subject matter jurisdiction of this case

and all proceedings arising therein or related thereto. Without in any manner limiting the scope

of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a) finally determine the classification, priority, allowance, disallowance, amount or objection to any Claim, including any Administrative Claim, or to estimate the Allowed amount of any Claim pursuant to Section 502(c) of the Bankruptcy Code;

(c) issue such orders as may be necessary for the implementation, execution, and Consummation of the Plan, including orders to ensure the conformity with the terms and conditions of the Plan and other orders of the Bankruptcy Court, notwithstanding any otherwise applicable non-bankruptcy law;

(d) determine any and all applications for allowance of compensation and expense reimbursement for periods on or before the Consummation Date and to determine any other request for payment of Administrative Claims;

(e) determine all matters which may be pending before the Bankruptcy Court on or before the Effective Date;

(f) resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any person's or entity's obligations incurred in connection with the Plan that arises at any time before this case is closed, including determination, to the extent a dispute arises, of the entities entitled to a distribution within any particular Class of Claims and of the scope and nature of any obligations to cure defaults under assumed contracts and leases, if any;

(g)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any person or entity with Consummation or enforcement of the Plan, except as otherwise provided herein;

(h)     determine any and all applications or motions for the rejection, assumption or assignment of executory contracts or unexpired leases and the allowance of any Claims resulting therefrom;

(i)     determine all applications, motions, adversary proceedings, contested matters and other litigated matters which were brought or which could have been brought on or before the Effective Date, even if such matters are initiated after Confirmation but before the entry of a final decree closing this bankruptcy case;

(j)     ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions hereof;

(k)     enter such orders as may be necessary or appropriate to implement or consummate the provisions hereof and all contracts, instruments, releases and other agreements or documents created in connection with the Plan;

(l)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)     determine such other matters and for such other purposes as may be provided in, or that may arise in connection with or relate to, the Plan, the Disclosure Statement, the Confirmation Order, the Liquidation Trust Agreement, or any contract, instrument, release or other agreement or document created in connection with the Plan or the Disclosure Statement;

(n)     modify the Plan or to remedy any apparent non-material defect or omission in the Plan, or to reconcile any non-material inconsistency in the Plan so as to carry out its intent and purposes; and

(o)     enter an order and/or final decree concluding this Chapter 11 Case.

## ARTICLE XV

## DISCLOSURE STATEMENT

The attention of holders, claimants, creditors, persons, entities and Interest holders is directed to the Disclosure Statement filed with the Bankruptcy Court in connection with the Plan.

Respectfully submitted,

WACHOVIA BANK, NATIONAL
ASSOCIATION, for and on behalf of the
Lenders

By:_____
    NAME:
    TITLE:

_____
One of Its Attorneys

Steven K. Kortanek, (Del. Bar No. 3106)
WOMBLE CARLYLE
SANDRIDGE & RICE, PLLC
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4363
Email: skortanek@wcsr.com

SIDLEY AUSTIN LLP
David R. Kuney
Bridget J. Hauserman
1501 K. St. N.W.
Washington, D.C. 20005
Telephone:  (202) 736-8650
Email: dkuney@sidley.com